**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KENNETH ROTH; DANIEL FROOMKIN; BEVERLY GAGE; PETER SCHMIDT-NOWARA; BENJAMIN WITTES; and ETHAN YOUNG,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; STEVEN CHEUNG, in his official capacity as Assistant to the President for Communications; SEAN M. CURRAN, in his official capacity as Director of the Secret Service; and SUSAN WILES, in her official capacity as White House Chief of Staff,<br><br>Defendants. | Civil Action No. 1:26-cv-09327 |

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## Table of Contents


Table of Authorities ........ ii

Introduction ........ 1

Statement of Facts ........ 3

A. The White House Press Forum ........ 3

B. The Policy ........ 6

C. Plaintiffs ........ 11

Standard of Review ........ 13

Argument ........ 13

I. Plaintiffs have standing. ........ 13

II. Plaintiffs are likely to succeed on the merits of their claim that the Policy violates their First Amendment rights. ........ 18

A. Government restrictions on First Amendment–protected activities in public forums must withstand heightened scrutiny. ........ 19

B. The White House Press Forum is a limited public forum. ........ 20

C. The Policy imposes restrictions that are viewpoint discriminatory and unreasonable. ........ 24

III. Plaintiffs also satisfy the other preliminary injunction factors. ........ 26

Conclusion ........ 27

Certificate of Compliance ........ 28

Certificate of Service ........ 29

## Table of Authorities

### Cases


*Abramowitz v. Lake*, 824 F. Supp. 3d 1 (D.D.C. 2026) .......... 14, 15

*Agudath Isr. of Am. v. Cuomo*, 983 F.3d 620 (2d Cir. 2020) .......... 26

*AP v. Budowich*, 2025 WL 1649265 (D.C. Cir. June 6, 2025) .......... 7

*AP v. Budowich*, 780 F. Supp. 3d 32 (D.D.C. 2025) .......... 5, 6, 22, 23

*Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998) .......... 20

*Arnett v. Kennedy*, 416 U.S. 134 (1974) .......... 18

*Ateba v. Leavitt*, 133 F.4th 114 (D.C. Cir. 2025) .......... 24, 25

*Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*, 88 F.4th 344 (2d Cir. 2023) .......... 18

*Babbitt v. UFW*, 442 U.S. 289 (1979) .......... 17

*Bd. of Educ. v. Pico*, 457 U.S. 853 (1982) .......... 14

*C.R. Corps v. LaSalle*, 741 F. Supp. 3d 112 (S.D.N.Y. 2024) .......... 13

*Cerame v. Slack*, 123 F.4th 72 (2d Cir. 2024) .......... 16

*CNN v. Trump*, 2026 WL 3063460 (D.D.C. Oct. 13, 2026) .......... 8, 9

*CNN v. Trump*, 840 F. Supp. 3d 29 (D.D.C. 2026) .......... 9

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985) .......... 19, 20, 21

*Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019) .......... 19

*Elrod v. Burns*, 427 U.S. 347 (1976) .......... 26

*First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174 (2026) .......... 15, 17, 18

*Gen. Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273 (2d Cir. 1997) .......... 20, 21

*Griswold v. Connecticut*, 381 U.S. 479 (1965) .......... 13

*Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936) .......... 2

*Houchins v. KQED, Inc.*, 438 U.S. 1 (1978) .......... 14

*In re Dow Jones & Co., Inc.*, 842 F.2d 603 (2d Cir. 1988) .......... 14

*Johnson v. Perry*, 859 F.3d 156 (2d Cir. 2017) .......... 23

*Knight First Amend. Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541 (S.D.N.Y. 2018) .......... 3, 19

*Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965) .......... 13

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .......... 13

*Mahoney v. U.S. Capitol Police Bd.*, 2026 WL 2836881 (D.C. Cir. Sep. 22, 2026) .......... 25

*Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133 (2d Cir. 2004) .......... 19, 20

*Martin v. Struthers*, 319 U.S. 141 (1943) .......... 13

*Matal v. Tam*, 582 U.S. 218 (2017) .......... 20

*McCullen v. Coakley*, 573 U.S. 464, 476 (2014) .......... 19, 20

*Minn. Voters All. v. Mansky*, 585 U.S. 1 (2018) .......... 25

*Murthy v. Missouri*, 603 U.S. 43 (2024) .......... 13, 16

*N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013) .......... 26

*N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) .......... 26

*Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682 (2d Cir. 2013) .......... 13

*New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279 (S.D.N.Y. 2020) .......... 13

*New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42 (2d Cir. 2020) .......... 13, 26

*Pen Am. Ctr., Inc. v. Trump*, 448 F. Supp. 3d 309 (S.D.N.Y. 2020) .......... 14, 17

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) .......... 19, 20

*Perry v. McDonald*, 280 F.3d 159 (2d Cir. 2001) .......... 21

*PETA v. Tabak*, 109 F.4th 627 (D.C. Cir. 2024) .......... 25

*Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009) .......... 19

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) .......... 3

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) .......... 19, 20

*Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975) .......... 19, 20

*Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977) .......... 4, 14, 27

*Stanley v. Georgia*, 394 U.S. 557 (1969) .......... 13

*Steffel v. Thompson*, 415 U.S. 452 (1974) .......... 16

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) .......... 16, 17

*UAW v. U.S. Dep't of State*, 2026 WL 2958310 (S.D.N.Y. Oct. 1, 2026) .......... 17

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748 (1976) .......... 14

*Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988) .......... 17

*Vitagliano v. Cnty. of Westchester*, 71 F.4th 130 (2d Cir. 2023) .......... 16

*Volokh v. James*, 148 F.4th 71 (2d Cir. 2025) .......... 27

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015) .......... 20

*Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981) .......... 23

*Zieper v. Metzinger*, 474 F.3d 60 (2d Cir. 2007) .......... 17

**Other Authorities**

31 C.F.R. § 409.1 .......... 5

John Hendel, *'Head on a Guillotine': ABC Says Trump's Threats Are Already Swaying Coverage*, POLITICO (Oct. 6, 2026) .......... 18

Vincent Blasi, *The Checking Value in First Amendment Theory*, 2 Am. Bar Found. Rsch. J. 521 (1977) .......... 23

William J. Brennan, Jr., *Address*, 32 Rutgers L. Rev. 173 (1979) .......... 23

## Introduction

President Trump and his aides have adopted a policy and practice of punishing members of the White House press corps whose reporting the president views as "false" or "fake" (the "Policy"). In furtherance of the Policy, the White House has revoked journalists' press credentials and expelled them from spaces where they had previously been allowed to gather and report the news. The president has described the Policy as a "ban on the free press."

Defendants have targeted some White House journalists and news organizations under the Policy already, and they have said they will target others. In February 2025, they expelled the Associated Press ("AP") from the White House press pool, a rotating group of credentialed journalists that covers the president when space is limited, because it refused to refer to the "Gulf of Mexico" as the "Gulf of America." In September 2026, they revoked the credentials of journalists from CNN, MS NOW, and POLITICO after declaring their reporting to be "fake" and "unfair," and later sought to justify these expulsions by referencing viewpoint-based and vague "standards of professionalism and decorum." Last week, Defendants barred a correspondent for the Independent from serving as a print pool reporter on Air Force One after he asked the president unwelcome questions at an Oval Office press conference. Defendants have threatened to ban other journalists and news organizations—including ABC, NBC, the New York Times, USA Today, and the Washington Post—if they fail to conform their reporting to the president's preferences.

The Policy violates the First Amendment. The White House has long maintained a protected forum for certain members of the press to engage in the First Amendment activities of newsgathering and reporting. This forum—the "White House Press Forum"—encompasses spaces in the White House complex that the president and his aides open to the press for these protected purposes as well as spaces that they open to the press when the president is away from the White

House, including on Air Force One. To regulate entry to the White House Press Forum, the White House issues credentials—"press passes"—to eligible journalists. It has also developed rules for the forum that use a rotation system for pool events. The Policy is unconstitutional because it conditions access and participation in the White House Press Forum on criteria that are viewpoint based and unreasonable.

Some of the news organizations targeted by the Policy have sued, arguing, correctly, that the First Amendment requires that their access be restored. The ultimate injury here, however, is to the democratic public. The First Amendment protects the press because an independent media is "one of the great interpreters between the government and the people," and because "informed public opinion is the most potent of all restraints upon misgovernment." *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936). Defendants' Policy of restricting the access of disfavored news organizations deprives the public of the reporting of those organizations, and it inevitably deprives them of the independent reporting of other news organizations as well, since every journalist who reports from the White House must now account for the possibility that a critical or ill-advised word about the president may result in their access being summarily restricted or revoked. The distorting effect of the Policy will persist so long as the Policy remains in place, even if the government is required to restore the access of the news organizations whose access has already been restricted, and even if news organizations targeted under the Policy in the future have the resources and will to challenge their targeting in court. Protecting the public's right to independent reporting requires broader equitable relief.

Plaintiffs—a human rights advocate, a media watchdog, a historian, a civics teacher, a legal journalist, and a student journalist—commence this suit to vindicate their right to receive news coverage that is not limited by the president's unlawful expulsions or distorted by the president's

unconstitutional threats. All of the Plaintiffs rely on the White House press corps for independent reporting about the president and his administration, and all of them use that reporting in a variety of ways in their scholarship, teaching, journalism, or advocacy. The Policy injures Plaintiffs because it deprives them of the reporting of the journalists and news organizations that Defendants have targeted under the Policy; because it will deprive them of the reporting of the journalists and news organizations that Defendants target under the Policy in the future; and because the threat of being targeted in the future is likely to distort the reporting of news organizations today.

Plaintiffs now seek a preliminary injunction against Defendants Cheung, Curran, and Wiles, prohibiting them from enforcing the Policy. Plaintiffs are entitled to preliminary injunctive relief because they are likely to prevail on the merits of their First Amendment claim, because they will be irreparably harmed if the Policy is not enjoined, and because the balance of equities and the public interest favor granting the preliminary injunction.[1]

## Statement of Facts

### A. The White House Press Forum

For well over a century, presidents from both political parties have given members of the press access to certain spaces within the White House complex and around the president so that they can engage in newsgathering and reporting on the presidency and fulfill the press's role as "surrogates for the public." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980); Ex. 1. Together, these spaces constitute the White House Press Forum. The White House Press

[1] Plaintiffs' Complaint seeks injunctive relief against all Defendants, but at this juncture Plaintiffs seek preliminary relief only against Defendants Cheung, Curran, and Wiles. Plaintiffs reserve the right to seek preliminary relief against Defendant Trump should relief against other Defendants prove insufficient to end the Policy and redress Plaintiffs' injuries. *See Knight First Amend. Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 577–80 (S.D.N.Y. 2018) (discussing courts' power to issue injunctive relief against the president), *aff'd*, 928 F.3d 226 (2d Cir. 2019), *vacated as moot sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021).

Forum encompasses spaces that the president and his aides open to the press for First Amendment–protected activities at the White House itself as well as spaces that they open to the press when the president is away from the White House, including on Air Force One. Access to these spaces allows journalists to ask questions of the president and senior officials, meet with officials less formally, and observe and report on important events firsthand. Compl. ¶¶ 21–34; Exs. 2–3.

Currently, multiple spaces within the White House complex are either specifically devoted to newsgathering, reporting, and related activities by the press, or routinely used by the press for those activities. The James S. Brady Press Briefing Room (the "Briefing Room") is the site of regular briefings by the White House Press Secretary and other senior officials, as well as press conferences and statements by the president himself. Ex. 3. Adjoining the Briefing Room are workspaces in which news organizations maintain desks and booths. Ex. 3. "Pebble Beach" is the colloquial name for an area on the White House North Lawn from which television correspondents deliver live reports. Ex. 3. The East Room is used for presidential press conferences, joint press conferences with visiting foreign leaders, bill signings, and other official events to which the press is invited. Ex. 4. Journalists regularly gather on the South Lawn to observe, report on, and ask questions during state and official arrival ceremonies and other events, as well as the president's departures and arrivals aboard Marine One. Ex. 3.

Since the early 20th century, the White House has provided journalists who regularly cover the White House with long-term credentials that allow pass holders routine access to the White House complex. Ex. 5; *see Sherrill v. Knight*, 569 F.2d 124, 129–30 (D.C. Cir. 1977). Today, these credentials are known as "hard passes," and they are approved by the White House Press Office. Ex. 6. Approximately 1,200 reporters hold active hard passes. Ex. 6. Journalists who do not have hard passes but want to access the White House can apply for and receive day passes. Ex. 6.

Secret Service regulations state that eligibility for press passes must be "guided solely" by whether the applicant "presents a potential source of physical danger to the President and/or the family of the President so serious as to justify his or her exclusion from White House press privileges." 31 C.F.R. § 409.1. Journalists with hard passes or day passes can enter the White House complex unescorted and access Pebble Beach, the Briefing Room, and the press workspaces in the West Wing. Ex. 3. Subject to a registration system administered by the White House Press Office, press pass holders can also attend and report on events in the East Room, on designated areas in the South Lawn, and in other spaces within the White House complex. Ex. 3; *AP v. Budowich*, 780 F. Supp. 3d 32, 40 (D.D.C. 2025).

Some of the president's official activities take place in spaces too small to accommodate the entire White House press corps, such as in the Oval Office and aboard Air Force One. To enable the press to cover the president's activities in these smaller areas, the White House has established the White House press pool. Ex. 7. Drawn from the larger group of hard pass holders, the press pool is comprised of a rotating group of journalists assigned to cover the president's activities and movements in these settings on behalf of the entire White House press corps. Ex. 8. The press pool includes wire, print, television, and radio reporters, as well as photojournalists. Ex. 8. The size and composition of the pool covering the president varies depending on location. Ex. 8.

In the Oval Office and other smaller spaces covered by the press pool, pool reporters observe events, ask questions of the president and sometimes others, and contemporaneously transmit their reporting on these events to their editors or directly to the public. Ex. 3; Ex. 9, at 28:9–31:21. Pool reporters who accompany the president on long-distance travel aboard Air Force One—which contains a designated cabin with seats reserved for the press—similarly have

occasion to question and interact with him during many flights. Ex. 8; Ex. 10. Members of the press pool report back to the rest of the White House press corps, including through written "pool reports." Ex. 3; Ex. 11. The White House regularly includes official pool events in its daily schedules. *E.g.*, Ex. 12.

Until February 2025, the press pool's composition was managed by the White House Correspondents' Association ("WHCA"), a membership organization for White House journalists. Ex. 8. That month, the White House Press Secretary announced that the government would take over the day-to-day management of the press pool, including deciding its composition and circulating pool reports. Ex. 13. As one court has found, aside from the allotment of additional seats to "new media," "[l]ittle else has changed" in the composition or structure of the press pool since the White House assumed responsibility for its management. *AP*, 780 F. Supp. 3d at 41.

**B. The Policy**

At the beginning of President Trump's second term, he and his aides adopted the Policy challenged here, under which Defendants have restricted or revoked the access of members of the White House press corps as punishment for reporting they deem to be "false" or "fake." Compl. ¶¶ 35–47.

In February 2025, the White House banned the AP from the White House press pool because it continued to use the term "Gulf of Mexico" in its reporting and style guide after President Trump demanded that it adopt the term "Gulf of America." Ex. 14. After the AP challenged the administration's action on First and Fifth Amendment grounds, a district judge in Washington, D.C. ordered the White House to restore the AP's access "immediately." *AP*, 780 F. Supp. 3d at 60. A divided three-judge panel stayed that ruling in part pending adjudication of the appeal, and the White House has continued to exclude AP reporters from pool events and restrict

their participation in the White House Press Forum for the time being. *AP v. Budowich*, 2025 WL 1649265, *13 (D.C. Cir. June 6, 2025) (per curiam); Ex. 15. In response to the panel's stay decision, President Trump reiterated his reasons for expelling the AP from the press pool: "Big WIN over AP today. They refused to state the facts or the Truth on the GULF OF AMERICA. FAKE NEWS!!!" Ex. 16.

In September 2026, the White House banned CNN, MS NOW, and POLITICO from the White House Press Forum by revoking their hard passes. On September 18, President Trump announced on the social media platform Truth Social that the ban on the three new outlets was in response to their "constant 'reporting' FAKE NEWS," "FICTION and LIES." Ex. 17. In the same post, he declared "[o]ther Fake News Media Outlets to follow." Ex. 17. During a press conference held in the Oval Office, President Trump was asked by White House reporters why he had banned these news organizations, and he responded that "it's really just cumulative stories over the last two years . . . . [T]hey purposely write negative news . . . and they do that because they want to try and diminish the Republicans and a Republican administration." Ex. 18 ("[I]f they could straighten themselves out . . . I'd love it."). He referred to his actions as "the ban on the free press." Ex. 18. Deprived of their White House press credentials, journalists from CNN, MS NOW, and POLITICO later attested that they were "unable to enter the White House complex to attend briefings or events, report from their broadcast positions, or speak in person with White House officials and staff." Ex. 32, at 18–19.

President Trump and other senior administration officials have made multiple statements describing the Policy and threatening additional enforcement actions under it. For example, on September 21, President Trump claimed in a Truth Social post that in implementing the Policy, the White House "is instituting an assault on the FAKE NEWS." Ex. 19. Later that day, President

Trump complained of "Fake News people and publications that only write negatively, and who violate our National Security by writing false and defamatory stories with unknown 'sources.'" Ex. 20. According to the president, these "Third Rate Clowns, who purposefully distort, twist, and degrade with everything they write or publish," should not "be allowed access" to the Oval Office because "[v]irtually every story about me, or anything having to do with me, is negative, wrong and, in many cases, DANGEROUS for our Country! . . . Why should I have to give 'access' to such people? . . . FAKE NEWS IS A THREAT TO DEMOCRACY . . . ." Ex. 20; *see also, e.g.*, Ex. 21 ("Why should perpetrators of FAKE NEWS, like CNN and MSDNC, be allowed access to a very sacred place, the White House?"); Ex. 22 ("FAKE NEWS SHOULD NOT BE ALLOWED IN THE WHITE HOUSE!!!"); Ex. 23 ("I haven't had a good story on CNN for years."); Ex. 24 ("[I]f they're fake news, I really think I have an obligation not to allow them into another very special house. . . . They're very bad for the country, very bad for national security. So, I have that obligation."). In one September 26 Truth Social post, President Trump identified a number of specific White House news organizations—USA Today, CNN, the Washington Post, the Guardian, Newsweek, the New York Times, ABC, NBC, and Forbes—and stated that they "and others" should "not be allowed to enter the White House premises, or Press Room, because they are CORRUPT and DISHONEST!" Ex. 25.

Shortly after they were banned from the forum, CNN, MS NOW, and POLITICO filed suit, challenging the revocation of their journalists' hard passes on First and Fifth Amendment grounds. *See CNN v. Trump*, 2026 WL 3063460, at *1 (D.D.C. Oct. 13, 2026). After they filed suit, the White House Press Office sent letters to each news organization purporting to "provide notice that the President has made the determination to revoke hard passes for members of [the] organization[s]" because of a "non-exhaustive list of reporting incidents, including those that have

threatened national security and/or spread falsehoods." Ex. 26; *CNN*, 2026 WL 3063460, at *2, *5, *8–10.

The letters invoke new "standards of professionalism and decorum" that appear to constitute enforcement criteria for the Policy. Ex. 26. These standards are not fully defined but "includ[e]" "trafficking in verifiable falsehoods about national security and other issues, and publishing sensitive or classified information." Ex. 26. The letters explain that members of the White House press corps may retain "[h]ard pass credentials" only if they "abide by standards of professional conduct," "demonstrate a level of trustworthiness," and "perform their duties in a way that does not interfere with the White House's daily operations." Ex. 26. The letters further state that "[t]he spread of misinformation," including but not limited to that which "relat[es] to national security, is a threat that undermines the President's ability to safeguard the national security"—and sufficient grounds for revocation of White House press credentials. Ex. 26.

On September 24, a district court in Washington, D.C. granted CNN, MS NOW, and POLITICO a temporary restraining order that directed the White House to "immediately return, reinstate, and restore" their journalists' hard passes. *CNN v. Trump*, 840 F. Supp. 3d 29, 35–36 (D.D.C. 2026). On October 13, the court granted the three news organizations a preliminary injunction, concluding that the government's revocation of the organizations' hard passes likely violated their First and Fifth Amendment rights. *CNN*, 2026 WL 3063460, at *1.

Despite these orders, the White House has continued to exclude some of these news organizations and their reporters from certain areas and events open to other members of the White House press corps, and from pool events in which they would otherwise have been able to participate. For example, on September 21, CNN was barred from accompanying President Trump aboard Air Force One to the United Nations General Assembly in New York. Ex. 27. On

September 24, the White House barred CNN and MS NOW journalists from covering Chinese leader Xi Jinping's arrival at the White House for a state dinner. Ex. 28. On September 25, the White House blocked CNN from participating in the domestic travel pool accompanying the president to Tennessee. Ex. 29. The following week, on October 5, the White House similarly excluded POLITICO from traveling on Air Force One even though it had been scheduled to do so. Ex. 30.

In court filings, CNN, MS NOW, and POLITICO have stated that the restriction or revocation of their access "is a severe sanction that chills speech" and that "[a]n indefinite ban would objectively deter a reporter." Ex. 31, at 8–9. They have explained that the "unpredictable and unexplained adverse treatment" their journalists have received, even after a judge ordered the White House to restore their press credentials, "only exacerbates the chilling effect on protected speech." Ex. 32, at 32.

Most recently, on October 21, the White House barred Andrew Feinberg, White House correspondent for the Independent, from serving as one of the print reporters assigned to the domestic travel pool for President Trump's upcoming trip to Iowa. Ex. 33. The prior day, during a press conference in the Oval Office, the president called Feinberg "a sick person" after the reporter had attempted to ask him questions about the government's claimed efforts to combat healthcare fraud and the president's plans to renovate a golf course in Washington, D.C. Ex. 34.

In court filings, the government has repeatedly described its actions in banning or restricting members of the White House press corps as part of a "policy" governing "access to the White House complex." Ex. 35, at 14, 21, 24; Ex. 36, at 11–12, 17. Defendants continue to initiate new enforcement actions under the Policy. Ex. 37 (quoting Defendant Cheung as stating: "All options remain on the table, and we will make an announcement when appropriate.").

## C. Plaintiffs

Plaintiffs are six individual citizens who research, teach, and write about the president and his administration. Plaintiff Kenneth Roth is a human rights advocate, legal scholar, and expert on U.S. foreign policy and the rule of law. Roth Decl. ¶ 5. Plaintiff Daniel Froomkin is a media and political journalist with over four decades of experience. Froomkin Decl. ¶ 5. Plaintiff Beverly Gage is a historian of U.S. political history and the John Lewis Gaddis Professor of History at Yale University. Gage Decl. ¶ 5. Plaintiff Peter Schmidt-Nowara is a civics and social studies teacher at Brooklyn Technical High School. Schmidt-Nowara Decl. ¶ 5. Plaintiff Benjamin Wittes is a legal journalist and the editor-in-chief of Lawfare, a non-profit multimedia publication that provides non-partisan, timely analysis on issues including national security, democracy, cybersecurity, executive powers, and foreign policy. Wittes Decl. ¶ 5. Plaintiff Ethan Young is a student journalist and the editor-in-chief of the Daily Pennsylvanian, the University of Pennsylvania's independent, student-run newspaper. Young Decl. ¶ 4.

Plaintiffs regularly rely on reporting from members of the White House press corps. Plaintiffs subscribe to and read reporting from a range of White House news organizations, including the AP, the Boston Globe, CNN, the Guardian, Al Jazeera, the New York Times, NPR, PBS, POLITICO, the Wall Street Journal, and the Washington Post. Roth Decl. ¶ 8; Froomkin Decl. ¶ 6; Gage Decl. ¶ 7; Schmidt-Nowara Decl. ¶ 6; Wittes Decl. ¶ 9; Young Decl. ¶ 5. Froomkin and Gage watch broadcast coverage of President Trump and his administration on CNN and MS NOW, and Gage also watches Fox News for the same purpose. Froomkin Decl. ¶ 6; Gage Decl. ¶ 7. Gage and Schmidt-Nowara subscribe and listen to podcasts from the New York Times or NPR that provide them with up-to-date news and information about President Trump's actions and policies. Gage Decl. ¶ 7; Schmidt-Nowara Decl. ¶ 6. Roth, Froomkin, Wittes, and Young follow

the accounts, and engage directly with the reporting, of specific members of the White House press corps on social media, particularly the platforms Bluesky and X. Roth Decl. ¶ 7; Froomkin Decl. ¶ 7; Wittes Decl. ¶¶ 8–9; Young Decl. ¶ 5.

In addition to relying on reporting from the White House press corps to stay informed as individual citizens, Plaintiffs each rely on White House newsgathering and reporting in their work. Roth cites White House reporting in his public writing, assigns White House reporting to his students, and shares, comments on, and engages in other ways with White House reporting on social media. Roth Decl. ¶¶ 10–11. Froomkin cites White House reporting in his public writing and shares, comments on, and engages in other ways with White House reporting on social media. Froomkin Decl. ¶¶ 8–9. Gage draws on White House reporting for her historical research, cites White House reporting in her public writing, and assigns White House reporting to her students. Gage Decl. ¶¶ 9, 11–12. Schmidt-Nowara uses White House reporting to prepare his syllabi and weekly lesson plans, and he assigns or presents White House reporting to his students. Schmidt-Nowara Decl. ¶ 8. Wittes uses White House reporting to research and source ideas for his public writing and episodes of the Lawfare Daily podcast. Wittes Decl. ¶¶ 10–13. And Young uses and cites to White House reporting in his own journalism and editorial work. Young Decl. ¶ 7.

By restricting and chilling the newsgathering and reporting of members of the White House press corps, the Policy deprives Plaintiffs of news, ideas, and information on which they rely to teach their students, conduct scholarship, offer public commentary, engage in their own journalistic endeavors, and understand the actions and policies of their government. Roth Decl. ¶¶ 12–16; Froomkin Decl. ¶¶ 9–11; Gage Decl. ¶¶ 13–16; Schmidt-Nowara Decl. ¶¶ 10–12; Wittes Decl. ¶¶ 14–15, 17; Young Decl. ¶¶ 8–11.

## Standard of Review

To obtain a preliminary injunction, Plaintiffs must establish that: "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." *New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 293 (S.D.N.Y. 2020). "Where, as here, the government is a party to the suit, the final two factors merge." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020).

## Argument

### I. Plaintiffs have standing.

To satisfy the requirements of Article III, Plaintiffs must show that they have suffered, or will suffer, "an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (citation and quotation marks omitted); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (same). When "First Amendment principles are at stake, the rules of standing are 'somewhat relaxed' to avoid an irreparable chilling effect on protected speech." *C.R. Corps v. LaSalle*, 741 F. Supp. 3d 112, 137 (S.D.N.Y. 2024) (quoting *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013)), *aff'd*, 184 F.4th 104 (2d Cir. 2026).

The injury requirement is satisfied here because the Policy burdens Plaintiffs' right to receive independent reporting from members of the White House press corps. The Supreme Court has long made clear that unconstitutional restrictions imposed on willing speakers can inflict cognizable injuries on listeners. *E.g.*, *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *Lamont v. Postmaster Gen.*, 381 U.S. 301, 305–07 (1965); *Griswold v. Connecticut*, 381 U.S. 479, 482–83 (1965); *Martin v. Struthers*, 319 U.S. 141, 143 (1943). Against this background, courts have

recognized listener injuries in many contexts. *E.g.*, *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 756–57 (1976) (holding that consumers had standing to challenge law that restricted pharmacists from publicizing the prices of prescription drugs); *In re Dow Jones & Co., Inc.*, 842 F.2d 603, 607 (2d Cir. 1988) (recognizing a "First Amendment protection for recipients of speech" that "extends to a wide variety of contexts." (citing cases)); *Pen Am. Ctr., Inc. v. Trump*, 448 F. Supp. 3d 309, 324 (S.D.N.Y. 2020) ("Defendant's actions have plausibly chilled the White House press corps' speech, the questions they ask Defendant and the reporting they consequently are able to publish. The chilling impedes Plaintiff's right to receive information.").

More specifically, restraints on newsgathering and reporting by members of the press impose injuries on those who follow and rely on their news coverage. *See, e.g.*, *Abramowitz v. Lake*, 824 F. Supp. 3d 1, 15 (D.D.C. 2026) (holding that restrictions on Voice of America ("VOA") broadcasts inflicted actual injury on plaintiffs "as consumers of VOA broadcasting" who alleged that they "rel[ied] on VOA as a 'critical flow of information'"); *Sherrill*, 569 F.2d at 129–30 ("Not only newsmen and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information."); *see also Houchins v. KQED, Inc.*, 438 U.S. 1, 8 (1978) (observing that the press serves as the public's "eyes and ears"); *Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) (observing that an individual's right to receive information and ideas "is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom" (emphasis omitted)).

The Policy burdens Plaintiffs' First Amendment right to receive information in three distinct ways.

First, it deprives them of reporting from journalists whose access to the White House Press Forum has already been restricted or revoked. *See Abramowitz*, 824 F. Supp. at 15 (listeners' injuries from lost VOA news broadcasts "are likely to persist so long as VOA's broadcasting remains broadly inoperative"). Each Plaintiff has received and relied specifically on reporting from journalists whose access Defendants have already restricted or revoked. Roth Decl. ¶¶ 8–9, 11; Froomkin Decl. ¶¶ 6–8; Gage Decl. ¶¶ 7–8, 11; Schmidt-Nowara Decl. ¶¶ 6–9; Wittes Decl. ¶¶ 7–16; Young Decl. ¶¶ 5–7. Defendants have limited those journalists' ability to gather news, question White House officials, and inform the public about the government's decisions and policies. Roth Decl. ¶¶ 14–15; Froomkin Decl. ¶ 10; Gage Decl. ¶ 15; Schmidt-Nowara Decl. ¶ 11; Wittes Decl. ¶ 17; Young Decl. ¶¶ 8–10. In so doing they have limited and distorted the reporting that Plaintiffs are able to receive. Roth Decl. ¶¶ 14–15; Froomkin Decl. ¶¶ 9–10; Gage Decl. ¶¶ 15–16; Schmidt-Nowara Decl. ¶¶ 10–11; Wittes Decl. ¶¶ 15, 17; Young Decl. ¶¶ 8–10.

Second, Plaintiffs satisfy the injury requirement because there is a "credible threat" that Defendants will restrict the access of other journalists under the Policy and thereby deprive Plaintiffs of those journalists' independent reporting. It is well settled that plaintiffs need not "wait for the government to take coercive action against [them] before filing suit to challenge the government's conduct." *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 183 (2026). In the First Amendment context, the Second Circuit asks whether plaintiffs have shown (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest"; (2) that the intended conduct is "arguably proscribed by" the challenged policy; and (3) that "there exists a credible threat of prosecution thereunder" that is "sufficiently imminent." *Cerame v. Slack*,

123 F.4th 72, 81 (2d Cir. 2024) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 162 (2014)). In assessing whether the "credible threat" standard is satisfied, courts consider, among other things, the government's past conduct and its statements about future conduct. *See id.* at 86; *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 138 (2d Cir. 2023) (explaining that the court "presume[s]" the government's intent to enforce a policy "in the absence of a disavowal by the government or another reason to conclude that no such intent existed" (citation omitted)).[2]

Here, journalists and news organizations in the White House Press Forum are engaged in First Amendment–protected newsgathering and reporting that is "arguably proscribed" by the Policy, and there is a "credible threat" that the Policy will be enforced against those journalists in the near future. Under the Policy, Defendants have already restricted or revoked the access of multiple members of the White House press corps. *See supra* pp. 6–11. And journalists who have not yet been directly targeted under the Policy are similarly situated to the banned journalists and engage in the same sort of protected activity that provoked the government to ban them. *See Driehaus*, 573 U.S. at 166 ("COAST has alleged an intent to engage in the same speech that was the subject of a prior enforcement proceeding."); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Far from disavowing any intent to enforce the Policy in the future, the government has explicitly threatened additional enforcement actions to come, including against the specific news organizations on whose reporting Plaintiffs routinely rely. *E.g.*, Ex. 17; Ex. 25.

The new "standards" that Defendants introduced to justify actions that they had already taken against CNN, MS NOW, and POLITICO offer no comfort that Defendants will abandon their Policy of expelling or otherwise punishing journalists and news organizations for coverage

[2] In *Murthy*, the Supreme Court did not cite this three-part framework but instead asked whether there was a "substantial risk" that the threatened harm would occur "in the near future." 603 U.S. at 49–50. Plaintiffs satisfy that test for the same reasons they satisfy the "credible threat" test.

that offends the president. To the contrary, the new standards are themselves irredeemably viewpoint based and vague and leave Defendants with unbridled discretion. Ex. 26. Indeed, in ongoing litigation brought by those media organizations, Defendants expressly claim unfettered authority to ban journalists based on viewpoint. Ex. 35, at 2, 9, 15 (arguing that the White House should be able to "consider journalists' viewpoints when deciding whether to grant access . . . to White House grounds" (citation omitted)).

Third, the possibility that news organizations' access will be restricted under the Policy in the future will inevitably have a deterrent effect on their willingness and ability to provide the independent reporting that Plaintiffs rely on today. *Pen Am.*, 448 F. Supp. 3d at 324. A chilling effect is a cognizable injury if it is objectively reasonable. *First Choice*, 608 U.S. at 191 ("[A] party suffering an objectively reasonable chill to its First Amendment associational rights has an injury in fact sufficient to give rise to Article III standing." (quotation marks omitted)); *Zieper v. Metzinger*, 474 F.3d 60, 65 (2d Cir. 2007). A chilling effect is objectively reasonable if the challenged policy is likely to deter a person of ordinary firmness from engaging in protected activity. *UAW v. U.S. Dep't of State*, 2026 WL 2958310, at *7 (S.D.N.Y. Oct. 1, 2026); *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988); *Driehaus*, 573 U.S. at 158–65; *Babbitt v. UFW*, 442 U.S. 289, 298, 302 (1979).

Here, the Policy's chill on the ability and willingness of members of the White House press corps to exercise their First Amendment freedoms is plain and objectively reasonable. As long as the Policy remains in place, every member of the White House press corps knows that their continued access to and participation in the White House Press Forum depends on their reporting not offending the President. In the East Room, on the South Lawn, or on Air Force One, the threat of viewpoint-based expulsion will hover over every exchange between a journalist and a White

House official. *See First Choice*, 608 U.S. at 192 ("The value of a sword of Damocles is that it hangs—not that it drops." (quoting *Arnett v. Kennedy*, 416 U.S. 134, 231 (1974) (Marshall, J., dissenting))). President Trump himself has declared forthrightly that the chill is the Policy's whole point. *E.g.*, Ex. 18 ("[I]f they could straighten themselves out, I'd love it."). The news organizations have acknowledged that the president's strategy may well succeed. Ex. 32, at 32; Ex. 31, at 8–9.[3]

The traceability and redressability requirements are also satisfied here. All of the injuries described above stem directly from the Policy. *See Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*, 88 F.4th 344, 352–53 (2d Cir. 2023) ("[T]he causal-connection element . . . does not create an onerous standard."). And all of these injuries would be redressed by the relief that Plaintiffs seek—principally, a declaration that the Policy is unconstitutional and an injunction against its enforcement.

## II. Plaintiffs are likely to succeed on the merits of their claim that the Policy violates their First Amendment rights.

The White House Press Forum is a limited public forum under the First Amendment because it comprises spaces that the White House has opened to credentialed journalists for newsgathering, reporting, and other related expressive activity. Because it is a limited public forum, the First Amendment precludes the government from restricting access to it based on viewpoint or for reasons that are unreasonable in light of the forum's purpose. But, as explained below, the White House is doing precisely that. The Policy violates the First Amendment rights of

[3] *Cf.* John Hendel, *'Head on a Guillotine': ABC Says Trump's Threats Are Already Swaying Coverage*, POLITICO (Oct. 6, 2026), https://perma.cc/7AGP-PLCP (quoting a lawyer for ABC describing the chilling effect of threats from President Trump's FCC: "We sit with our head on the guillotine. . . . We are watching everything we do.").

journalists whose access to the forum is now contingent on viewpoint, and it also violates Plaintiffs' First Amendment right to receive those journalists' independent reporting.

### A. Government restrictions on First Amendment–protected activities in public forums must withstand heightened scrutiny.

Recognizing the essential role that public property sometimes plays in facilitating expression important to our democracy, the Supreme Court has held that the First Amendment gives special protection to "public forums." The government establishes a public forum when it makes government space available for members of the public to engage in expressive activity. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985); *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555 (1975). A forum may be physical, or it may be "metaphysical," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995), such as a "channel of communication," *Cornelius*, 473 U.S. at 802, a funding stream, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46–47 (1983), or a social media account, *Knight First Amend. Inst.*, 928 F.3d at 237; *Davison v. Randall*, 912 F.3d 666, 682–87 (4th Cir. 2019).

Protected forums fall into several categories. *Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 142 (2d Cir. 2004). "Traditional" public forums, which include sidewalks and parks, are forums that have been used "immemorially . . . for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)). "Designated" public forums are spaces—including "place[s] or channel[s] of communication"—that the government opens "for use by the public at large for assembly and speech." *Cornelius*, 473 U.S. at 802. "Limited" public forums, a subset of designated public forums, are spaces that the government opens for First Amendment activity by "certain groups" or related to "certain topics." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015) (quoting *Rosenberger*,

515 U.S. at 829); *see also Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998). Finally, a "nonpublic forum" "is public property not traditionally open to public expression or intentionally designated by the government as a place for such expression." *Make the Rd.*, 378 F.3d at 143; *see also Gen. Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273, 278 (2d Cir. 1997) (explaining that "all remaining public property" that is not a traditional or designated public forum is a nonpublic forum).

The level of First Amendment scrutiny applicable to restrictions on expressive activity in a protected forum depends on the type of forum the government has created. *Make the Rd.*, 378 F.3d at 142. Crucially, restrictions that discriminate based on viewpoint are unconstitutional in all forums, including nonpublic ones. *Matal v. Tam*, 582 U.S. 218, 243–44 (2017); *Rosenberger*, 515 U.S. at 829; *Se. Promotions, Ltd.*, 420 U.S. at 563 ("As soon as municipal officials are permitted to pick and choose . . . the path is cleared for a regime of censorship under which full voice can be given only to those views which meet with the approval of the powers that be."). In both traditional public forums and designated public forums, restrictions that discriminate based on content are subject to strict scrutiny. *McCullen*, 573 U.S. at 478; *Perry Educ. Ass'n*, 460 U.S. at 45. In limited public forums and nonpublic forums, content-based speech restrictions must be viewpoint neutral and "reasonable in light of the purpose served by the forum." *Cornelius*, 473 U.S. at 806.

### B. The White House Press Forum is a limited public forum.

The "touchstone" for determining what type of forum the government has created is intent. *Make the Rd.*, 378 F.3d at 143. To determine intent, courts look "to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum," *Cornelius*, 473 U.S. at 802, as well as to the "nature of the property,

and its compatibility with expressive activity," *Gen. Media*, 131 F.3d at 279; *see also Perry v. McDonald*, 280 F.3d 159, 167 (2d Cir. 2001) (describing forum analysis factors).

The White House Press Forum is a limited public forum created to facilitate newsgathering and reporting about the president and his administration. The forum encompasses spaces in the White House complex that the president and his aides open to the press for newsgathering and reporting as well as spaces that they open to the press for these protected purposes when the president is away from the White House, including when he travels. That the White House Public Forum is a limited public forum is evident from the government's policy and practice, as well as from the nature of the spaces that make up the forum and their compatibility with expressive activity.

First, the White House's consistent policy and practice demonstrate an intent to establish a limited public forum for reporters to pursue their First Amendment–protected activities. Over decades and across presidencies from both parties, the White House has deliberately opened certain spaces to members of the White House press corps to facilitate newsgathering, reporting, and related expressive activity. Ex. 2. Every administration since President Theodore Roosevelt's has dedicated space in the White House for these purposes, even if the particulars of the spaces dedicated to press activities have changed over time. Ex. 2. These spaces have included, and continue to include, workspaces and other physical facilities that enable the press to report from the White House, as well as dedicated briefing rooms and broadcast locations. Ex. 2. The White House created the credentialing process to facilitate press access to these spaces, Ex. 5, and it actively participates in scheduling and facilitating press events, Ex. 3; Ex. 12. Journalists use these spaces to engage in First Amendment–protected activity—to question the president and his aides, observe and analyze events, communicate with editors and colleagues, and share reporting with

the public. Ex. 11. In other words, the longtime consistent policy and practice of the White House has been to maintain a forum for expressive First Amendment–protected activity by members of the White House press corps—a forum intended to enable the press to ensure that the public is fully informed about the president's activities, decisions, policies, and statements. *See Sherrill*, 569 F.2d at 129 (observing that the White House has made press facilities "publicly available as a source of information for newsmen").

That the White House sometimes restricts access to these spaces to smaller groups of credentialed journalists drawn from the White House press corps—as it does when a press pool covers the president in the Oval Office or on Air Force One—does not change the analysis. Where space is limited, a smaller pool of credentialed journalists is provided access to cover the president and report to the public. A press pool can be of varying size depending on the space available. The White House has for decades facilitated the functioning of the press pool by coordinating scheduling with members of the pool, inviting members to cover press events in the Oval Office, during the president's travel, and aboard Air Force One, and coordinating travel arrangements and cost reimbursement with press pool members who travel in a section of Air Force One that is expressly reserved for the press. Ex. 3; Ex. 6. The White House recently took over responsibility for managing the press pool from the WHCA, but the rotation system remains essentially unchanged. *See AP*, 780 F. Supp. 3d at 41.

Second, the spaces that comprise the White House Press Forum are plainly compatible with expressive activity. Although the White House complex is used for many purposes, several of the areas in the Press Forum—including the Briefing Room, the press workspaces, and Pebble Beach—are expressly dedicated to newsgathering and reporting. These activities are the core of the First Amendment's protection. *See* Vincent Blasi, *The Checking Value in First Amendment*

*Theory*, 2 Am. Bar Found. Rsch. J. 521, 541 (1977) (explaining that the founders included freedom of the press in the First Amendment to safeguard reporters' ability to "acquir[e] enough information to pass judgment on the actions of government"); *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981) (observing that the First Amendment protects newsgathering because it "is essential to a free press"); William J. Brennan, Jr., *Address*, 32 Rutgers L. Rev. 173, 177 (1979) (observing that the press "is not only shielded when it speaks out, but when it performs all of the myriad tasks necessary for it to gather and disseminate the news"). Moreover, in areas like the Oval Office and Air Force One, Defendants assist members of the press pool in using the spaces to engage in protected newsgathering and reporting activities—by inviting the press to cover the president at certain times, accommodating reporters and their equipment, and reserving transportation and a section on Air Force One for the press. Exs. 8–9. In other words, while these spaces are not always open to the press, they are plainly compatible with First Amendment activity at the times they *are* opened to the press—which is the relevant question for forum doctrine. *Cf. Johnson v. Perry*, 859 F.3d 156, 175 (2d Cir. 2017) (holding that a "school may regulate access to its gymnasium when it is being used as a limited public forum only if its restrictions are reasonable and viewpoint-neutral").

Indeed, the spaces that comprise the White House Press Forum are not merely compatible with reporting on the presidency but are uniquely valuable to that activity. Access to the White House Press Forum allows journalists to ask questions of the president and senior officials, meet with officials less formally, and observe and report on important events firsthand. *AP*, 780 F. Supp. 3d at 57; Ex. 3. Excluding journalists from the forum is consequential because there is no real substitute for access to these expressive spaces. *AP*, 780 F. Supp. 3d at 57; Ex. 3; Roth Decl. ¶ 13;

Froomkin Decl. ¶ 9; Gage Decl. ¶¶ 9, 13–14; Schmidt-Nowara Decl. ¶¶ 10–12; Wittes Decl. ¶ 14; Young Decl. ¶ 9.

In sum, the White House's consistent policy and practice over many decades, as well as the compatibility of the forum's spaces with First Amendment–protected activity, demonstrate an intent to create a limited public forum.[4]

### C. The Policy imposes restrictions that are viewpoint discriminatory and unreasonable.

The Policy violates the First Amendment because the restrictions it imposes are viewpoint based and unreasonable. As an initial matter, there is no question that the Policy discriminates on the basis of viewpoint. In describing his decisions to ban CNN, MS NOW, and POLITICO from the White House Press Forum, President Trump stated repeatedly that he was excluding these outlets because of the viewpoints reflected in their reporting. Exs. 17–25. President Trump offered similar explanations for his decision to expel the AP from the press pool. Ex. 16. These explanations are classic viewpoint discrimination, and not even the government has argued otherwise. Ex. 35, at 1 (not contesting that the expulsions were viewpoint discriminatory but arguing that the President has the authority to expel disfavored journalists because "access to the White House is a privilege—not a right").

The "standards" put forth as part of Defendants' post-hoc justification of their enforcement actions in *CNN v. Trump* are similarly viewpoint discriminatory. To the extent that Defendants have defined any of the relevant terms, they have made clear that their definitions are viewpoint discriminatory. *E.g.*, Ex. 20 ("Virtually every story about me, or anything having to do with me,

---

[4] The D.C. Circuit has concluded that many of the spaces within the White House Press Forum constitute a nonpublic forum. *See, e.g.*, *Ateba v. Leavitt*, 133 F.4th 114, 122–23 (D.C. Cir. 2025). Ultimately, nothing turns on the distinction because the First Amendment supplies the same protection in nonpublic forums as in limited public forums.

is negative, wrong and, in many cases, DANGEROUS for our Country! . . . FAKE NEWS IS A THREAT TO DEMOCRACY . . . .").

The Policy is also unreasonable. It is unreasonable, first, because it undermines the expressive purposes of the White House Press Forum—to facilitate newsgathering and reporting by the White House press corps and thereby to ensure that the public is informed about the president and his policies. To state the obvious, it does not serve this purpose to condition journalists' access to the forum on the president's approval of their reporting. The Policy is unreasonable for the additional reason that it vests unbridled discretion in government officials. The president has repeatedly restricted journalists' access to the forum on the basis of his own subjective determination that their reporting is "false" or "fake." To the extent Defendants have tried to rationalize the president's decisions after the fact, they have pointed to "standards" of "professionalism and decorum" that are not only viewpoint based and vague, but on their face grant the White House unbridled discretion to exclude journalists from the forum. That is per se unreasonable. *See Minn. Voters All. v. Mansky*, 585 U.S. 1, 16 (2018) ("[T]he State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out."); *Ateba*, 133 F.4th at 125 ("[W]e have held that the exercise of unbridled discretion to deny access to a nonpublic forum is unreasonable."); *Mahoney v. U.S. Capitol Police Bd.*, 2026 WL 2836881, at *8 (D.C. Cir. Sep. 22, 2026) (similar); *PETA v. Tabak*, 109 F.4th 627, 637–38 (D.C. Cir. 2024) (same). Likewise, the White House's attempt to defend the Policy as necessary to prevent against "threats to national security" is too indeterminate to serve as a meaningful constraint on the government's discretion. *See Mansky*, 585 U.S. at 16–17 (concluding that state law is unreasonable

because of "the unmoored use of the term 'political' . . . , combined with haphazard interpretations the State has provided in official guidance and representations to this Court").[5]

## III. Plaintiffs also satisfy the other preliminary injunction factors.

While "in the First Amendment context, . . . the likelihood of success on the merits is the dominant, if not the dispositive, factor," *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013), the other preliminary injunction factors also weigh decisively in favor of Plaintiffs' requested relief here.

Plaintiffs' ongoing and imminent First Amendment injuries are irreparable. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality); *see also Agudath Isr. of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020) ("[T]he deprivation of First Amendment rights is an irreparable harm . . . ."). This is so when "First Amendment interests [are] either threatened or in fact being impaired at the time relief [is] sought." *Elrod*, 427 U.S. at 373. And the harm here is "particularly irreparable" because the upstream restrictions on journalists and news organizations burdens Plaintiffs' and the public's right to receive important information about the President of the United States and his administration. *See N.Y. Progress*, 733 F.3d at 486.

The balance of equities and the public interest—which "merge" when "the government is a party to the suit," *New York*, 969 F.3d at 58–59—similarly weigh heavily in favor of injunctive relief. "[S]ecuring First Amendment rights is in the public interest." *N.Y. Progress*, 733 F.3d at 488. Because the Policy "is likely unconstitutional, the public is irreparably harmed by [Defendants'] infringement on First Amendment freedoms and any resulting chilling effect on

[5] The "national security" pretext is also hopelessly vague as a guide to journalists and news organizations because reporting on matters relating to national security is protected by the First Amendment. *See, e.g.*, *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971).

expression." *Volokh v. James*, 148 F.4th 71, 82 (2d Cir. 2025). Broad and immediate injunctive relief is necessary to adequately protect the public interest in receiving reporting, free from unconstitutional censorship or interference, from journalists and news organizations in the White House Press Forum. *See Sherrill*, 569 F.2d at 129–32 (noting that "the public at large" has "an interest protected by the first amendment" in a free press).

**Conclusion**

For the reasons stated above, Plaintiffs respectfully request that the Court preliminarily enjoin Defendants Cheung, Curran, and Wiles from enforcing the Policy.

October 26, 2026

Respectfully submitted,

/s/ *Katherine Fallow*

Katherine Fallow
Jameel Jaffer
Jake Karr
Nicola Morrow
Taylor Fox*
Knight First Amendment Institute
at Columbia University
475 Riverside Drive, Suite 302
New York, N.Y. 10115
(646) 745-8500
katie.fallow@knightcolumbia.org

* Application for admission pending

David A. Schulz
Christina Lee
Media Freedom & Information Access Clinic
Yale Law School[6]
127 Wall Street
New Haven, C.T. 06511
(203) 432-5827
david.schulz@yale.edu

*Counsel for Plaintiffs*

[6] The views expressed herein do not purport to represent the institutional views of Yale Law School.

**Certificate of Compliance**

Pursuant to Local Civil Rule 7.1(c), I certify that this memorandum of law contains 8,748 words, excluding the caption, table of contents, table of authorities, and signature blocks.

October 26, 2026

Respectfully submitted,

/s/ *Katherine Fallow*

Katherine Fallow

## Certificate of Service

I, the undersigned counsel, certify that on October 26, 2026, I electronically filed the forgoing in the U.S. District Court for the Southern District of New York using the CM/ECF system. I certify the forgoing will be served on Defendants via USPS certified mail upon issuance of summonses at the addresses below:

Donald J. Trump, in his official capacity as President of the United States,
1600 Pennsylvania Avenue N.W.
Washington, D.C. 20500

Steven Cheung, in his official capacity as Assistant to the President for Communications,
1600 Pennsylvania Avenue N.W.
Washington, D.C. 20500

Sean M. Curran, in his official capacity as Director of the Secret Service,
245 Murray Lane, S.W., Building T-5
Washington, D.C. 20223

Susan Wiles, in her official capacity as White House Chief of Staff,
1600 Pennsylvania Avenue N.W.
Washington, D.C. 20500

October 26, 2026

Respectfully submitted,

/s/ *Katherine Fallow*
Katherine Fallow