**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KENNETH ROTH; DANIEL FROOMKIN; BEVERLY GAGE; PETER SCHMIDT-NOWARA; BENJAMIN WITTES; and ETHAN YOUNG,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; STEVEN CHEUNG, in his official capacity as Assistant to the President for Communications; SEAN M. CURRAN, in his official capacity as Director of the Secret Service; and SUSAN WILES, in her official capacity as White House Chief of Staff,<br><br>Defendants. | Civil Action No. |

**DECLARATION OF BENJAMIN WITTES**

I, Benjamin Wittes, declare and state as follows:

1. I am a plaintiff in this matter and am submitting this declaration in support of a motion for a preliminary injunction.

2. I am over the age of eighteen. I have personal knowledge of the facts stated in this declaration, and, if called to testify, I could and would competently do so under oath.

3. I am a resident of Washington, D.C., and a citizen of the United States.

4. I received a B.A. in History and English Literature from Oberlin College.

5. I am a legal journalist and editor-in-chief of Lawfare, a publication dedicated to non-partisan, timely analysis on U.S. law and national security matters. I am also a senior fellow in Governance Studies at the Brookings Institution. From 1997 to 2006, I covered legal affairs as

an editorial writer for the Washington Post. Throughout my over three decades as a journalist and writer, I have written for a wide range of outlets, including the Atlantic, Slate, the New Republic, the Weekly Standard, and Policy Review.

6. I report and publish widely on national security law and policy, areas in which the White House plays a critical role. As editor-in-chief and a columnist at Lawfare, I frequently write about developments in the Trump Administration, with particular focus on U.S. foreign policy, national security, the presidency, and executive actions that I understand as hostile to the rule of law. As part of my work with Lawfare, I direct and often host the Lawfare Podcast, including a weekly episode called "The Trials of the Trump Administration."

7. I have also published several books on topics related to national security and presidential administration. For instance, in 2020, I co-authored *Unmaking the Presidency: Donald Trump's War on the World's Most Powerful Office* (with Susan Hennessey), which examines how the first Trump Administration transformed and eroded longstanding norms of the American executive branch. In researching and writing this book, I relied on robust and uncompromising reporting from several White House reporters. For instance, I read and cited coverage of high-stakes diplomatic events, like New York Times reporter Peter Baker's March 10, 2018, account of President Trump's historic decision to meet with North Korean president Kim Jong Un. **Exhibit 1** (*Unmaking the Presidency* chapter 2 excerpt and endnotes); **Exhibit 2** (Baker New York Times article) (available at https://perma.cc/NZ7K-J4M4). I also read and cited in-depth analysis of President Trump's first year in office from inside the White House, such as a December 9, 2017, article by New York Times reporters Maggie Haberman, Glenn Thrush, and Peter Baker. **Exhibit 3** (*Unmaking the Presidency* chapter 5 excerpt and endnotes); **Exhibit 4** (Haberman, Thrush, and Baker New York Times article) (available at https://perma.cc/8XJN-3RRW). Similarly, for my

discussion of President Trump's erratic foreign policy decision-making in Chapter 2, I read and cited an article co-authored by Josh Dawsey, then-White House reporter for the Washington Post. **Exhibit 1** (*Unmaking the Presidency* chapter 2 excerpt and endnotes); **Exhibit 5** (Dawsey Washington Post article) (available at https://perma.cc/22EA-VQDN). This article described Trump's withdrawal of U.S. forces from Syria and Afghanistan in 2018, and Trump's reaction to James Mattis' subsequent resignation as Secretary of Defense.

8. To prepare for my work as an editor and columnist at Lawfare, I use multiple social media platforms to follow current events, offer commentary, and communicate with journalists and members of the public. I maintain active accounts on Bluesky, Instagram, Facebook, and LinkedIn. On Bluesky alone, I have over 200,000 followers. On social media, I regularly post, comment on, and repost coverage of foreign affairs, wars, and other executive actions, as well as judicial responses to developments in the Trump Administration.

9. To stay informed of ongoing developments out of the White House and the Trump Administration, I depend heavily on journalists and news organizations that have access to the White House and the president, including the New York Times and POLITICO. I subscribe to the New York Times, the Washington Post, and the Atlantic, among other publications. I also follow the accounts of several members of the White House press corps, including the New York Times, NPR, the Washington Post, and Andrew Feinberg of the Independent.

10. I rely on reporting from members of the White House press corps to research and source ideas for my public writing. For instance, at the beginning of President Trump's second term, I published in Lawfare a day-by-day timeline of his first 100 days in office on May 1, 2025. **Exhibit 6** (available at https://perma.cc/4XV7-92RN). This account drew from nearly a dozen sources by White House reporters, who provided indispensable coverage of the President's

substantial and often legally dubious changes to longstanding features of U.S. federal policy and practice, including his overhaul of the federal bureaucracy, freezing of foreign aid, and punitive tariff regime. For instance, I read and cited to a February 12, 2025 article co-authored by Maggie Haberman and Zolan Kanno-Youngs, two White House reporters for the New York Times, that covered Trump's first confirmed conversation with Russian President Vladimir Putin regarding the war in Ukraine. **Exhibit 7** (available at https://perma.cc/HJE2-ZHGR).

11. I frequently cite to specific White House reporting for my regular Lawfare column, "The Situation." This column tracks the Trump Administration's impacts on the rule of law at home and abroad, with a focus on actions by the executive branch. For instance, one recent column from March 17, 2026, "The Situation: Meanwhile," provides analysis of the U.S. war with Iran. **Exhibit 8** (available at https://perma.cc/84XZ-K7JG). My analysis was informed by direct coverage of President Trump's statements from the White House, including reporting by New York Times White House reporters Erica L. Green and David E. Sanger about a White House event with the Kennedy Center board. **Exhibit 9** (available at https://perma.cc/DDE8-F74Z).

12. When researching and developing ideas for "The Situation," I read statements made by the president and other administration officials as reported by members of the press corps. My recent column "The Situation: Meanwhile" relied on reporting from the New York Times documenting statements President Trump made about Cuba to reporters in the Oval Office. **Exhibit 8** (Lawfare column) (available at https://perma.cc/84XZ-K7JG); **Exhibit 10** (New York Times article) (available at https://perma.cc/ENY3-GHPB).

13. Like my Lawfare column, my Lawfare Daily podcast relies directly and extensively on reporting from the White House to inform our coverage of the president and his policies, especially for our weekly episode series, "The Trials of the Trump Administration." For example,

in a recent episode recorded on July 17, 2026, my cohosts and I discussed President Trump's speech on election security, delivered the previous day from the White House. **Exhibit 11** (Lawfare podcast episode transcript) (available at https://perma.cc/ME4D-5574). In his speech, President Trump called on federal law enforcement to investigate and prosecute any individual allegedly engaged in election interference, and specifically, in collaboration with the Chinese government—a topic that bears directly on Lawfare's coverage of national security and the presidency. In preparing for this podcast, our team drew from a transcript of President Trump's speech. On July 17, 2026, CNN published an annotated transcript of President Trump's speech from the previous day. **Exhibit 12** (available at https://perma.cc/LN3H-2JTN). This kind of independent, unbiased, and timely reporting is critical to my work as a journalist.

14. Since Lawfare has never employed reporters with White House credentials or reporters who travel with the president, I depend on members of the White House press corps to relay breaking news on my behalf. My Lawfare colleagues and I have made the strategic judgment to focus our reporting on the courts. One of the reasons that we can do that is because other news organizations—those who are members of the White House press corps—have this covered. We have confidence in external coverage of the White House by the press corps, and, therefore, commit our own resources to the courts, because of the integrity and independence of the White House press corps.

15. It matters that White House reporters are unafraid to challenge those in power: that they ask difficult questions, investigate discrepancies in officials' statements, and are not deterred by the risk of losing access to the White House for doing so. Only then can I be confident that coverage of the White House is not shaped by the viewpoints of the government itself.

16. In my decades of experience as a legal journalist, I have learned to particularly value unbiased White House reporting that provides context beyond what officials may state publicly. A recent example illustrates this point. On September 20, 2026, President Trump stated that his proposed "Triumphal Arch" near Arlington National Cemetery is a "military complex" and, therefore, a national security priority. When a statement like this appears, I look to subsequent reporting to understand what lies behind it, including whether it reflects particular facts on the ground or may even reveal the government's intended litigation posture. Here, I valued CNN reporting from September 20, 2026 that further contextualized the President's statements on the "Triumphal Arch" in previous rhetoric on national security and public infrastructure, such as his attempts to refashion the White House Ballroom as a "military complex." **Exhibit 13** (available at https://perma.cc/BTE4-UBEZ). As editor-in-chief and a columnist at Lawfare, I consult such reporting to supplement and reinforce my analysis of the Trump Administration's evolving rhetoric and policies on national security.

17. My work as a legal journalist and editor-in-chief of Lawfare is hindered by President Trump's press policy. I trust the White House press corps' coverage because it is independent from, and not subject to the ideological whims of its primary subject—the president. The White House's policy and practice of excluding reporters based on disfavored viewpoints is corrosive to the independence and integrity of the free press. First wielded against the Associated Press, CNN, MS NOW, and POLITICO, but also threatened against additional news organizations that refuse to bend the knee, this policy intimidates other outlets into compliance with the Trump administration's ideological convictions. If these news organizations are less willing to ask critical questions of the president, or risk expulsion for doing so, then I cannot guarantee the quality and

accuracy of their newsgathering. The president's policy of excluding reporters whose viewpoints he opposes—if permitted to continue unchecked—will significantly harm my work as a journalist.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: October 23, 2026

Benjamin Wittes