# EXHIBIT 31

(Declaration of Katherine Fallow)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CABLE NEWS NETWORK, INC., MS NOW CABLE, LLC, POLITICO LLC, ET AL.,<br><br>*Plaintiffs*,<br><br>*v.*<br><br>DONALD J. TRUMP, ET AL.,<br><br>*Defendants*. | Case No. 1:26-cv-03287-TJK |

# REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Theodore J. Boutrous, Jr. (D.C. Bar No. 420440)
Katie Townsend (D.C. Bar No. 1026115)
Patrick J. Fuster (CA Bar No. 326789)*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000

Connor S. Sullivan (D.C. Bar No. D00506)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2459

Connor P. Mui (D.C. Bar No. 90009004)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500

*Counsel for Plaintiffs Cable News Network, Inc., MS NOW Cable, LLC, POLITICO LLC, Akayla Gardner, Cheyenne Haslett, and Betsy Klein*

**Admitted Pro Hac Vice*

# TABLE OF CONTENTS


Page

INTRODUCTION .......... 1

ARGUMENT .......... 2

I. Plaintiffs are likely to establish that the ban is unconstitutional. .......... 2

A. The ban violates the Due Process Clause. .......... 2

B. The ban retaliates against Plaintiffs for newsgathering and reporting protected by the First Amendment. .......... 8

C. The ban unconstitutionally restricts access to a nonpublic forum. .......... 15

II. Plaintiffs will suffer irreparable injury absent a preliminary injunction. .......... 19

III. The balance of equities and public interest favor a preliminary injunction. .......... 20

IV. Defendants' arguments for limiting the scope of relief are premature and flawed. .......... 23

V. This Court should deny Defendants' request for a stay pending appeal. .......... 25

CONCLUSION .......... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l*,
570 U.S. 205 (2013)....................16

*Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*,
663 F.3d 476 (D.C. Cir. 2011)....................7

*Am. Acad. of Pediatrics v. HHS*,
816 F. Supp. 3d 27 (D.D.C. 2026)....................10

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016)....................8–10

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998)....................16

*Associated Press v. Budowich*,
2025 WL 1649265 (D.C. Cir. June 6, 2025)....................16

*Associated Press v. Budowich*,
2025 WL 2047025 (D.C. Cir. July 22, 2025)....................24

*Associated Press v. Budowich*,
780 F. Supp. 3d 32 (D.D.C. 2025)....................24

**Ateba v. Leavitt*,
133 F.4th 114 (D.C. Cir. 2025)....................16, 17

*Baltimore Sun Co. v. Ehrlich*,
437 F.3d 410 (4th Cir. 2006)....................11

*Biden v. Nebraska*,
600 U.S. 477 (2023)....................23

*BMW of N. Am. v. Gore*,
517 U.S. 559 (1996)....................6

*Bouie v. City of Columbia*,
378 U.S. 347 (1964)....................6

*Brown v. Ent. Merchants Ass'n*,
564 U.S. 786 (2011)....................18

*Constantine v. Rectors & Visitors of George Mason Univ.*,
411 F.3d 474 (4th Cir. 2005)....................10

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985)....................17

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019)....................13

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)....................4

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)....................23

*Frederick Douglass Found., Inc. v. District of Columbia*,
82 F.4th 1122 (D.C. Cir. 2023)....................15

*FS Credit Opportunities Corp. v. Saba Capital Master Fund, Ltd.*,
608 U.S. 608 (2026)....................14

*Goldberg v. Kelly*,
397 U.S. 254 (1970)....................3

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013)....................19

*Goss v. Lopez*,
419 U.S. 565 (1975)....................3

*Grosjean v. Am. Press Co.*,
297 U.S. 233 (1936)....................21, 22

*Houchins v. KQED, Inc.*,
438 U.S. 1 (1978)....................17

*Iancu v. Brunetti*,
588 U.S. 388 (2019)....................17

*Karem v. Trump*,
404 F. Supp. 3d 203 (D.D.C. 2019)....................9, 11

**Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020)....................1, 4, 6, 7, 9, 18, 21, 23

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022)....................14, 19

*LeFande v. District of Columbia*,
841 F.3d 485 (D.C. Cir. 2016)....................13

*Mahmoud v. Taylor*,
606 U.S. 522 (2025)....................19

**Mahoney v. U.S. Capitol Police Bd.*,
— F.4th —, 2026 WL 2836881 (D.C. Cir. Sept. 22, 2026)....................15, 16, 18

*Marshall v. Jerrico, Inc.*,
446 U.S. 238 (1980)....................8

*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025) .....9

*Mills v. District of Columbia*,
571 F.3d 1304 (D.C. Cir. 2009) .....19

**Minn. Voters All. v. Mansky*,
585 U.S. 1 (2018) .....17, 18

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977) .....13, 14

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) .....16

*Nat'l Pub. Radio, Inc. v. Trump*,
827 F. Supp. 3d 48 (D.D.C. 2026) .....9

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) .....11, 15

*New York Times Co. v. Dep't of Def.*,
2026 WL 1179440 (D.C. Cir. Apr. 27, 2026) .....22, 23

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) .....15, 22

*New York Times Co. v. United States*,
403 U.S. 713 (1971) .....5, 15

*Pell v. Procunier*,
417 U.S. 817 (1974) .....17

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) .....15

**Sherrill v. Knight*,
569 F.2d 124 (D.C. Cir. 1977) .....1, 3, 4, 10, 24

*Students for Fair Admission, Inc. v. President & Fellows of Harv. Coll.*,
600 U.S. 181 (2023) .....18

*Tao v. Freeh*,
27 F.3d 635 (D.C. Cir. 1994) .....9

*Taylor v. Trump*,
823 F. Supp. 3d 17 (D.D.C. 2026) .....19

*TikTok Inc. v. Garland*,
604 U.S. 56 (2025) .....14

*Trump v. Cook*,
609 U.S. 528 (2026) .....13

*United States v. Morison*,
844 F.2d 1057 (4th Cir. 1988) ....................22

*United States v. Trump*,
88 F.4th 990 (D.C. Cir. 2023) ....................8

*Wannall v. Honeywell, Inc.*,
775 F.3d 425 (D.C. Cir. 2014) ....................6

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ....................23

*Zemel v. Rusk*,
381 U.S. 1 (1965) ....................17

*Zevallos v. Obama*,
793 F.3d 106 (D.C. Cir. 2015) ....................7

**Constitutional Provisions**

U.S. Const. amend. I ....................1

U.S. Const. amend. V ....................1

**Statutes**

18 U.S.C. § 798 ....................4–6

**Other Authorities**

Kenneth Shepsle, *Congress Is a "They," Not an "It,"*
12 Int'l Rev. L. & Econ. 239 (1992) ....................14

## INTRODUCTION

Nearly three weeks ago, President Donald J. Trump announced that he was banning journalists with three news organizations—CNN, MS NOW, and POLITICO—from the White House because, in his view, their reporting about him and his administration is too "negative." At every turn since, Defendants have sought to justify the President's "ban on the free press" with a series of shifting rationales, lurching from unarticulated standards of professionalism to nebulous and pretextual concerns about protecting national security. But all the while, the President himself has continued telling anyone who will listen precisely what this ban is really about, most recently complaining at length in an interview with Time magazine that he banned Plaintiffs because he feels that he should not "be forced to bear" what he considers "constantly bad stories," as he "won the election" and has "done great things." Boutrous Supp. Decl., Ex. N at 6–7. The President's viewpoint-driven ban is a blatantly unconstitutional attack on a free and independent press.

This Court should convert the temporary restraining order into a preliminary injunction under the Due Process Clause. Defendants submit no additional evidence and do little more than preserve their arguments that the D.C. Circuit took a wrong turn in *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977), half a century ago and again when reaffirming *Sherrill* decades later in *Karem v. Trump*, 960 F.3d 656 (D.C. Cir. 2020). Defendants make no serious attempt to square the ban with this well-established precedent and the demands of due process: advance notice of prohibited conduct based on clear standards, fair notice of the potential sanction, and an opportunity to be heard before a sanction is imposed.

This Court also should hold that Plaintiffs are likely to prevail under the First Amendment. Even while the President has been consistent and candid about his true motivations, Defendants have tried to manufacture a show of post-deprivation process for purposes of this lawsuit, claiming that routine reporting violated standards of professionalism and threatened national security. No

amount of process could produce a ban that complies with the First Amendment because the ban retaliates against Plaintiffs for protected speech and unconstitutionally restricts their access to a nonpublic forum through unreasonable means to achieve viewpoint-discriminatory ends. Reaching those claims would forestall further attempts by Defendants to circumvent this Court's ruling with sham process and made-for-litigation pretextual rationales.

Defendants otherwise say nothing new—and submit no new evidence—that should change this Court's conclusions that the ban will irreparably injure Plaintiffs and that the public interest favors immediate relief. Violations of constitutional rights are still irreparable. The ban still would substantially interfere with Plaintiffs' ability to cover the President and his administration—and thus their ability to fulfill their constitutionally protected role in our democracy. The public interest still favors stopping constitutional violations. And Defendants' post hoc national-security justification is still unsupported, pretextual, and undercut by the President's own public statements. The Court should preliminarily enjoin Defendants before the temporary restraining order expires.

## ARGUMENT

### I. Plaintiffs are likely to establish that the ban is unconstitutional.

#### A. The ban violates the Due Process Clause.

This Court correctly concluded that Plaintiffs are likely to succeed on their due process claim for three independent reasons: Defendants failed to provide (1) fair notice of the standards they would use to justify Plaintiffs' ban from the White House, (2) fair notice of the magnitude of the sanction they imposed, and (3) notice and an opportunity to be heard *before* revocation of Plaintiffs' access. ECF No. 24 at 2–3. Defendants make little effort to engage with this Court's reasons for issuing a temporary restraining order. Instead, they criticize binding D.C. Circuit precedent. They offer up vague and meaningless standards of conduct with no serious attempt to argue that those standards were articulated to Plaintiffs in advance. They fail to dispute (and thus

concede) that they provided no notice of the magnitude of the sanction for violating those supposed standards. And they barely attempt to justify the conceded lack of pre-deprivation process.

As a preliminary matter, Defendants once again insist (at 15–16) that the D.C. Circuit was wrong to hold in *Sherrill* and again in *Karem* that the Due Process Clause protects a journalist's interest in White House access. But this Court recognized in granting the temporary restraining order that "this Court is bound by D.C. Circuit precedent, full stop." ECF No. 24 at 3.

In challenging *Sherrill*, Defendants also misunderstand basic principles of due process. They repeat (at 1) their mantra that "access to the White House is a privilege—not a right." Yet the question posed by the Due Process Clause "cannot be answered by an argument" that "benefits are a 'privilege' and not a 'right.'" *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970) (some quotation marks omitted). Whether or not the Constitution by its own force creates a right to access the White House, the Supreme Court has made clear that, "[h]aving chosen to extend" such a right "to people of [Plaintiffs'] class generally," the government "may not withdraw that right" without providing "fundamentally fair procedures." *Goss v. Lopez*, 419 U.S. 565, 574 (1975). The D.C. Circuit correctly recognized the important First Amendment liberty interests implicated by arbitrarily depriving journalists of access to the White House to cover newsworthy events like press conferences, bill signings, and meetings with world leaders. *Sherrill*, 569 F.2d at 129–31; *see id.* at 131 n.22 (suggesting that reporters also have a property interest in press credentials). Even if this Court were not bound by those decisions, there would be no reason to question *Sherrill* and *Karem*, which make clear that the President's "ban on the free press" deprived Plaintiffs of due process for the following three independent reasons.

First, Defendants offer no reason to question this Court's determination that "the record is bereft of any relevant 'formally articulated standards' in place *before* any of the conduct for which

Defendants revoked their hard passes." ECF No. 24 at 3 (quoting *Karem*, 960 F.3d at 665). In opposing Plaintiffs' motion for a temporary restraining order, Defendants suggested that they had provided notice of the governing standards in post-litigation letters to Plaintiffs. ECF No. 16 at 13. But they now concede (at 16) that *Karem* establishes that due process requires advance "knowledge of the substantive standards and the consequences of violation before a person engages in conduct for which they are punished." The latest post hoc justifications that Defendants surface in litigation—the President's longstanding practice of disparaging press coverage he dislikes as "fake news" and statutory prohibitions on government employees' disclosure of classified information—come nowhere near satisfying the Due Process Clause's command that "explicit and meaningful standard[s]" be "formally articulated" in advance. *Karem*, 960 F.3d at 666 (quoting *Sherrill*, 569 F.2d at 130–31).

To begin with, Defendants suggest (at 16) that the President's public criticism of "Plaintiffs as fake news" put them on notice of his "expectations of the press." But the President's personal view that reporting is "fake"—because, as he has explained, it is overly "negative" towards him or "one-sided," ECF No. 32-4 at 26:47–28:00—"fails to provide a person of ordinary intelligence fair notice of what is prohibited" and is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (quotation marks omitted). That empty standard also facially discriminates based on the content and perceived editorial viewpoint of Plaintiffs' reporting. Because "content-based criteria for press pass issuance are prohibited under the First Amendment," they cannot satisfy the Due Process Clause's requirement of "meaningful standard[s]." *Sherrill*, 569 F.2d at 129–31.

Defendants also assert (at 16–17) that Plaintiffs were on notice that the President has criticized "'[l]eaking classified information'" and that 18 U.S.C. § 798 prohibits "'publish[ing]

. . . classified information.'" But there is no "precedent for applying [such] laws to reporters." ECF No. 24 at 4 n.2. The First Amendment protects news organizations that publish stories on important matters affecting national security. *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam). Because "[o]nly a free and unrestrained press can effectively expose deception in government," it has always been lawful and expected for journalists to seek out and publish non-public information about the government. *Id.* at 717 (Black, J., concurring).

Defendants also have no evidence that Plaintiffs threatened the national security. In granting the temporary restraining order, this Court correctly noted that the specific stories Defendants identified as purported national-security risks are "routine" and that Defendants had provided no "factual support . . . explaining how any of the reporting [Defendants] identified in their letters to Plaintiffs damaged the national security" or supporting "Defendants' contention that the revocation of Plaintiffs' hard passes will in fact protect national security." ECF No. 24 at 4, 6–7. Defendants had an opportunity to supplement the record in opposing Plaintiffs' motion for a preliminary injunction. They submitted *no* additional factual support whatsoever—because none exists. Now, Defendants even disavow (at 22) any attempt to "show that [Plaintiffs] actually published classified information."

In any event, the statute Defendants invoke, § 798, plainly would not reach Plaintiffs' conduct in this case. Defendants have never suggested that any of Plaintiffs' journalists "leaked" classified information—*i.e.*, that they violated the terms of a security clearance by disclosing classified information. Even worse, Defendants neglect to mention that § 798 prohibits publishing only four specific categories of information relating to cryptography and communication intelligence: a government "code, cipher, or cryptographic system"; the design, use, repair, etc. of such a system; information concerning "communication intelligence activities"; and information

knowingly "obtained by the processes of communication intelligence." 18 U.S.C. § 798(a). Statutory standards that prohibit government employees from disclosing specific categories of classified information could not have possibly put Plaintiffs on notice that Defendants would ban them for conduct that no one even argues involves classified information, much less the categories enumerated in § 798. *See Karem*, 960 F.3d at 665. Even if the First Amendment permitted sanctioning reporters for the content of their reporting, Defendants' attempt to justify the President's "ban on the free press" under § 798 transgresses the Due Process Clause because the statute's text gives "no reason even to suspect that conduct clearly outside [its] scope" would be covered. *Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964).

Second, Defendants do not address this Court's conclusion that "nothing put Plaintiffs on notice of the magnitude of the sanction Defendants imposed." ECF No. 24 at 3. The D.C. Circuit held in *Karem* that the plaintiff lacked fair notice that a month-long suspension—"an eon in today's news business"—could be imposed for his alleged violation of the White House's purported professionalism expectations. 960 F.3d at 665 (citing *BMW of N. Am. v. Gore*, 517 U.S. 559, 574 (1996)). Here, Plaintiffs likewise lacked fair notice that Defendants might impose a total and indefinite ban from the White House on all journalists working for a news outlet—a far more serious sanction—for Plaintiffs' supposed transgressions. Because Defendants never argue that Plaintiffs had fair notice of the magnitude of the potential sanction, this Court "may treat the unaddressed arguments as conceded." *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014). The undisputed lack of "notice of 'the magnitude of the sanction'" alone supports a preliminary injunction. *Karem*, 960 F.3d at 665.

Third, Defendants provide no reason for this Court to deviate from its earlier conclusion that due process guaranteed Plaintiffs an opportunity to be heard *before* Defendants implemented

the ban. ECF No. 24 at 3–4. Defendants cite (at 17) *Zevallos v. Obama*, 793 F.3d 106 (D.C. Cir. 2015), for the proposition that due process tolerates post-deprivation process in certain circumstances. But *Zevallos* contemplates "extraordinary" cases where the government "must act quickly, or where it would be impractical to provide predeprivation process"—like a seizure aimed at property that could be destroyed or concealed. *Id.* at 116 (quotation marks omitted). Although Defendants assert (at 17) that "[p]rotecting sensitive information" justifies an extraordinary departure from the typical requirements of due process, they never explain why pre-deprivation process would be impracticable here. This Court already held that "nothing in the record suggests the need for such urgency here," particularly when (as this Court observed and Defendants do not dispute) Defendants' post hoc letters targeted "routine" reporting. ECF No. 24 at 4. Defendants did not even attempt to supplement the record to demonstrate otherwise now. With good reason: Defendants, among other things, renewed hard passes for Betsy Klein and Jake Traylor *after* they published supposedly offending articles. Mot. 25–26.

Defendants try to salvage all these failures by insisting (at 17) that "Plaintiffs declined to submit any response" to their post-deprivation letters. That is not true: Plaintiffs responded to those letters in correspondence to Defendants' counsel on September 25, which Plaintiffs attached as an exhibit to their motion for a preliminary injunction. ECF No. 32-11. Regardless, manufacturing an after-the-fact process does not cure the violation of due process, *Karem*, 960 F.3d at 666–67, or eliminate the irreparable harm, *id.* at 667–68. Plaintiffs had no obligation to dignify the sham process by defending their articles against pretextual accusations when every public statement confirms the President's "'unalterably closed mind'" on banning Plaintiffs until he receives coverage he deems sufficiently positive. *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487 (D.C. Cir. 2011). After all, the Due Process Clause "preserves

both the appearance and *reality* of fairness." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) (emphasis added).

This Court's conclusion that the ban violates the Due Process Clause was correct. Defendants offered no new evidence or argument that calls this Court's conclusion into question. The Court should convert the temporary restraining order into a preliminary injunction.

**B. The ban retaliates against Plaintiffs for newsgathering and reporting protected by the First Amendment.**

This Court should go beyond due process and enjoin the ban as textbook First Amendment retaliation. The record leaves no doubt that Plaintiffs are likely to establish all three elements of their claim: (1) Plaintiffs engaged in protected speech; (2) the ban is a severe sanction that chills speech; and (3) the ban was, in the President's words, the "result of" Plaintiffs' speech. ECF No. 32-3; *see Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Defendants do not dispute that Plaintiffs engaged in protected speech—after all, Plaintiffs' reporting on the President and his administration's activities "in the conduct of 'governmental affairs'" is "entitled to the strongest form of First Amendment protection." *United States v. Trump*, 88 F.4th 990, 1022 (D.C. Cir. 2023). Instead, Defendants argue that the ban is too trivial to count as an adverse action and that the President had an independent motive for banning Plaintiffs from the White House. Neither contention has any support in precedent or the record.

First, Defendants argue (at 13–14) that the ban is not a sufficiently adverse action to support a retaliation claim. But the President himself expressed hope that his extraordinary and unprecedented ban (which ousted 78 credentialed journalists and three major news organizations from the White House) will force journalists to conform the content of their news coverage to his liking—to "straighten themselves out." ECF No. 32-4 at 53:38–53:58. And he threatened to ban other news outlets in a transparent attempt to alter their reporting, too. *Id.* at 26:06–26:28, 55:35–

55:46; *see* ECF No. 32-3. The fact that the President intended the ban to chill speech is powerful evidence that it does. If "'even an act of retaliation as trivial as failing to hold a birthday party for a public employee'" can support a First Amendment retaliation claim, *Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994), the much more offensive act of banning Plaintiffs from the White House certainly is "sufficient to deter a person of ordinary firmness in plaintiff's position" from engaging in speech the government disfavors, *Aref*, 833 F.3d at 258; *see Nat'l Pub. Radio, Inc. v. Trump*, 827 F. Supp. 3d 48, 87–88 (D.D.C. 2026) (executive order barring two media organizations from receiving federal funding "in retaliation for saying things that [the President] does not like" violated the First Amendment and was "particularly perilous because the targeted speakers are members of the press, which receives special solicitude under the First Amendment").

Defendants also have not contested Plaintiffs' evidence of how serious the loss of White House access is for journalists whose job is to cover the President—journalists who would miss newsworthy events, be unable to ask questions at press conferences and during other interactions with White House officials, and accordingly would face "serious impediments to doing their jobs and producing valuable reporting as members of the press as a result of the ban." Compl. ¶ 55; *see, e.g.*, Gardner Decl. ¶¶ 4–5, 7–8; Klein Decl. ¶¶ 5, 8, 9; Reddy Decl. ¶¶ 36, 38. Plaintiffs' declarations confirm that, "without access to the [White House]," reporters "effectively cannot perform the duties of a White House correspondent because [they] lack[ ] the ability to observe events firsthand and to ask questions of White House officials." *Karem v. Trump*, 404 F. Supp. 3d 203, 216 (D.D.C. 2019). An indefinite ban would objectively deter a reporter and her organization when the loss of White House access for just a month is already an "eon in today's news business." *Karem*, 960 F.3d at 665. These "special burdens on [Plaintiffs'] newsgathering activities" amply support a retaliation claim. *Media Matters for Am. v. Paxton*, 138 F.4th 563, 581

(D.C. Cir. 2025).

Defendants cannot defeat Plaintiffs' retaliation claim by observing (at 14) that Plaintiffs have not changed their coverage to meet the President's demands. The applicable standard is an objective one that protects speakers who do not bow to pressure by looking to the natural consequences of the retaliatory act. *See, e.g.*, *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005) (rejecting "a subjective standard [that] would expose public officials to liability in some cases, but not in others, for the very same conduct, depending upon the plaintiff's will to fight"); *Am. Acad. of Pediatrics v. HHS*, 816 F. Supp. 3d 27, 53 (D.D.C. 2026) (explaining that a subjective standard would "strip constitutional rights away from the most principled speakers"). What matters is that the ban would deter journalists of "ordinary firmness"—just as the President expressly said he intended. *Aref*, 833 F.3d at 258.

Historical practice underscores that banning news organizations from the White House is a materially adverse action. For at least half a century, the White House grounds generally have been "open to all bona fide Washington-based journalists." *Sherrill*, 569 F.2d at 129. Individual reporters and their organizations have relied on that tradition of access to report on Presidents of both parties—building careers and businesses while providing invaluable information to the American public. *See, e.g.*, Gardner Decl. ¶¶ 2–5, 7–8; Vigilante Decl. ¶¶ 5–7, 9–12, 15. Given that reliance, interfering with journalists' and news outlets' reasonable expectations of continued access to the White House and their ability to do their jobs is a far greater deterrent than, for example, declining to invite a reporter to one private, off-the-record conversation, as Defendants say (at 3) President Theodore Roosevelt did. As the Reporters Committee for Freedom of the Press and 77 media organizations explain, banning Plaintiffs has an even more severe chilling effect on the press when viewed against the backdrop of a long history of viewpoint-neutral access

to the White House. ECF No. 40-1 at 2–7.

Defendants' reliance (at 13–14) on *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006), is misplaced. There, the Fourth Circuit held that a reporter of ordinary firmness would not be "chilled by a politician's refusal to comment or answer questions on account of the reporter's previous reporting." *Id.* at 418–19. Defendants claim (at 14) that the cold shoulder is "stronger medicine" than the White House ban at issue here. But declining to speak to a particular reporter is "pervasive, mundane, and universal in government operations" and does not create a chilling effect "any different from or greater than that experienced by . . . all reporters in their everyday journalistic activities." 437 F.3d at 416. Here, by contrast, the uncontroverted record evidence is that journalists "effectively cannot perform the duties of a White House correspondent" because of the ban. *Karem*, 404 F. Supp. 3d at 216; *see supra*, at 9. Refusing to call on a particular reporter at a press conference pales in comparison to barring not just that reporter but every member of an entire news organization from their workplace—preventing them from attending press conferences at all and fundamentally impairing their ability to do their jobs. A government official may share his views "freely and criticize particular beliefs," but may not "use the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024).

Second, Defendants cannot credibly argue (at 14) that the but-for cause of the ban was that "the President determined that Plaintiffs have failed to maintain minimum professional journalistic standards by publishing classified and national security information." Defendants have not come forward with a shred of evidence supporting that defense. Defendants' post hoc litigation-driven justifications do not overcome what the President himself has repeatedly said both before and after the ban. The President said he was banning Plaintiffs "as a result of their . . . reporting" because, in his view, it is "one-sided" and "purposely negative." ECF Nos. 32-3, 32-4 at 26:47–28:00,

38:25–38:51; *see* ECF No. 24 at 6. And the President has continued to admit that he imposed the ban based on the content and perceived viewpoints of Plaintiffs' coverage, *without even mentioning national security as a justification*. *E.g.*, ECF Nos. 32-12 to 32-14. As recently as September 28, the President told Time magazine that he restricted Plaintiffs' White House access because CNN and "MSDNC" are "fake news"—*i.e.*, he "ha[dn't] had a good story on CNN for years." Ex. N at 6. The President's words prove that the purported "negativ[ity]" of Plaintiffs' reporting caused the ban.

Defendants cannot connect the dots between the President's ban and the stories singled out by the White House Press Office's letters. As this Court correctly concluded in issuing the temporary restraining order, "nothing in the record that predates this suit suggests that the revocation of Plaintiffs' hard passes was motivated by national security concerns." ECF No. 24 at 6. This Court observed that "Defendants offer no declarations or other support—classified or unclassified—explaining how any of the reporting they identified in their letters to Plaintiffs damaged the national security." *Id.* at 6–7. They still do not. Defendants stick with the same two declarations from "senior officials in the Department of Defense who have no direct knowledge of how reporters operate in the White House, or about any of the facts at issue here." *Id.* at 7; *see* Opp. 21–22. They offer no evidence showing how the ban could possibly advance their purported interests when "the reporters who authored the stories Defendants identify in their letters *did not even hold hard passes*." ECF No. 24 at 7. And they still fail to explain why, if Plaintiffs' reporting supposedly damaged national security, the White House renewed the hard passes of Betsy Klein and Jake Traylor *after* they published supposedly damaging articles. Mot. 25–26.

Since the hearing on the temporary restraining order, Defendants have only reinforced that the reason for the ban was Plaintiffs' viewpoint, not national security. They filed the President's

September 23 Truth Social post attacking an MS NOW story reporting on discussions about the possibility of adding the President's name to Ford's Theater, ECF No. 23-1, arguing that this routine article "support[ed] Defendants' conclusions that Plaintiffs have exhibited behavior in violation of the standards of professionalism and decorum expected of those given access to the White House Complex," ECF No. 23 at 1. They did not even suggest that the article had any connection to national security. And President Trump offered public explanations of his ban that omit any mention of national security and focus only on his disdain for the content of Plaintiffs' news coverage. ECF Nos. 32-12 to 32-14; Ex. N. This Court need not "exhibit a naiveté from which ordinary citizens are free." *Trump v. Cook*, 609 U.S. 528, 547 (2026) (quoting *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019)).

Unable to defeat causation, Defendants retreat to suggesting (at 14) that Plaintiffs bear the burden of "showing that the Government would not have taken adverse action against them, but-for their protected speech." But in a First Amendment retaliation case, plaintiffs need show only that their protected speech was a "substantial or motivating factor in prompting the retaliation." *LeFande v. District of Columbia*, 841 F.3d 485, 494 (D.C. Cir. 2016). Defendants do not—and could not, given the President's extensive public comments to the contrary—contest that Plaintiffs' protected speech was a substantial or motivating factor behind the ban. *See supra*, at 11–12. Because Defendants rely on *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), Defendants are the ones with the burden to "show[ ] by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct." *Id.* at 287; *accord LeFande*, 841 F.3d at 494 (a retaliation plaintiff will prevail if "the government" is "unable to show that it would have reached the same decision absent the protected speech").

Defendants also mischaracterize (at 14) the *Mt. Healthy* defense as something like a rational-basis standard, arguing that, so long as there is "an adequate, alternative ground to support the actions here," then Plaintiffs' retaliation claim fails. *Mt. Healthy* and its progeny do not insulate the government from a retaliation claim so long as some other, non-speech-related justification *could have* justified its action. To the contrary, *Mt. Healthy* requires the government to prove "by a preponderance of the evidence" that it in fact "*would* have reached the same decision" absent the protected conduct. 429 U.S. at 287 (emphasis added). In other words, Defendants must come forward with evidence that proves that their so-called professional and national-security justifications—not the President's dislike of Plaintiffs' journalism—caused the ban. "Government justifications for interfering with First Amendment rights must be genuine, not hypothesized or invented post hoc in response to litigation." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) (quotation marks and brackets omitted).

Defendants' invocation (at 14) of *TikTok Inc. v. Garland*, 604 U.S. 56 (2025), does not unsettle this fundamental First Amendment principle. In *TikTok*, the plaintiffs challenged *an Act of Congress* that could have been justified based on either content-neutral or content-based grounds. *Id.* at 78–79. Applying *Mt. Healthy* to Congress would make no sense because the Supreme Court has rejected the "fictional premise" that Congress, as a collective decisionmaker, has a "unified" intention with respect to the laws that it enacts. *FS Credit Opportunities Corp. v. Saba Capital Master Fund, Ltd.*, 608 U.S. 608, 621 (2026) (citing Kenneth Shepsle, *Congress Is a "They," Not an "It,"* 12 Int'l Rev. L. & Econ. 239, 241–44 (1992)). *TikTok* does not affect the standard that applies when an individual government official retaliates against someone for speech.

In any case, even if this Court were to credit the explanation for the ban that Defendants manufactured in response to this litigation, Plaintiffs are still likely to prevail on their retaliation

claim. National security, no matter how weighty an interest, does not create a "talismanic immunity from constitutional limitations." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964). The First Amendment fully protects speech about matters of national security and other newsworthy activities of the President and his administration. *See New York Times Co. v. United States*, 403 U.S. at 714. As a result, punishing Plaintiffs because of their supposed failure to meet the President's bespoke "standards of professional conduct" for journalists and their publication of what Defendants view as "misinformation . . . relating to national security" is simply retaliation for protected speech by another name. Mot. 31–32. It would be just as unconstitutional as punishing Plaintiffs because the President views their reporting as too negative.

**C. The ban unconstitutionally restricts access to a nonpublic forum.**

Viewpoint discrimination is "'poison'" that is "uniquely harmful to a free and democratic society." *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023) (first quote); *Vullo*, 602 U.S. at 187 (second quote). Defendants do not dispute that they engaged in viewpoint discrimination in banning Plaintiffs from the White House. Nor could they: The record leaves no doubt that President Trump expressly targeted Plaintiffs based on "particular views" expressed in their reporting. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *see* Mot. 33–34. Neither do Defendants dispute that the President has claimed "standardless discretion" to deny access to the White House—a per se unreasonable restriction on access to a nonpublic forum. *Mahoney v. U.S. Capitol Police Bd.*, — F.4th —, 2026 WL 2836881, at *6 (D.C. Cir. Sept. 22, 2026). Defendants instead argue that (1) the D.C. Circuit erred in holding that the White House is a nonpublic forum where viewpoint discrimination is impermissible and (2) upholding professionalism and safeguarding national security are "compelling" reasons that can justify viewpoint discrimination. Both arguments are meritless.

First, Defendants make no headway by arguing (at 8) that the D.C. Circuit "wrongly

decided" that the White House press facilities are a nonpublic forum that must be free from viewpoint discrimination. D.C. Circuit precedent is binding—and correct. A nonpublic forum is public property that the government opens to speech for some. *Ateba v. Leavitt*, 133 F.4th 114, 121–22 (D.C. Cir. 2025) (citing *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998)). That perfectly describes the White House press areas, which allow "'selective access for individual speakers.'" *Id.* at 122. And when the government grants some speakers access to a nonpublic forum or other programs, it may not deny access to others based on viewpoint. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205, 213–14 (2013); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 586–87 (1998). That is why the D.C. Circuit had "no trouble" concluding that the White House press areas are a nonpublic forum where viewpoint discrimination is impermissible. *Ateba*, 133 F.4th at 123. That decision controls here.

It is mystifying that Defendants attempt (at 8–10) to undercut *Ateba* with the nonprecedential stay decision in *Associated Press v. Budowich*, 2025 WL 1649265 (D.C. Cir. June 6, 2025). The stay ruling in *AP* reaffirmed that *Ateba* stands "for the proposition that White House spaces generally open to the press are nonpublic fora" and that, "[w]hen the White House opens its facilities to the press generally," the government "cannot exclude journalists based on viewpoint." *Id.* at *6 (Rao, J., concurring). Last month, Judge Rao—this time writing for a *precedential* majority—repeated that "it would be unreasonable to control access to White House press facilities through standardless discretion." *Mahoney*, 2026 WL 2836881, at *6 (citing *Ateba*, 133 F.4th at 125). Defendants may see (at 10) "no principled way of easily distinguishing between rooms that are a nonpublic forum and those that are no forum at all." But both the principle that the First Amendment forbids viewpoint discrimination once the government opens public property to speakers and the precedent applying that principle to the White House are firmly established.

Defendants also miss the point in contending (at 7–8) that the press has no freestanding First Amendment right to access the White House. They rely on an inapposite dictum in *Zemel v. Rusk*, 381 U.S. 1 (1965), that citizens have no First Amendment right of "unrestrained" access to the White House. *Id.* at 17. But as cases that have repeated the *Zemel* dictum make clear, there can be "no discrimination in terms of content" once the government opens up a public facility to some speakers. *Pell v. Procunier*, 417 U.S. 817, 826 (1974); *see Houchins v. KQED, Inc.*, 438 U.S. 1, 16 (1978) (Stewart, J., concurring) (explaining that the Constitution "assure[s] the public and the press equal access once government has opened its doors"). No case says that the First Amendment tolerates viewpoint discrimination when the government invites the press into a public building. Regardless of whether the government must "open such spaces for any speech at all, the government creates a 'nonpublic forum' when it provides selective access for individual speakers." *Ateba*, 133 F.4th at 122 (some quotation marks omitted).

Second, Defendants press (at 10–11) the fallback argument that they have compelling reasons for withholding access to the White House based on viewpoint. But a "finding of viewpoint bias end[s] the matter" and establishes a per se First Amendment violation. *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019). As the Supreme Court has explained, "[c]ontrol over access to a nonpublic forum" can be appropriate only when the restrictions "are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985); *see Minn. Voters All. v. Mansky*, 585 U.S. 1, 12 (2018) (speech restrictions in a nonpublic forum must not be "an effort to suppress expression merely because public officials oppose the speaker's view"). No reason—compelling or not—can justify viewpoint discrimination. Here, Plaintiffs are likely to prevail because, as Defendants do not even contest, the ban discriminates based on viewpoint and unreasonably wields "standardless

discretion" to deny access. *Mahoney*, 2026 WL 2836881, at *6; *see* Mot. 33–37.

Even if compelling reasons could justify viewpoint discrimination, Defendants' offering (at 11) of "minimum standards of professionalism" falls far short. "[U]narticulated standards of professionalism" do not even provide fair notice, *Karem*, 960 F.3d at 666, much less a compelling interest. As the Supreme Court has made clear, an interest must be "sufficiently coherent" and capable of "measure[ment]" to count as compelling. *Students for Fair Admission, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 214 (2023). Unbridled discretion in the hands of the President and his staff to determine what is and is not "professional" on the part of a journalist or news outlet is hardly a "sensible basis for distinguishing what may come in from what must stay out." *Mansky*, 585 U.S. at 16. And to the extent that Defendants' "standards of professionalism" (Opp. 20) have any discernible content, the record shows that the President's yardstick is that journalists should avoid "negative" coverage that does not sufficiently praise his administration's accomplishments. Ex. N at 6–8. Defendants' effort to police editorial viewpoint under the guise of upholding professionalism is not compelling—it is an affront to the First Amendment.

Nor does "national security," which Defendants now relegate (at 12–13) to second billing, justify their viewpoint discrimination. The First Amendment protects reporting on national security. *See supra*, at 5. The ban also is not narrowly tailored to any supposed risk to national security because Defendants seek to exclude all reporters at CNN, MS NOW, and POLITICO based on letters singling out articles that have no apparent connection to national security and were written by journalists without White House hard passes. ECF No. 24 at 6–7; *see Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 804 (2011). As this Court recognized when granting the temporary restraining order, "nothing in the record" suggests that Defendants' national-security concerns are genuine—or that banning Plaintiffs advanced an interest in protecting national

security at all. ECF No. 24 at 6. And developments, including the President's own repeated statements, have left no doubt that the purported national-security justification was "invented post hoc in response to litigation." *Kennedy*, 597 U.S. at 543 n.8. Defendants' reliance on national security is a charade.

**II. Plaintiffs will suffer irreparable injury absent a preliminary injunction.**

Defendants' response on the second *Winter* factor—irreparable injury—is incomplete and unpersuasive. They ignore the basis for the temporary restraining order. They discount the serious harms that Plaintiffs suffered before entry of that order and would suffer again without a preliminary injunction. And they misunderstand bedrock principles of due process in arguing that the White House Press Office's after-the-fact letters remedied Plaintiffs' harms.

To start, Defendants refuse to confront the basis for this Court's finding of irreparable harm in its order granting the temporary restraining order. This Court correctly held that, "[i]n the D.C. Circuit, it 'has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" ECF No. 24 at 5 (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)). That rule applies to likely violations of both the First Amendment, *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025), and the Due Process Clause, *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). And those decisions compel the same conclusion here: "[B]ecause Plaintiffs have shown a likelihood of success on at least one of their constitutional claims, they have also met the irreparable harm requirement." ECF No. 24 at 5; *accord Taylor v. Trump*, 823 F. Supp. 3d 17, 40 (D.D.C. 2026).

Defendants argue (at 18) that the ban does not interfere with Plaintiffs' ability to report on the President and his administration. That response is a non sequitur because the violation of Plaintiffs' constitutional rights is itself an irreparable harm. In any case, there is no record support for Defendants' blithe prediction that banning Plaintiffs from the White House will not hamper

their reporting. The uncontroverted record shows that "a hard pass is an essential requirement to work as a White House journalist for a national news organization," and that without the access that accompanies those credentials, journalists "are severely hampered from doing their jobs." Reddy Decl. ¶ 9; *see* Vigilante Decl. ¶ 5 ("a journalist cannot enter the complex on short notice and, as a practical matter, cannot cover the White House on a regular basis"); Marsh Decl. ¶ 16 (the ability "to attend press briefings or other events open to credentialed journalists," as well as "the reporting that depends on it, cannot be replicated from outside the White House"). Material gathered at briefings, gaggles, and one-on-one exchanges "is available only to a reporter who is physically present." Klein Decl. ¶ 9. Defendants point (at 18) to the availability of pool footage but ignore the fact that their targeting of Plaintiffs has severely disrupted the pool's ability to cover the White House. Vigilante Decl. ¶¶ 13–14, 27. In any event, pool footage is an inadequate substitute for access. Klein Decl. ¶ 9. Those harms cement the showing of irreparable injury.

Defendants also insist (at 19) that they remedied any irreparable harm from the deprivation of due process by sending letters that advanced post hoc justifications for the ban. But that after-the-fact process did nothing to eliminate the violation. *See supra*, at 7–8. In fact, the sham process exacerbates the harm because the letters declared Plaintiffs' reporting on the ongoing Iran War, the President's plans to build a new White House ballroom, and the "vibes" at the Republican midterm convention in Dallas to be threats to "national security" and violations of the President's personal "standards of professionalism and decorum" for journalists. ECF Nos. 16-1 to 16-3. Forcing Plaintiffs to defend "routine" reporting on highly newsworthy topics, ECF No. 24 at 4, on a story-by-story basis against ludicrous accusations would only add insult to (irreparable) injury.

## III. The balance of equities and public interest favor a preliminary injunction.

This Court already correctly determined that the balance of equities and public interest favored a temporary restraining order against the enforcement of the ban. Defendants offer nothing

that would justify a different conclusion now. They cannot dispute that "enforcement of an unconstitutional law is always contrary to the public interest." ECF No. 24 at 5 (quoting *Karem*, 960 F.3d at 668). Nor can they dispute that "Plaintiffs—and the public—have an abiding interest in maintaining the status quo ante given the importance of the free press, which 'stands as one of the great interpreters between the government and the people.'" *Id.* (quoting *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936)). Like last time, Defendants argue (at 19) only that "public interests in protecting classified and sensitive national security information strongly outweigh any countervailing interests Plaintiffs can identify." But Defendants' pretextual national-security justification for the ban is no more persuasive for the public-interest factor than for the likelihood-of-success factor.

First, this Court should adhere to its conclusion that the ban serves no legitimate interest in protecting national security. "[N]othing in the record that predates this suit suggests that the revocation of Plaintiffs' hard passes was motivated by national security concerns." ECF No. 24 at 6. Defendants say (at 20) that a "judgment" involving national security "was made by the President himself." But they have submitted no new evidence at the preliminary-injunction stage, let alone evidence to support the notion that the President's true motivation was to protect national security. President Trump's recent statements further reinforce that he imposed the ban because of an "alleged lack of truthfulness and negativity of Plaintiffs' reporting." ECF No. 24 at 6; *see* ECF Nos. 32-12 to 32-14; Ex. N at 6–7. The public interest strongly disfavors Defendants' attempt to insulate their unconstitutional actions on pretextual grounds.

Second, Defendants admit that this case does not concern classified information. The First Amendment protects the publication of classified information. *See supra*, at 5. But this case does not even implicate that protection because Defendants disclaim (at 22) any need "to show that the

reporters or outlets actually published classified information" and instead complain that stories *about* national security "diverted 'White House resources and those of the national security team in particular.'" The public interest does not support that fundamentally un-American view of the government's relationship to the press and the public. As the Society for the Rule of Law explains, the colonists fought the Revolution in part to escape "the British government's 'persistent effort' to 'prevent or abridge the free expression of any opinion which seemed to criticize or exhibit in an unfavorable light, however truly, the agencies and operations of the government.'" ECF No. 37-1 at 14 (quoting *Grosjean*, 297 U.S. at 245). And as the ACLU recounts, the lowest points for the First Amendment since the Founding—including the Alien and Sedition Act and the crackdown on speech during World War I—stemmed from the same impulse that the Executive Branch could not bear to be "diverted" from its task at hand by unfavorable or critical speech. Opp. 22; *see* ECF No. 33-2 at 4–7. That reasoning has been discredited by the "court of history," as well as the Supreme Court. *Sullivan*, 376 U.S. at 276. Simply put, "[t]he First Amendment interest in informed popular debate does not simply vanish at the invocation of the words 'national security'" because "[n]ational security is public security, not government security from informed criticism." *United States v. Morison*, 844 F.2d 1057, 1081 (4th Cir. 1988) (Wilkinson, J., concurring).

Third, the government badly misstates (at 20) the non-precedential stay ruling in *New York Times Co. v. Department of Defense*, 2026 WL 1179440 (D.C. Cir. Apr. 27, 2026). That decision granted "very limited relief" that did not disturb an injunction prohibiting enforcement of an unconstitutional Department policy that "restrict[ed] Pentagon access" for credentialed journalists on the basis of their perceived editorial viewpoint. *Id.* at *2. The majority partially stayed a compliance order solely as to one aspect of an "interim" Department policy that required credentialed journalists to be accompanied by an official escort while in the Pentagon. *Id.* at *3.

And the majority reached that ruling not based on the public interest—which the majority concluded did "not strongly favor either party"—but instead on its conclusion that the escort requirement likely fell outside the scope of the district court's original injunction. *Id.* The district court later found that the declarations that the Department had filed for the first time in the D.C. Circuit in support of its stay motion did not support the Department's post hoc reliance on national security. *New York Times Co. v. Dep't of Def.*, No. 26-cv-1690 (D.D.C. June 30, 2026), ECF No. 17 at 26–29 (finding the Department's "suspicious[ly]" "tim[ed]" invocation of national-security concerns "facially dubious" and "refuted" by contrary evidence).

Fourth, Defendants are wrong to argue (at 23) that a preliminary injunction "would raise serious separation of powers concerns." Plaintiffs have not requested an injunction against President Trump. Mot. 40–41. In fact, the President was apparently not even aware for days after entry of the temporary restraining order that this Court had granted Plaintiffs access to "the premises of the White House." Ex. N at 7. Relief against the President's subordinates is the everyday way that federal courts enforce constitutional restrictions against presidential administrations. *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) (plurality opinion); *see, e.g.*, *Biden v. Nebraska*, 600 U.S. 477, 488–89 (2023); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 584 (1952); *Karem*, 960 F.3d at 668. The public interest does not support allowing the President's officials to carry out an unconstitutional ban while this case proceeds.

## IV. Defendants' arguments for limiting the scope of relief are premature and flawed.

Defendants do not meaningfully contest that, if Plaintiffs have satisfied the *Winter* factors, the Court should at least convert its temporary restraining order into a preliminary injunction that prevents Defendants from interfering with "the White House 'hard pass' press credentials held by employees of CNN, MS NOW, and POLITICO." ECF No. 24 at 8. The Court should also clarify that *Sherrill* protects Plaintiffs' access to "press facilities [that] are perceived as being open to all

bona fide Washington-based journalists," not only the physical hard passes. 569 F.2d at 129.

Defendants argue (at 23–24) that this Court should expressly exclude the Oval Office and Air Force One from any injunction. But Defendants get ahead of themselves. To resolve Plaintiffs' motion, this Court need address only the constitutionality of the President's total ban of Plaintiffs from the White House—the same course the Court took in resolving Plaintiffs' motion for a temporary restraining order. Defendants have not announced nor provided notice of any formal policy of restricting Plaintiffs' access to any particular area. And the factual record has continued to evolve, even since Plaintiffs' filing of their motion for a preliminary injunction, because Defendants have persisted in unpredictably targeting Plaintiffs, including by recently excluding both CNN and POLITICO from Air Force One without explanation. Marsh Supp. Decl. ¶ 2; Reddy Supp. Decl. ¶ 3; Vigilante Supp. Decl. ¶ 3. Plaintiffs reserve all rights to seek further relief if and when appropriate.

Defendants' reliance (at 15) on the nonprecedential stay decision in *Associated Press* is also mistaken. For one thing, the merits panel in *Associated Press* has not yet ruled. Judge McFadden's conclusions—that the Oval Office is a nonpublic forum that must be free from viewpoint discrimination during pool events and that retaliatory exclusion independently violates the First Amendment—are firmly rooted in Supreme Court and D.C. Circuit precedent. *Associated Press v. Budowich*, 780 F. Supp. 3d 32, 49–54, 56–58 (D.D.C. 2025); *see Associated Press v. Budowich*, 2025 WL 2047025, at *2 (D.C. Cir. July 22, 2025) (Walker, J., concurring in denial of rehearing en banc). For another, if Plaintiffs seek relief against their exclusion from the Oval Office and Air Force One, they will be in a materially different position from the Associated Press. CNN, for example, has invested substantial financial and other resources to perform its responsibilities as one of five members of the primary television network pool and has a right to

fair notice before the government interferes with those liberty and property interests. Vigilante Decl. ¶ 15. Those investments, combined with the "physical space limitations" that make such "pool coverage" a "necessity," amplify the chilling effect of the President's retaliation. *Id.* ¶ 11. And since the *Associated Press* stay decision, it has become even clearer that the Oval Office and Air Force One are this administration's go-to forum for press briefings. The President may not use Air Force One as a flying press briefing room and then claim standardless discretion to exclude news organizations based on the content of their reporting or their perceived editorial viewpoint.

In short, this Court should convert its temporary restraining order into a preliminary injunction and permit Plaintiffs as needed to demonstrate on a complete factual record that any further access restrictions Defendants might seek to impose on Plaintiffs violate the Constitution.

**V. This Court should deny Defendants' request for a stay pending appeal.**

Defendants conclude with a cursory request for a stay. They argue that, "[f]or the same reasons Plaintiffs' motion fails, Defendants also satisfy the *Nken* standard for a stay pending appeal." Opp. 24 (citation omitted). That request is incoherent. This Court reaches the stay issue once it determines that Plaintiffs *have* satisfied the requirements for a preliminary injunction. So for the same reasons that Plaintiffs' motion warrants relief, Defendants necessarily do *not* satisfy the *Nken* standard for a stay pending appeal. Defendants also offer no independent reason why this Court should stay the injunction if Plaintiffs are likely to prevail on the merits and to be irreparably harmed by the ban. This Court should continue to "preserve the last uncontested status quo while the litigation proceeds." ECF No. 24 at 7.

## CONCLUSION

This Court should preliminarily enjoin Defendants (save the President) and those acting in concert with them from taking any action to enforce the White House ban against Plaintiffs. The Court also should dispense with any bond, which Defendants do not even request.

Dated: October 5, 2026

Respectfully submitted,

*/s/ Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr. (D.C. Bar No. 420440)
Katie Townsend (D.C. Bar No. 1026115)
Patrick J. Fuster (CA Bar No. 326789)*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com
PFuster@gibsondunn.com

Connor S. Sullivan (D.C. Bar No. D00506)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2459
CSSullivan@gibsondunn.com

Connor P. Mui (D.C. Bar No. 90009004)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
CMui@gibsondunn.com

*Counsel for Plaintiffs*

**Admitted Pro Hac Vice*