# EXHIBIT 32

(Declaration of Katherine Fallow)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CABLE NEWS NETWORK, INC., MS NOW CABLE, LLC, POLITICO LLC, ET AL.,<br><br>*Plaintiffs*,<br><br>*v.*<br><br>DONALD J. TRUMP, ET AL.,<br><br>*Defendants*. | Case No. 1:26-cv-03287-TJK |

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Theodore J. Boutrous, Jr. (D.C. Bar No. 420440)
Katie Townsend (D.C. Bar No. 1026115)
Patrick J. Fuster (CA Bar No. 326789)*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000

Connor S. Sullivan (D.C. Bar No. D00506)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2459

Connor P. Mui (D.C. Bar No. 90009004)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500

*Counsel for Plaintiffs Cable News Network, Inc., MS NOW Cable, LLC, POLITICO LLC, Akayla Gardner, Cheyenne Haslett, and Betsy Klein*

**Admitted Pro Hac Vice*

## TABLE OF CONTENTS

**Page**


INTRODUCTION .......... 1

BACKGROUND .......... 6

A. Journalists and news organizations have long covered the President and his administration from White House grounds. .......... 6

B. CNN, MS NOW, and POLITICO are among the prominent news outlets that report from the White House. .......... 8

C. The President bans CNN, MS NOW, and POLITICO from the White House because of their coverage. .......... 11

D. After Plaintiffs file suit, the White House Press Office notifies Plaintiffs that their hard passes had been revoked. .......... 15

E. This Court enters a temporary restraining order to restore Plaintiffs' access to the White House. .......... 17

LEGAL STANDARD .......... 21

ARGUMENT .......... 21

I. Plaintiffs are likely to establish that the ban is unconstitutional. .......... 21

A. The ban violates the Due Process Clause. .......... 22

B. The ban retaliates against Plaintiffs for newsgathering and reporting protected by the First Amendment. .......... 28

C. The ban unconstitutionally restricts access to a nonpublic forum. .......... 33

II. Plaintiffs will suffer irreparable injury absent a preliminary injunction. .......... 37

III. The balance of hardships and public interest favor a preliminary injunction. .......... 39

IV. The Court should waive any bond requirement. .......... 40

CONCLUSION .......... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023)....................29

*Aamer v. Obama*,
742 F.3d 1023 (D.C. Cir. 2014)....................21

*Am. First Legal Found. v. Becerra*,
2024 WL 3741402 (D.D.C. Aug. 9, 2024)....................40

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016)....................29

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998)....................33

*Associated Press v. Budowich*,
780 F. Supp. 3d 32 (D.D.C. 2025)....................6, 40

**Ateba v. Leavitt*,
133 F.4th 114 (D.C. Cir. 2025)....................4, 33, 34, 36

*BMW of N. Am. v. Gore*,
517 U.S. 559 (1996)....................23

*Board of Cnty. Comm'rs v. Umbehr*,
518 U.S. 668 (1996)....................32

*Boddie v. Connecticut*,
401 U.S. 371 (1971)....................24

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000)....................29

*Branzburg v. Hayes*,
408 U.S. 665 (1972)....................29

*Cable News Network, Inc. v. Am. Broad. Cos.*,
518 F. Supp. 1238 (N.D. Ga. 1981)....................36, 39

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010)....................29

*City of Lakewood v. Plain Dealer Publ'g Co.*,
486 U.S. 750 (1988)....................36

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985)....................24

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985) .......... 33

*Counterman v. Colorado*,
600 U.S. 66 (2023) .......... 28, 30

*Davis v. District of Columbia*,
158 F.3d 1342 (D.C. Cir. 1998) .......... 38

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019) .......... 31

*Elrod v. Burns*,
427 U.S. 347 (1976) .......... 5, 37

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) .......... 22, 26

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
636 F.2d 755 (D.C. Cir. 1980) .......... 40

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
608 U.S. 174 (2026) .......... 28

*Frederick Douglass Found., Inc. v. District of Columbia*,
82 F.4th 1122 (D.C. Cir. 2023) .......... 34

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013) .......... 38, 40

*Houchins v. KQED, Inc.*,
438 U.S. 1 (1978) .......... 29

*Houston Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022) .......... 28

*Karem v. Trump*,
404 F. Supp. 3d 203 (D.D.C. 2019) .......... 38

**Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020) .......... 3, 7, 9, 17, 22, 23, 26, 27, 30, 38, 39

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) .......... 31

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 38

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) .......... 5, 37

**Mahoney v. U.S. Capitol Police Bd.*,
— F.4th —, 2026 WL 2836881 (D.C. Cir. Sept. 22, 2026) .......... 4, 33, 35–37

*Media Matters for Am. v. FTC*,
805 F. Supp. 3d 105 (D.D.C. 2025) ........ 28

*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025) ........ 29, 39

*Mills v. Alabama*,
384 U.S. 214 (1966) ........ 5, 29

*Mills v. District of Columbia*,
571 F.3d 1304 (D.C. Cir. 2009) ........ 37

**Minn. Voters All. v. Mansky*,
585 U.S. 1 (2018) ........ 4, 33, 36

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ........ 34

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
339 U.S. 306 (1950) ........ 24

*Nat'l Pub. Radio, Inc. v. Trump*,
827 F. Supp. 3d 48 (D.D.C. 2026) ........ 34

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) ........ 28, 33

*Near v. Minnesota ex rel. Olson*,
283 U.S. 697 (1931) ........ 29

*New York Times Co. v. Dep't of Defense*,
824 F. Supp. 3d 27 (D.D.C. 2026) ........ 27, 39

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) ........ 30, 37

*New York Times Co. v. United States*,
403 U.S. 713 (1971) ........ 5, 25, 37

*Nken v. Holder*,
556 U.S. 418 (2009) ........ 39

*Perry v. Sindermann*,
408 U.S. 593 (1972) ........ 32

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ........ 33

*Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555 (1980) ........ 39

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) ........ 5, 37

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) .......... 34

**Sherrill v. Knight*,
569 F.2d 124 (D.C. Cir. 1977) .......... 3, 22, 26, 27, 36

*Taylor v. Trump*,
823 F. Supp. 3d 17 (D.D.C. 2026) .......... 38, 40

*Town of Greece v. Galloway*,
572 U.S. 565 (2014) .......... 35

*Trump v. Cook*,
609 U.S. 528 (2026) .......... 24, 31

*Turner v. U.S. Agency for Glob. Media*,
502 F. Supp. 3d 333 (D.D.C. 2020) .......... 37

*United States v. U.S. Dist. Ct. for E. Dist. of Mich.*,
407 U.S. 297 (1972) .......... 27

*United States v. Virginia*,
518 U.S. 515 (1996) .......... 31

*United States v. Williams*,
553 U.S. 285 (2008) .......... 27

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 21

*Zerilli v. Smith*,
656 F.2d 705 (D.C. Cir. 1981) .......... 28

**Constitutional Provisions**

U.S. Const. amend. I .......... 2

U.S. Const. amend. V .......... 22

**Regulations**

31 C.F.R. § 409.1 .......... 7

31 C.F.R. § 409.2 .......... 7

**Other Authorities**

1 Annals of Cong. (1789)
p. 952 .......... 35
p. 954 .......... 35
p. 955 .......... 35

Alexander Bickel, *The Morality of Consent* (1975) .......... 5

James A. Jacobs, *The President, the Press, and Proximity: The Creation of the White House Press Center*, White House Hist. Ass'n (Mar. 1, 2015) ....................6

Elizabeth Gregory McPherson, *Reporting the Debates of Congress*, 28 Q.J. Speech 141 (1942) ....................35

## INTRODUCTION

On September 18, 2026, President Donald J. Trump announced that "effective immediately" he was "banning" journalists with three news organizations from the White House for being "FAKE NEWS"—an epithet the President invokes to describe journalism he dislikes. Ex. A.[1] The President explained his action later that same day, complaining (without identifying any supposedly false story) that reporting about him and his administration by CNN, MS NOW, and POLITICO "over the last two years" has been "one-sided" and "never good," and has "diminish[ed]" his accomplishments in office. Ex. B at 26:47-28:00.[2] He explained that "[t]here's something wrong with a country that can allow people to write purposely negative stories" and referred to his own unprecedented act as "the ban on the free press." *Id.* at 38:25-38:51, 53:38-53:58. He threatened that bans on other "Fake News" outlets would "follow." Ex. A; Ex. B at 55:35-55:46.

The administration moved swiftly to implement the President's unprecedented and blatantly unconstitutional ban through the White House Press Office and Secret Service: deactivating reporters' "hard pass" credentials overnight, confiscating hard passes of White House correspondents when they showed up to work the following morning, and precluding CNN from fulfilling its role as designated television network pooler on behalf of the entire press corps. After receiving notice that Plaintiffs would be filing this lawsuit and seeking emergency relief from the President's unlawful ban, the White House got to work backfilling contrived justifications for it, sending letters to CNN, MS NOW, and POLITICO that declared routine reporting on highly

---

[1] All citations are to exhibits attached to the declaration of Theodore J. Boutrous, Jr.

[2] The video of the President's remarks is available at https://www.whitehouse.gov/videos/president-trump-makes-an-announcement-on-healthcare-sep-18-2026/.

newsworthy topics (including the ongoing Iran War, the President's plans to build a new White House ballroom, and "the 'vibes' at" the Republican midterm convention in Dallas) to be threats to "national security" and violations of the President's personal "standards of professionalism and decorum" for journalists. ECF Nos. 16-1 to 16-3. But the President, all the while, has continued to criticize Plaintiffs on social media and in public for their purportedly "negative" coverage, confirming the original (and true) rationale for the ban. Exs. J–L; Boutrous Decl. ¶ 17.

On September 24, this Court entered an order temporarily prohibiting enforcement of the President's ban, correctly holding that the administration's post hoc letters were too little, too late, to satisfy the Due Process Clause under binding Supreme Court and D.C. Circuit precedent. Despite this Court's clear direction that the hard passes of CNN, MS NOW, and POLITICO reporters be "immediately return[ed], reinstat[ed], and restore[d]," ECF No. 24 at 8, the administration continued to confiscate passes and deny access to journalists who came to work at the White House on September 24, before finally coming into compliance roughly 11 hours after this Court's order. And the White House has persisted in unpredictably and inconsistently implementing its ban, including by barring CNN from fulfilling its role as designated television network pooler on September 26—to the detriment of CNN, its fellow pool members and, ultimately, the American public. The White House's words and actions leave little doubt that it will immediately reinstitute a complete ban of CNN, MS NOW, and POLITICO if allowed the opportunity. Because the ban is an unlawful assault on the most fundamental First Amendment freedoms and will inflict irreparable harm on Plaintiffs and the public if not restrained, this Court should preliminarily enjoin its enforcement pending the resolution of this case.

The President's "ban on the free press" is a stark departure from our constitutional tradition. As the Court already correctly determined, Plaintiffs are likely to prevail on their due-process

claim. ECF No. 24 at 2–4. The D.C. Circuit has held that "'the interest of a bona fide Washington correspondent in obtaining'" a press credential "is not only 'protected by the first amendment' but also 'undoubtedly qualifies as a liberty interest which may not be denied without due process of law under the fifth amendment.'" *Karem v. Trump*, 960 F.3d 656, 660 (D.C. Cir. 2020) (quoting *Sherrill v. Knight*, 569 F.2d 124, 130–31 (D.C. Cir. 1977)) (brackets omitted). The ban deprives CNN, MS NOW, POLITICO, and their journalists of liberty and property interests without anything remotely close to the bare minimum requirements of due process: fair notice of the standard that prohibited their conduct and the magnitude of the sanction, an opportunity to be heard before the deprivation, and meaningful standards that prevent arbitrary enforcement and standardless discretion. Defendants provided no notice that news organizations would be banned from the White House grounds as a result of their reporting. The after-the-fact letters sent to Plaintiffs are no substitute for the pre-conduct notice and pre-deprivation opportunity for hearing that the Constitution requires. And the administration's pretextual, post hoc "professionalism" standards and purported "national security" concerns—of which this Court had good reason to be "skeptical," ECF No. 24 at 4—are in any event far too vague under *Sherrill* and *Karem* to ensure adequate notice. They are ready weapons for the arbitrary and discriminatory enforcement that due process forbids.

The ban also retaliates against protected newsgathering and speech in violation of the First Amendment. The President has made no attempt to hide the fact that he decided to ban CNN, MS NOW, and POLITICO for their "cumulative" coverage of him and his administration over the past two years—coverage that he claims is "purposely . . . negative," "one-sided," and "never good," and "diminish[es]" his administration. Ex. B at 26:47-28:00. His statements also make clear he implemented the ban to coerce more favorable coverage from CNN, MS NOW, and POLITICO,

and to deter other journalists and news organizations from newsgathering and reporting that the President might view as negative. And his administration has continued to retaliate against Plaintiffs even after the temporary restraining order, only underscoring that Defendants' motive is to punish and chill journalism they dislike.

Moreover, the ban independently violates the First Amendment by restricting access to and use of a nonpublic forum on viewpoint-discriminatory and unreasonable terms. The government "creates a 'nonpublic forum' when it provides 'selective access for individual speakers.'" *Ateba v. Leavitt*, 133 F.4th 114, 122 (D.C. Cir. 2025), *cert. denied*, 146 S. Ct. 822 (2025). Under binding D.C. Circuit precedent, the White House's press areas are a nonpublic forum subject to the First Amendment's commands. *Id.* at 124–25. The First Amendment requires that any restrictions on access to such areas be both viewpoint neutral and "'reasonable in light of the purpose served by the forum.'" *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11–12 (2018). The ban satisfies neither requirement. It is a brazen "'effort to suppress expression merely because public officials oppose the speaker's view,'" *id.* at 12—in this case, independent, fact-based journalism that the President dislikes. And the ban lacks any "objective, workable standards" and serves no permissible objective in view of the purpose of the forum—areas designated for journalists to gather and report newsworthy information for the benefit of the American public. *Id.* at 21–22. Because Defendants have claimed "'unbridled discretion'" to deny access to the White House, the ban is patently unreasonable and thus unconstitutional. *Mahoney v. U.S. Capitol Police Bd.*, — F.4th —, 2026 WL 2836881, at *6 (D.C. Cir. Sept. 22, 2026).

The administration's complete lack of objective standards counsels in favor of this Court addressing the First Amendment in addition to the Due Process Clause. As supposed support for the ban, Defendants have not only highlighted stories with no conceivable effect on national

security but also overlooked that the First Amendment protects reporting on matters affecting national security. *See New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam). The Framers understood the First Amendment to give the press the protection necessary for it "to fulfill its essential role in our democracy" as "'one of the great bulwarks of liberty.'" *Id.* at 716–17 (Black, J., concurring) (quoting Madison's version of the speech and press clauses, introduced in the House of Representatives on June 8, 1789). The First Amendment "ordains an unruly contest between the press, whose office is freedom of information and whose ambition is joined to that office, and government, whose need is often the privacy of decision-making and whose servants are ambitious to satisfy that need." Alexander Bickel, *The Morality of Consent* 87 (1975). The President's "ban on the free press" is a direct assault on that "constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills v. Alabama*, 384 U.S. 214, 219 (1966). Because no amount of manufactured process could ever allow a "ban on the free press" under the First Amendment, entering a preliminary injunction on First Amendment grounds prevents further "shenanigans," as Plaintiffs' counsel warned at the hearing on the temporary restraining order. Ex. H.

This Court also already correctly determined that the other equitable factors support relief. Without a preliminary injunction, Plaintiffs—and the public that relies on them for reporting about the President and his administration—will irreparably suffer. Violations of the Due Process Clause and "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitute[ ] irreparable injury." *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion))). Every day, critically important news is breaking at the White House, and the ban will substantially interfere with Plaintiffs' ability to cover it. The

ban also inflicts an injury on all news media organizations—which now risk a similar fate if they engage in fact-based, independent reporting the President deems insufficiently favorable. And the balance of the equities and public interest merge and favor immediate injunctive relief because enjoining unconstitutional action is always in the public interest. The motion should be granted.

## BACKGROUND

### A. Journalists and news organizations have long covered the President and his administration from White House grounds.

Almost 125 years ago, President Theodore Roosevelt set aside a room in the new West Wing for the press.[3] The press has been in the White House ever since. Today, the White House press facilities include the James S. Brady Press Briefing Room, where the Press Secretary holds briefings; the North Lawn and West Wing driveway, from which the networks report live; and the South Lawn, where Marine One arrives and departs. Klein Decl. ¶ 8; Vigilante Decl. ¶¶ 7, 16; Gardner Decl. ¶ 7; Reddy Decl. ¶ 6. The President also regularly opens up the Oval Office for "press pool availabilities" that "involve a gaggle of reporters, all vying for space and information," who may ask questions. *Associated Press v. Budowich*, 780 F. Supp. 3d 32, 53 (D.D.C. 2025), *stayed in part pending appeal*, 2025 WL 1649265 (D.C. Cir. June 6, 2025). Indeed, because President Trump rarely holds press conferences in the Brady Briefing Room, press briefings in the Oval Office and on Air Force One are frequently the only times when journalists may ask the President about his administration's policies and actions. Klein Decl. ¶¶ 10, 21.

"For over fifty years, the White House Press Secretary has provided journalists on the White House beat with 'hard passes'—special press credentials that allow on-demand access to

---

[3] James A. Jacobs, *The President, the Press, and Proximity: The Creation of the White House Press Center*, White House Hist. Ass'n (Mar. 1, 2015), https://www.whitehousehistory.org/the-president-the-press-and-proximity.

the White House complex." *Karem*, 960 F.3d at 659. A hard pass is available to journalists who regularly cover the White House, reside in the Washington area, are accredited by a press gallery of the Supreme Court, the U.S. Senate, or the U.S. House of Representatives, and clear a background check by the United States Secret Service. 31 C.F.R. § 409.1; Reddy Decl. ¶ 7; *see also* Klein Decl. ¶ 4; Vigilante Decl. ¶ 4. The Secret Service's role in that process is narrowly defined by regulation. In deciding whether to approve an applicant during a background check, Secret Service officials must "be guided solely by the principle of whether the applicant presents a potential source of physical danger to the President and/or the family of the President so serious as to justify his or her exclusion from White House press privileges." 31 C.F.R. § 409.1. The regulation prescribes the process that must precede any denial: written notice of the factual basis for the proposed denial, an opportunity for the applicant to respond in writing and to be heard, and a final written decision. *Id.* § 409.2. Nothing in the regulation permits a pass to be denied, suspended, or revoked because of the content of a journalist's reporting.

A hard pass is essential to a White House correspondent because it provides immediate, unescorted access to the areas of the White House complex designated for the press. Klein Decl. ¶ 5; Gardner Decl. ¶¶ 4–5; Haslett Decl. ¶ 2. Every Secret Service officer on the complex recognizes the credential on sight. Klein Decl. ¶ 5; Gardner Decl. ¶ 4. For White House correspondents, the White House—or wherever the President happens to be—is the workplace. Klein Decl. ¶ 8; Gardner Decl. ¶ 7. Much of what happens at the White House happens with little or no notice: A briefing is called, often no more than half an hour in advance; the President briefs the press and takes questions at an event, in the Oval Office, or aboard Air Force One; a visiting head of state arrives; a statement is issued and reporters are summoned to the Briefing Room. Klein Decl. ¶¶ 5, 9; Gardner Decl. ¶ 8. A reporter who is not there when that happens simply

misses it, and an event a reporter could not attend cannot be covered after the fact. Klein Decl. ¶ 9; Gardner Decl. ¶ 8. CNN's Betsy Klein, MS NOW's Akayla Gardner, and POLITICO's Cheyenne Haslett report, write, and broadcast from the White House grounds themselves. Klein Decl. ¶ 8; Gardner Decl. ¶ 7; Haslett Decl. ¶ 2.

A hard pass is also a practical necessity for participation in the print and television network press pool, which includes a rotating group of the credentialed journalists in the White House press corps who accompany the President and share reporting, video, audio, and photographs with the rest of the press corps and, through them, with the American public and the world. Vigilante Decl. ¶ 9; Reddy Decl. ¶ 10. Each day the pool includes representatives of television, print, radio, and digital outlets. Vigilante Decl. ¶ 9; Reddy Decl. ¶ 11. The television component of the pool consists of primary and secondary slots. Vigilante Decl. ¶ 10; Reddy Decl. ¶ 11. The primary slot rotates among five networks—ABC, CBS, CNN, Fox News, and NBC—each of which absorbs 20% of the operating costs. Vigilante Decl. ¶¶ 10, 15; Reddy Decl. ¶ 11. When on duty, CNN supplies video and audio of the President's events to the other four networks; more than 1,000 local affiliate television stations across the United States receive the pool feed through CNN. Vigilante Decl. ¶ 10. When CNN serves as the designated television network pooler, it does not engage in unilateral newsgathering but rather acts as a proxy for all media. *Id.* ¶ 11. The secondary slot rotates among a larger group of outlets that includes MS NOW. Reddy Decl. ¶ 11. POLITICO is also a member of the print component of the pool. Marsh Decl. ¶ 3.

### B. CNN, MS NOW, and POLITICO are among the prominent news outlets that report from the White House.

CNN launched in 1980 as the first 24-hour cable news network and has covered every President since Jimmy Carter from inside the White House complex. Vigilante Decl. ¶ 3. CNN's correspondents attend the daily press briefing, cover events in the Oval Office and the East Room,

and elsewhere on the grounds, report live from CNN's standing broadcast position on the North Lawn, and cover the President's arrivals and departures on the South Lawn; CNN maintains a booth adjoining the Briefing Room, together with broadcast and transmission equipment installed on the grounds. *Id.* ¶¶ 7, 13, 16; Klein Decl. ¶¶ 7–8. As of September 18, 2026, 40 CNN journalists, including Ms. Klein, held valid White House hard passes. Vigilante Decl. ¶ 5; Klein Decl. ¶ 4. CNN journalists have held White House hard passes continuously since 1980, and CNN has been part of the White House television pool for 45 years. Vigilante Decl. ¶ 6.

Before September 18, 2026, no President had barred CNN as an organization from the White House. Vigilante Decl. ¶ 6. The only prior attempt to strip a CNN journalist of his hard pass because of his reporting did not survive judicial review. In November 2018, hours after President Trump told CNN's then-chief White House correspondent, Jim Acosta, that he was "a rude, terrible person" who "shouldn't be working for CNN," the Secret Service took Mr. Acosta's hard pass at the White House gate. Compl. ¶¶ 35, 41, *Cable News Network, Inc. v. Trump*, No. 1:18-cv-02610 (D.D.C. Nov. 13, 2018), ECF No. 1. CNN and Mr. Acosta sued in this Court, which entered a temporary restraining order requiring the White House to restore the pass, finding that it likely had been revoked without the process the Fifth Amendment requires. Hr'g Tr., *Cable News Network*, No. 1:18-cv-02610, 2018 WL 9436958, at *3–5 (D.D.C. Nov. 16, 2018); *see also Karem*, 960 F.3d at 661 (describing incident and litigation). The White House restored the pass that same day.

MS NOW operates a cable news network and a digital news service. It launched in 1996 as MSNBC and adopted the name MS NOW in November 2025 in connection with its separation from NBCUniversal as part of Comcast's spin-off of Versant Media Group. Reddy Decl. ¶ 3. MS NOW has covered every Presidency since the Clinton administration and assigns approximately

ten journalists full time to the White House, and approximately fifteen MS NOW journalists regularly cover it. *Id.* ¶ 5. As of September 18, 2026, 22 MS NOW journalists held valid White House hard passes. *Id.* ¶ 8. MS NOW participates in the secondary slot of the television pool and served in the pool approximately ten times in the eight months preceding the ban, and MS NOW journalists were on the White House grounds on September 18, when the President announced the ban. *Id.* ¶¶ 11, 13, 17. Before that date, to the knowledge of Sudeep Reddy, MS NOW's Washington Bureau Chief, no President had barred MS NOW, or any of its reporters, from the White House. *Id.* ¶ 8.

Since its launch in 2007, POLITICO has covered the White House from inside the White House complex. Marsh Decl. ¶ 2. POLITICO publishes news at politico.com and in newsletters, including West Wing Playbook, a daily newsletter devoted to coverage of the White House, and provides policy news and analysis to subscribers through POLITICO Pro. *Id.* POLITICO assigns approximately 16 journalists to cover the White House, and as of September 18, 2026, all 16 held White House hard passes. *Id.* ¶ 3. To the knowledge of Julia Marsh, POLITICO's Executive Editor, Washington, no POLITICO journalist had ever had a hard pass denied, suspended, or revoked before September 19. *Id.*

President Trump has long attacked CNN, MS NOW, and POLITICO, along with other news outlets, for the content of their coverage. Weeks into his first term, for example, he posted that "[t]he FAKE NEWS media (failing @nytimes, @NBCNews, @ABC, @CBS, @CNN) is not my enemy, it is the enemy of the American People!"[4] (MS NOW, then MSNBC, was part of the NBC News group.) The attacks intensified after he returned to office in January 2025. Two days

[4] @realDonaldTrump, X (Feb. 17, 2017), https://x.com/realDonaldTrump/status/832708293516632065.

after his second inauguration, he posted that MS NOW was "even worse than CNN" and that "[t]hey shouldn't even have a right to broadcast—Only in America!"[5] Two days after that: "MSNBC IS CLOSE TO DEATH. CNN HAS REACHED THE BOTTOM. This is a good thing. They are the Enemy of the people."[6] He has since warned that MS NOW (which he frequently calls "MSDNC"), CNN, and "all other Mainstream Media Liars, are ON NOTICE that the days of them being allowed to deceive the American People are OVER."[7] And in October 2025, he declared that "Politico has gone bad" and has "been so wrong about everything."[8]

### C. The President bans CNN, MS NOW, and POLITICO from the White House because of their coverage.

At 3:04 p.m. on Friday, September 18, 2026, the President announced on Truth Social that he was barring Plaintiffs' reporters from the White House, effective immediately, because of the content of their reporting:

---

[5] @realDonaldTrump, Truth Social (Jan. 22, 2025), https://truthsocial.com/@realDonaldTrump/posts/113874735766176608.

[6] @realDonaldTrump, Truth Social (Jan. 24, 2025), https://truthsocial.com/@realDonaldTrump/posts/113887487731381945.

[7] @realDonaldTrump, Truth Social (July 22, 2025), https://truthsocial.com/@realDonaldTrump/posts/114898229237459086.

[8] Remarks by President Trump (Oct. 12, 2025), https://www.govinfo.gov/content/pkg/DCPD-202501004/pdf/DCPD-202501004.pdf.

> **Donald J. Trump**
> @realDonaldTrump
>
> I am proud to announce that, effective immediately, I am banning Fake News CNN, MSNOW (who recently changed their name from MSNBC due to lack of viewership and credibility!), and Politico (The recipients of an illegal and ridiculous $8 Million Dollar subscription, an All Time Record, directly from the United States Government, under Crooked Joe Biden, in order to keep them "alive." Seems like corruption to me!), from the White House as a result of their constant "reporting" FAKE NEWS! Media Outlets shouldn't be able to constantly write or report FICTION and LIES when they're covering the President of the United States, the Trump Administration, or the United States of America. Other Fake News Media Outlets to follow. Thank you for your attention to this matter! President DONALD J. TRUMP
>
> **13.4k** ReTruths **54.6k** Likes Sep 18, 2026, 3:04 PM

Ex. A.

About an hour later, the President took questions from reporters at an Oval Office event. Asked whether there was "a particular reason" for the ban, he answered: "No, just because—no, no, it's—it's really just cumulative stories over the last two years. . . . [T]hey purposely write negative news. And they do that because they want to try and diminish the Republicans and a Republican administration." Ex. B at 27:17-28:00. He explained that "[t]here's something wrong with a country that can allow people to write purposely negative stories," and that "if they want to write them, that's fine, but I don't have to let them into my—into the people's house." *Id.* at 38:25-38:51. Asked whether he was trying to intimidate the press, the President answered: "No, no, no, no, I dislike dishonest press like you. I think you're terrible. But I dislike dishonest—I like to see honest press." *Id.* at 35:14-35:27. He added that the ban could be lifted if the banned outlets "could straighten themselves out," and that "[i]f they could straighten themselves out, I'd love it." *Id.* at 53:38-53:58. He referred to his action as "the ban on the free press." *Id.*

Asked whether he thought the ban would "survive a court challenge," and reminded that a court had blocked a similar effort against CNN in 2018, the President answered: "Well, we'll see. . . . I think it's good to point it out, whether it survives or doesn't. I mean, I don't think the court should allow—it depends on the judge you get, to be honest with you." Ex. B at 35:27-35:55. Asked about the logistics of the ban—whether he was taking away the outlets' press badges and whether he was removing them from the pool—the President said he would take the ban "as far as you can." *Id.* at 53:35-53:58.

The President also made clear that other news organizations face the same treatment if he dislikes their coverage. His Truth Social post announcing the ban promised "Other Fake News Media Outlets to follow," *see supra*, at 12, and in the Oval Office he said that "there may be others to join them," specifically naming The New York Times and The Washington Post, Ex. B at 55:35-55:46; *see id.* at 45:37-46:09.

Neither the post nor the President's remarks that followed it identified any standard by which the three news organizations' coverage had been judged or would be judged in the future, any official responsible for applying that standard, any procedure by which Plaintiffs could contest the ban, or any date on which the ban would end. Vigilante Decl. ¶¶ 17–18; Reddy Decl. ¶¶ 15, 20; *see also* Marsh Decl. ¶ 6. White House staff—including members of the White House Press Office—were themselves given no advance notice of the President's post and were left scrambling to learn how the ban would be carried out. Klein Decl. ¶ 12; *see also* Reddy Decl. ¶ 17.

The White House nevertheless worked swiftly to implement the President's directive at the instruction and under the supervision of Assistant to the President for Communications Steven Cheung, Director of the Secret Service Sean M. Curran, and White House Chief of Staff Susan Wiles. Journalists' hard passes were deactivated overnight following the President's

announcement. And the following morning, Secret Service officers refused to admit Plaintiffs' reporters. At approximately 8:00 a.m. on Saturday, September 19, Ms. Gardner attempted to enter the White House as usual to work for MS NOW but was informed that her hard pass had "been disabled." Gardner Decl. ¶ 10; Reddy Decl. ¶ 18. An MS NOW photographer who arrived earlier that morning was likewise turned away and his hard pass taken, while the MS NOW producer who accompanied Ms. Gardner scanned her pass and was admitted. Gardner Decl. ¶ 10; Reddy Decl. ¶ 18. At approximately 9:30 a.m., Ms. Klein, a CNN reporter who has covered the White House since 2015 and has held a hard pass continuously since February 2018, also went to the White House to work, as she does whenever she is assigned to cover it. Klein Decl. ¶¶ 2, 4, 13. When she submitted her hard pass, a Secret Service officer told her it had been deactivated and kept it; he provided no further information and referred her to the White House Press Office. *Id.* ¶ 13. POLITICO's Cheyenne Haslett was likewise denied entry at the gate that morning, and the Secret Service officer took her hard pass without giving her a reason. Haslett Decl. ¶ 4; Marsh Decl. ¶ 5.

Plaintiffs received no advance written notice of the ban from the President, the White House Press Office, the Office of Communications, the Secret Service, or any other White House official. Before the ban went into effect, no one advised them of the scope or duration of the ban or of any process by which they could respond to or contest it. Vigilante Decl. ¶¶ 17–18; Reddy Decl. ¶¶ 15–17; Marsh Decl. ¶¶ 4, 6; *see also* Klein Decl. ¶ 14; Gardner Decl. ¶ 12; Haslett Decl. ¶ 3. MS NOW journalists had remained on the White House grounds through the evening of September 18, but no White House official contacted MS NOW that night to say whether, when, or how the ban would be enforced, and MS NOW was even included that evening in a White House press call previewing the President's schedule for the coming week. Reddy Decl. ¶ 17.

**D. After Plaintiffs file suit, the White House Press Office notifies Plaintiffs that their hard passes had been revoked.**

On the morning of Monday, September 21, after CNN, MS NOW, and POLITICO gave notice and provided copies of their pleadings to the government and released a public statement about their impending lawsuit to challenge the unconstitutional ban, the President responded on Truth Social. He reiterated that the ban's target was, in his view, the "corrupt, purposeful, pervasive, fully coordinated, and totally out of control" "FAKE NEWS." Ex. C. He also declared for the first time that the ban was intended to "stop[ ]" a "threat to our National Security." *Id.*

Plaintiffs filed suit later that morning and moved for a temporary restraining order. ECF Nos. 1, 2. The President again posted on Truth Social, this time to complain about the lawsuit and denigrate Plaintiffs as "Third Rate Clowns, who purposefully distort, twist, and degrade with everything they write or publish." Ex. D. He criticized Plaintiffs' reporting about him, which he labeled "negative, wrong and, in many cases, DANGEROUS." *Id.* And he again accused Plaintiffs of "violat[ing] our National Security." *Id.*

This Court requested a response to the motion for a temporary restraining order by September 22. Less than two hours before Defendants filed their response, the White House Press Office sent letters to journalists who work for Plaintiffs, selecting those journalists seemingly at random, and notifying them for the first time that the White House hard passes held by journalists at their news organizations had been revoked. Vigilante Decl. ¶ 21; Reddy Decl. ¶ 22; Marsh Decl. ¶ 8. The letters accused Plaintiffs of violating previously unstated "standards of professionalism and decorum expected of those given access to the White House Complex, including by trafficking in verifiable falsehoods about national security and other issues, and publishing sensitive or classified information." ECF No. 16-1 at 1; ECF No. 16-2 at 1; ECF No. 16-3 at 1. Each letter identified certain pieces of Plaintiffs' reporting between April 2025 and September 2026 that the

White House claimed "threatened national security and/or spread falsehoods." ECF No. 16-1 at 1; ECF No. 16-2 at 1; ECF No. 16-3 at 1. Each letter requested that Plaintiffs "submit a written response" to "contest [the] initial decision or the factual basis set forth" in the letters. ECF Nos. 16-1, 16-2, 16-3.

With respect to CNN, the letter identified four articles, including a January 19, 2026 article by Ms. Klein about plans to rebuild the bunker beneath the White House East Wing, two articles from the summer of 2026 about the depletion of munitions, and an article from the day of the ban's announcement about a United Nations report on a United States strike on a school in Iran. Vigilante Decl. ¶ 22. Only one of those articles—the January article by Ms. Klein—was written by a journalist with a hard pass. *Id.* ¶¶ 23–24. The White House had renewed Ms. Klein's hard pass after she wrote that article. Klein Decl. ¶¶ 4, 15; Vigilante Decl. ¶ 23.

With respect to MS NOW, the letter identified three articles, including a June 11, 2026 article by Jake Traylor that the White House Press Office described as "claim[ing] a source said that President Trump 'underestimated the willingness of Iran to resume conflict,'" an article about depleted munitions from the Iran conflict, and an article about an FBI leak investigation. Reddy Decl. ¶ 23. Only one of those three articles—the June article by Mr. Traylor—was written by a journalist with a hard pass. *Id.* ¶¶ 24–25. The White House had renewed Mr. Traylor's hard pass after that story was published. *Id.* ¶ 24.

With respect to POLITICO, the letter identified six articles, including a June 12, 2026 article co-authored by Ms. Haslett about the administration's negotiations with the government of Iran and a September 9, 2026 article reporting on bad "vibes" at the Republican midterm convention. Marsh Decl. ¶¶ 9, 11. Of the six articles identified in the letter, only those two were written by journalists with a hard pass at the time of the reporting. *Id.* ¶¶ 11–12. The June article,

which the letter asserted "threatened national security and/or spread falsehoods," was based on an authorized press call that the White House organized that had included journalists from a number of news organizations, including POLITICO. *Id.* ¶ 13. During that call, reporters were instructed by the White House to attribute quotes to an anonymous "senior administration official." *Id.*

On the evening of September 23, Defendants filed a declaration citing an MS NOW article as further support for their position that Plaintiffs had violated White House standards of professionalism and decorum. ECF No. 23 ¶ 3. The article reported that Trump administration officials had discussed adding the President's name to Ford's Theatre. ECF No. 23-2. Defendants also submitted a Truth Social post in which the President characterized the article as "FAKE NEWS" and a "Hoax." ECF No. 23-1.

**E. This Court enters a temporary restraining order to restore Plaintiffs' access to the White House.**

After a hearing, this Court entered a temporary restraining order shortly before 1:00 a.m. on September 24, 2026. ECF No. 24. The Court explained that D.C. Circuit precedent established that a "duly issued hard pass may not be suspended without due process." *Id.* at 2 (quoting *Karem*, 960 F.3d at 665). Applying that binding precedent, the Court concluded that Plaintiffs were likely to establish that the ban violated the Fifth Amendment's Due Process Clause. *Id.* The Court rejected Defendants' reliance on their September 22 letters, explaining that the standard articulated in the letters was "so vague it hardly does the trick." *Id.* at 3. It also noted that the fact that Defendants had "renewed Plaintiff Betsy Klein's hard pass several months *after* she published some of the identified reporting" undermined "any argument that she or her employer . . . had the requisite notice that the conduct at issue violated a relevant standard." *Id.* And the Court rejected Defendants' generalized invocation of "national security" to justify the ban because the "reporting identified by Defendants" was "routine." *Id.* at 4. Indeed, the Court was "skeptical" that

"Defendants' interest in safeguarding national security is the actual motivation for, or is even advanced by, the revocation of Plaintiffs' hard passes." *Id.*

The Court determined that the remaining factors supported the temporary restraining order. The Court found that Plaintiffs would suffer irreparable harm because, "[w]hen constitutional harm is the basis for irreparable harm, the likelihood of success on the merits overlaps heavily with the irreparable harm inquiry." ECF No. 24 at 5. As to the balance of the equities and the public interest, the Court concluded that Plaintiffs and the public "have an abiding interest in maintaining the status quo ante given the importance of the free press." *Id.* Because Defendants "offer[ed] little to back up their asserted national security interest," that interest did not "tilt [the] factors in their favor." *Id.* at 6. The Court thus ordered that Defendants "immediately return, reinstate, and restore" Plaintiffs' hard passes. *Id.* at 8.

Defendants did not comply at first with the Court's order. When Plaintiffs' reporters went to work at the White House on the morning of September 24, they were turned away, and the hard passes of a CNN photojournalist, two MS NOW journalists, and a POLITICO journalist were confiscated. Waldman Decl. ¶ 5; Klein Decl. ¶¶ 17–18; Vigilante Decl. ¶ 25; Reddy Decl. ¶¶ 28–30; Marsh Decl. ¶ 15. MS NOW reporter Laura Barrón-López was turned away and had her hard pass confiscated at approximately 8:19 a.m., and she was turned away again at approximately 11:20 a.m.—after Plaintiffs had filed a notice of Defendants' noncompliance and after the Court had ordered Defendants to respond to it. Reddy Decl. ¶¶ 29–30. The White House did not begin returning hard passes until around noon, approximately 11 hours after the Court issued the temporary restraining order. Waldman Decl. ¶¶ 6–7; Klein Decl. ¶ 19; Vigilante Decl. ¶ 25; Reddy Decl. ¶¶ 32–33. For more than five days, before the Court's order was implemented, Plaintiffs' reporters were unable to enter the White House complex to attend briefings or events, report from

their broadcast positions, or speak in person with White House officials and staff. Klein Decl. ¶ 20; Gardner Decl. ¶ 19; Haslett Decl. ¶ 5; Vigilante Decl. ¶ 29; Reddy Decl. ¶¶ 32, 36; Marsh Decl. ¶ 7. Plaintiffs' broadcast positions, cameras, and transmission equipment remained inside the White House complex during that time. Vigilante Decl. ¶ 20; Reddy Decl. ¶ 21.

Defendants have continued to impose restrictions on Plaintiffs' access without explanation. On September 23, CNN timely requested credentials for reporters, producers, and camera crew to cover President Xi Jinping's arrival for the state dinner the following day. Vigilante Decl. ¶ 26. About an hour before President Xi's arrival, the White House informed CNN that only a photojournalist and audio technician would be admitted. *Id.* Unlike other television networks, CNN was not permitted to have an editorial team present. *Id.* MS NOW had timely submitted the name of its reporter, Laura Barrón-López, but she was denied entry approximately 25 minutes before the event began; when she asked why, a White House staffer told her to "talk to Steven," apparently referring to Defendant Cheung. Reddy Decl. ¶ 35. On the evening of September 25, CNN learned that it would not be permitted to travel aboard Air Force One as the designated television network pooler for the President's September 26 trip to Knoxville, Tennessee. Vigilante Decl. ¶ 27. CNN received no official communication from the White House explaining its exclusion. *Id.* Because CNN was excluded and no replacement designated, no primary television network pooler accompanied the President on the trip. *Id.* CNN is presently scheduled to serve as the designated television network pooler on October 1. *Id.* ¶ 28.

The administration has continued to admit that Plaintiffs' reporting is the true motive for the ban. The President publicly discussed Plaintiffs and the ban again on September 26. In three Truth Social posts, he questioned why CNN and MS NOW should be permitted access to the White House given what he characterized as overwhelmingly negative coverage and asserted that news

organizations he viewed as dishonest should be excluded from the White House. Exs. J–L. And when asked by MS NOW's Akayla Gardner whether he wanted only supportive outlets in the press pool, the President said he wanted "real news, not fake news—like you." Gardner Decl. ¶ 18. He criticized CNN and MS NOW, stating: "what I don't want is fake news. . . . In two years, I doubt they did one good story. And I won the election in a landslide." *Id.* The President's recent statements have made no mention of national security. On September 27, Attorney General Todd Blanche echoed the President, explaining that after "years and years and years of one-sided media coverage of the president from certain outlets, the president finally said it's not fair to the American people that this is happening and did something about it." Ex. M. Attorney General Blanche described "complete misinformation," "inaccuracy," and "one-sided news" as a "national security issue." *Id.*

This Court's temporary restraining order will expire on October 8. Absent preliminary injunctive relief, the irreparable harm Plaintiffs have already suffered from the ban will quickly compound. Defendants will not be restrained from once again deactivating and confiscating Plaintiffs' hard-pass credentials or denying Plaintiffs' journalists access to the White House to gather and report newsworthy information. Defendants' conduct subsequent to the entry of the Court's order, including Plaintiffs' exclusion from the state dinner and their scheduled pool rotation, underlines Defendants' intention to, in the President's words, take the ban "as far as [they] can." Ex. B at 53:38-53:58.

The losses Plaintiffs will suffer cannot be repaired after the fact. A press briefing Plaintiffs cannot attend is a briefing at which they cannot ask a question; an event they cannot cover is an event they cannot report to their audiences. Vigilante Decl. ¶¶ 29, 31; Reddy Decl. ¶ 36; Marsh Decl. ¶ 16. If not preliminarily enjoined, the ban will deprive Plaintiffs of the ability to gather

news firsthand at the seat of the Executive Branch. Vigilante Decl. ¶ 32; *see also* Reddy Decl. ¶ 38; Marsh Decl. ¶ 16; Waldman Decl. ¶ 8. The President has stated that there will be "Other Fake News Media Outlets to follow," *see supra*, at 12, leaving other news organizations covering the White House to face the prospect that their access may likewise depend on the President's view of their coverage. And each day the ban remains in effect, the public loses access to essential reporting on the President and his administration. Vigilante Decl. ¶¶ 11–12, 31–32; Reddy Decl. ¶ 37; Marsh Decl. ¶ 16.

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must demonstrate: (1) a likelihood of success on the merits; (2) that the plaintiff is likely to suffer irreparable injury in the absence of such relief; and (3) that the balance of the equities and (4) the public interest favor an injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Here, all four elements are readily satisfied: Defendants' conduct is blatantly unconstitutional; Plaintiffs will suffer irreparable injury through the loss of their constitutional freedoms if the President's ban goes back into effect; and the balance of equities and public interest overwhelmingly favor Plaintiffs.

## ARGUMENT

### I. Plaintiffs are likely to establish that the ban is unconstitutional.

The "first and most important factor" is "likelihood of success on the merits." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). Plaintiffs are likely to succeed on the merits because the ban blatantly denies them due process, retaliates against their protected newsgathering and speech, and imposes viewpoint-discriminatory and unreasonable restrictions on their access to a forum designed to facilitate activity protected by the First Amendment.

### A. The ban violates the Due Process Clause.

This Court correctly held that the ban likely violates the Fifth Amendment's Due Process Clause and should extend its ruling from a temporary restraining order to a preliminary injunction. ECF No. 24 at 2–4. The Fifth Amendment forbids the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amend. V. Clear-cut precedent establishes that "the interest of a bona fide Washington correspondent" in obtaining and retaining a hard-pass press credential "undoubtedly qualifies as [a] liberty [interest] which may not be denied without due process of law under the fifth amendment." *Sherrill*, 569 F.2d at 130–31; *see also id.* at 131 n.22 (suggesting that a press credential is also a protected property interest). When the government "has voluntarily decided to establish press facilities for correspondents who need to report therefrom," important First Amendment rights are implicated, and access cannot be denied "arbitrarily or for less than compelling reasons." *Id.* at 129–30; *see Karem*, 960 F.3d at 660. For three reasons, Plaintiffs are likely to prevail on their claim that Defendants' sudden, unprompted, and total ban of Plaintiffs from the White House—including their revocation and confiscation of Plaintiffs' hard passes—violates the Due Process Clause.

First, due process requires "fair notice" of both the "conduct that would subject" someone to punishment *and* the "magnitude of the sanction that the White House might impose." *Karem*, 960 F.3d at 665 (quotation marks and alterations omitted). Revocation of a "duly issued hard pass" requires "fair notice" ahead of time "of conduct that is forbidden or required." *Id.* at 664–65 (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)). The government must provide such fair notice of the forbidden conduct and the potential sanction *before* the conduct being sanctioned because "regulated parties should know what is required of them *so they may act accordingly*." *Fox*, 567 U.S. at 253 (emphasis added). Plaintiffs received advance notice of neither the prohibited conduct nor the potential sanction.

For one thing, no standard was "formally articulated or published" that would have put Plaintiffs on notice that the content of their reporting could "subject [them] to punishment." *Karem*, 960 F.3d at 665–66. Plaintiffs certainly had no advance notice that access to the White House could be revoked if they published stories the President perceives as "negative" or "diminish[ing]" his administration or his political party. Ex. B at 27:41-28:00. Even if one could suspend disbelief and take the White House's post hoc letters at face value, those letters make no attempt to show that the so-called standards they announce—*e.g.*, policing "standards of professionalism and decorum" and prohibiting publication of "sensitive security information and misinformation"—were formally articulated before Plaintiffs published the articles identified in the letters. ECF No. 16-1 at 1; ECF No. 16-2 at 1; ECF No. 16-3 at 1. As this Court observed, "the record is bereft of any relevant 'formally articulated standards' in place *before* any of the conduct for which Defendants revoked their hard passes." ECF No. 24 at 3; *see also Karem*, 960 F.3d at 666 ("the White House may not rely on unarticulated standards of professionalism" to justify suspension of hard passes). Allowing Defendants to deny access based on standards they make up after the fact would deny Plaintiffs any semblance of fair notice and allow arbitrary and discriminatory enforcement.

For another thing, Plaintiffs did not have notice of the "magnitude of the sanction that the White House might impose." *Karem*, 960 F.3d at 665 (quoting *BMW of N. Am. v. Gore*, 517 U.S. 559, 574 (1996)) (brackets omitted). *Karem* held that exclusion from the White House violated the Due Process Clause when the government did not provide advance notice that one journalist's hard pass could be suspended for a month based on the journalist's "purportedly unprofessional conduct." *Id.* at 665–66. Here, as the Court explained, "nothing put Plaintiffs on notice of the

magnitude of the sanction Defendants imposed"—the dramatically more severe sanction of a complete and indefinite ban for every journalist in three media organizations. ECF No. 24 at 3.

Second, Defendants "do not dispute" that Plaintiffs were given no "opportunity to be heard" before Defendants implemented the ban. ECF No. 24 at 3. The Due Process Clause requires "an opportunity to present [one's] objections" to the deprivation of liberty. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Here, Plaintiffs had no "avenue for a response" before losing access to the White House. *Trump v. Cook*, 609 U.S. 528, 557 (2026). The administration immediately implemented the ban by deactivating hard passes for Plaintiffs' reporters overnight, barring their entry to the White House grounds, and seizing physical hard passes the following morning. *See supra*, at 13–14. As the Supreme Court held earlier this year in response to another of the President's posts on Truth Social, "[t]hat will not do" when a person has a right to be heard *before* a final decision. *Cook*, 609 U.S. at 557.

The letters that Defendants sent *after* they banned Plaintiffs and litigation commenced—mere hours before they filed their response to Plaintiffs' motion for a temporary restraining order—do not cure the violation. The "root requirement" of due process is an "opportunity for a hearing *before* [one] is deprived" of liberty or property. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). Post-deprivation process satisfies due process only in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971). As this Court found, Defendants' vague references to "national security" in their post-deprivation letters do not establish extraordinary circumstances warranting an exception from the general rule requiring pre-deprivation notice. ECF No. 24 at 3–4.

The Court has correctly seen these after-the-fact justifications for what they are. "The sorts of stories Defendants identify" as purported national-security risks are "routine"—and protected by the First Amendment. ECF No. 24 at 4; *see New York Times Co. v. United States*, 403 U.S. at 714. Even after the White House Press Office letters and Defendants' opposition brief invoked national security, President Trump has continued to justify the ban on the ground that he dislikes Plaintiffs' coverage of him and his administration without even mentioning national security. Exs. J–L. And Attorney General Blanche even sought to recharacterize purportedly "one-sided news out of certain organizations" as reporting that threatened "national security." Ex. M. Defendants' "national security" concerns are transparently pretextual and certainly provide no legitimate basis for dispensing with the ordinary requirement of pre-deprivation process.

Even taken on their own terms, Defendants' "national security" concerns also are not credible. Defendants' letter to CNN criticized a story written by Betsy Klein in January 2026, but the White House later renewed her press pass. ECF No. 24 at 3; *see* Klein Decl. ¶¶ 4, 15; ECF No. 16-1 at 1. Defendants' letter to MS NOW criticized a piece by Jake Traylor that likewise was written before his hard pass was renewed. Reddy Decl. ¶¶ 23–24. As the Court noted in its temporary restraining order, "in most cases, the reporters who authored the stories Defendants identify in their letters *did not even hold hard passes*." ECF No. 24 at 7. And at least some of those stories bear no relationship to national security at all. *See, e.g.*, ECF No. 16-3 at 2 n.6 (citing POLITICO article about the Republican midterm convention entitled "'The vibes are very bad' in Texas"). Remarkably, the letter to POLITICO asserted that an article "threatened national security and/or spread falsehoods" because it cited an anonymous source, ECF No. 16-3 at 1–2, even though it was the White House *itself* that organized a press briefing call during which reporters at a number of news organizations were expressly instructed to quote only an anonymous "senior

administration official." Marsh Decl. ¶ 13. Even setting aside that such reporting is protected by the First Amendment, Defendants made no attempt whatsoever to explain how any of these stories supposedly compromised national security. ECF No. 24 at 6–7.

Third, no matter how much notice or process Defendants purport to provide, Plaintiffs are likely to prevail because the so-called standards Defendants applied here are patently unconstitutional. Due process requires "an explicit and meaningful standard governing" press passes, including denials or revocations "for security reasons," and it affords additional procedural protections—namely, notice of the factual bases for denial, an opportunity for the applicant to respond, and a final written statement of the reasons for denial—to those denied passes. *Sherrill*, 569 F.2d at 131–32. "[A]rbitrary or content-based criteria" necessarily flunk this test—with "content-based criteria for press pass issuance" also violating "the First Amendment." *Id.* at 129. Because the suspension of a hard pass "implicates important first amendment rights," this Court analyzes standards for denying access "under a particularly stringent vagueness and fair-notice test." *Karem*, 960 F.3d at 665 (brackets and quotation marks omitted). Such "precision and guidance are necessary" so that government officials cannot "act in an arbitrary or discriminatory way." *Fox*, 567 U.S. at 253.

The real reason Defendants imposed the ban—expressed contemporaneously and repeatedly since then—is that the President dislikes Plaintiffs' supposedly "negative" reporting. Ex. B at 37:02-38:51; *see* Exs. J–L. That standard is (at risk of understatement) completely impermissible. Again, any standard for regulating access to the White House must be "explicit and meaningful." *Karem*, 960 F.3d at 666 (quoting *Sherrill*, 569 F.2d at 130–31). Due process does not tolerate justifications that are "so standardless that [they] authorize[ ] or encourage[ ] seriously discriminatory enforcement." *Fox*, 567 U.S. at 253 (quotation marks omitted). The

President's "standardless" prohibition on coverage he perceives to be too negative is unconstitutionally vague and allows "seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *accord New York Times Co. v. Dep't of Defense*, 824 F. Supp. 3d 27, 46 (D.D.C. 2026). Indeed, discrimination is the entire point, as the President's own statements about the ban have repeatedly made clear.

Moreover, even if one were to credit the post hoc justifications in Defendants' letters, the standards set forth there are similarly vague, arbitrary, and content-based. Requiring adherence to "standards of professionalism and decorum," as this Court recognized, "is so vague it hardly does the trick." ECF No. 24 at 3; *see Karem*, 960 F.3d at 666. The letters also discuss "trustworthiness" and "falsehoods," but those requirements likewise grant Defendants impermissible, arbitrary discretion. Under *Sherrill*, "vague" notions of "security" cannot justify the ban, either. 569 F.2d at 130; *see also United States v. U.S. Dist. Ct. for E. Dist. of Mich.*, 407 U.S. 297, 314 (1972) (noting that the "danger" to the exercise of First Amendment rights "is acute where the [g]overnment attempts to act under so vague a concept as the power to protect 'domestic security'"). And a standard that would revoke hard passes of journalists who publish whatever the government deemed "misinformation" is plainly based on content and viewpoint in violation of *Sherrill*. 569 F.2d at 129. At base, the empty, malleable supposed standards cited by the White House do nothing but authorize Defendants to punish reporting they dislike in violation of the Due Process Clause and First Amendment.

Each of these infirmities alone—the lack of advance notice of the prohibited conduct and the sanction's severity, the denial of a pre-deprivation opportunity to be heard, and the unconstitutionally vague and content-based standards—establishes a violation of the Due Process Clause. Together, they reflect a fundamental rupture in the process for regulating access to the

White House grounds for purposes of reporting on the President and his administration. This Court should again hold that Plaintiffs are likely to prove that the ban violates the Due Process Clause.

**B. The ban retaliates against Plaintiffs for newsgathering and reporting protected by the First Amendment.**

Plaintiffs are also likely to prevail on the ground that the ban retaliates against them for engaging in speech, publication, and newsgathering activities that the First Amendment protects but the administration disfavors. The First Amendment "guarantees all Americans the rights to speak, worship, publish, assemble, and petition their government freely." *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 184 (2026). To safeguard those rights, the First Amendment "prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022). Government officials have their own right to speak and may "do so forcefully," but they may not "use the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024). If the rule were otherwise, the government, through retaliation for protected speech, could achieve the "'self-censorship' of speech that could not be proscribed." *Counterman v. Colorado*, 600 U.S. 66, 75 (2023).

Retaliation is particularly pernicious when directed against the press. "Without an unfettered press, citizens would be far less able to make informed political, social, and economic choices"; "the press' function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired." *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981). "It should alarm all Americans when the Government retaliates against individuals or organizations for engaging in constitutionally protected public debate," and "that alarm should ring even louder when the Government retaliates against those engaged in newsgathering and reporting." *Media*

*Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 111 (D.D.C. 2025), *stay denied*, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025).

To demonstrate that unlawful retaliation has occurred, a plaintiff must show that "'(1) [it] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action.'" *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Plaintiffs are likely to prove each element.

First, Plaintiffs "are obviously engaged in conduct protected under the First Amendment" when covering the President and his administration, including Plaintiffs' newsgathering and reporting. *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025); *see also Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated."). "The Framers designed the Free Speech Clause of the First Amendment to protect the 'freedom to think as you will and to speak as you think.'" *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660–61 (2000)). And the Press Clause of the First Amendment serves as "an acknowledgment of the critical role played by the press in American society." *Houchins v. KQED, Inc.*, 438 U.S. 1, 17 (1978) (Stewart, J., concurring); *see also Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 716–19 (1931) (noting that the Continental Congress dubbed "freedom of the press" as one of the "five great rights"). "Suppression" of the press "muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free." *Mills*, 384 U.S. at 219. All told, speech about official action "is an essential mechanism of democracy" that "hold[s] officials accountable to the people." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010). Plaintiffs' reporting—even (or especially) their reporting on

matters touching political controversies and issues of national security—is protected by the First Amendment.

Second, banning Plaintiffs from the White House grounds is precisely the type of adverse action that would deter journalists and news organizations of ordinary firmness from continuing to provide fact-based, independent coverage of the administration that the President dislikes. Indeed, that is the entire point of the ban: The President said that he would "love" it if the ban forced Plaintiffs to "straighten themselves out." Ex. B at 53:38-53:58. As the President well knows, access to the White House is critically important for journalists and news organizations that cover the President and his administration. Even a one-month suspension from the White House grounds is "an eon in today's news business." *Karem*, 960 F.3d at 665. An indefinite ban has an even greater chilling effect on future coverage. And the President's threat of "Other Fake News Media Outlets to follow" only exacerbates the chilling effect of the ban for all journalists and news organizations. *See supra*, at 13. The ban undeniably "discourage[s] the 'uninhibited, robust, and wide-open debate that the First Amendment is intended to protect.'" *Counterman*, 600 U.S. at 78 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

Third, President Trump has made explicit the causal link between the ban and Plaintiffs' coverage of him and his administration. The President's Truth Social post announcing the ban declares that he has barred Plaintiffs from the White House grounds "*as a result* of their constant 'reporting' FAKE NEWS!"—meaning coverage that, regardless of its accuracy, the President dislikes. *See supra*, at 12 (emphasis added). The President attributed the ban to "cumulative stories over the last two years," and his belief that Plaintiffs "purposely write negative news." Ex. B at 27:22-28:00. He even referred to his own unprecedented act as "the ban on the free press." *Id.* at 53:38-53:58. And since announcing the ban and even since this Court entered a temporary

restraining order, the President has continued to single out Plaintiffs for their coverage. Exs. J–L. As Attorney General Blanche has since explained, the President "did something" about "one-sided media coverage" by banning "certain outlets" from the White House. Ex. M.

Defendants cannot credibly attribute their decisions to anything other than a bare desire to retaliate against Plaintiffs for their journalism. Although the administration attempted to invent new justifications other than the facially retaliatory motive that the President announced (and has since reiterated), its litigation-focused letters do not break the causal chain from the President. Not once did the President mention "national security" or "classified information" before he instituted the ban—or before Plaintiffs gave notice of their intent to file this lawsuit. And since the administration's short-lived effort to attribute the ban to new rationales, the President has repeatedly made clear that his disapproval of the content of Plaintiffs' reporting motivated the ban. Exs. J–L. "Government 'justification[s]' for interfering with First Amendment rights 'must be genuine, not hypothesized or invented post hoc in response to litigation.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). When it comes to the administration's motives, the Court is not "required to exhibit a naiveté from which ordinary citizens are free." *Cook*, 609 U.S. at 547 (quoting *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019)). The administration's new "national security" mantra is patently pretextual.

In any event, the letters bolster Plaintiffs' evidence of retaliation. The letters state that the ban is punishment for Plaintiffs' supposed failure to meet "standards of professional conduct" for journalists and their publication of what Defendants label "misinformation . . . relating to national security." ECF No. 16-1 at 1–2. That is just another way of saying that Defendants dislike or disagree with Plaintiffs' speech. And as this Court recognized, Defendants' own letters "purport

to identify reporting that 'threatened national security and/*or spread falsehoods*,' leaving open the possibility that all the stories fall into the latter bucket, rather than the former." ECF No. 24 at 6 (quoting ECF No. 16-1) (emphasis added). Banning Plaintiffs because Defendants dislike Plaintiffs' reporting echoes the President's original stated rationale for the ban and is, of course, straightforward retaliation for the content and perceived viewpoints of Plaintiffs' speech.

Defendants have proclaimed that access to spaces where the President delivers press briefings and takes questions from the press "is a privilege—not a right." ECF No. 16 at 2. But that is wholly irrelevant for purposes of a claim of retaliation. The law is settled that Defendants may not "deny a benefit to a person because of his constitutionally protected speech or associations" because "his exercise of those freedoms would in effect be penalized and inhibited" by such retaliation. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *see Board of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996) (government may not condition access to benefit on grounds that violate the First Amendment "even if [a person] has no entitlement to that benefit"). And Defendants' continued unpredictable and unexplained adverse treatment of Plaintiffs since this Court's entry of a temporary restraining order—including denying access to Thursday's state dinner and interfering with CNN's assigned pool duties on Saturday, *see supra*, at 19—only exacerbates the chilling effect on protected speech.

In short, the President's own words leave no doubt that banning Plaintiffs from the White House and denying them the access they had as of September 18 is retaliation for their protected newsgathering and speech—adverse action intended to cow them into conforming the content of their reporting to the President's preferences and to threaten other journalists lest they suffer the same fate. That is a paradigmatic First Amendment violation.

**C. The ban unconstitutionally restricts access to a nonpublic forum.**

Even setting aside the unconstitutional retaliation, the ban also violates the First Amendment because the President's ban of three disfavored news outlets is an unreasonable and viewpoint-discriminatory restriction on access to a nonpublic forum.

A "nonpublic forum" is "government property" that the government has opened to speech for selected speakers. *Ateba*, 133 F.4th at 121–22; *see, e.g.*, *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998); *Mahoney*, 2026 WL 2836881, at *3–4. The D.C. Circuit has held that the "White House Press Area"—including "the briefing room, the press offices, and certain other locations in and around the White House"—"is a nonpublic forum," because the government "provides selective access for individual speakers." *Ateba*, 133 F.4th at 117, 122 (quotation marks omitted). And "[e]ven when the government may regulate speech, it must avoid 'unfair or inconsistent enforcement.'" *Mahoney*, 2026 WL 2836881, at *6 (quoting *Mansky*, 585 U.S. at 22). The First Amendment thus requires that any restrictions on access to those areas be both viewpoint neutral and "reasonable in light of the purpose served by the forum." *Mansky*, 585 U.S. at 13; *see also Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) (the "government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject"). The ban meets neither requirement. It is expressly viewpoint discriminatory and patently unreasonable in light of the purpose of the forum.

Viewpoint discrimination is anathema to the First Amendment. As a unanimous Supreme Court held in 2024, the "recognition that viewpoint discrimination is uniquely harmful to a free and democratic society" resides at "the heart of the First Amendment's Free Speech Clause." *Vullo*, 602 U.S. at 187; *see also Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015) (viewpoint discrimination is a "'more blatant' and 'egregious form of content discrimination'" (quoting

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995))). In the words of the D.C. Circuit, "viewpoint discrimination is poison." *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023) (quotation marks omitted). That does not change when the government claims to discriminate in an attempt to make speech more "fair" or "balanced": "[I]t is no job for government to decide what counts as the right balance of private expression—to 'un-bias' what it thinks biased, rather than to leave such judgments to speakers and their audiences." *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024).

The First Amendment's prohibition of viewpoint discrimination "limits the restrictions that the government may impose on speech, including speech on government property." *Ateba*, 133 F.4th at 119. Here, President Trump has expressly targeted Plaintiffs based on their perceived editorial viewpoints—targeting the "particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829. The President has left no doubt that he has banned Plaintiffs from the White House because, in his view, their coverage is not "fair" and "honest." Ex. B at 26:47-27:08. The President explained that he was banning Plaintiffs because he believes they "write negative news" and "want to try and diminish the Republicans and a Republican administration." *Id.* at 27:41-28:00. While Plaintiffs contest the President's characterizations of their journalism, the President indisputably has targeted Plaintiffs based on what he perceives to be their "motivating ideology or the opinion or perspective" and thus engaged in paradigmatic viewpoint discrimination. *Rosenberger*, 515 U.S. at 829; *accord Nat'l Pub. Radio, Inc. v. Trump*, 827 F. Supp. 3d 48, 88 (D.D.C. 2026) ("It is difficult to conceive of clearer evidence that a government action is targeted at viewpoints that the President does not like and seeks to squelch."). This clear viewpoint discrimination means that the ban is flatly unconstitutional.

The Nation's history of press access to governmental institutions reinforces the conclusion that the President's viewpoint-discriminatory ban violates the First Amendment. *Mahoney*, 2026 WL 2836881, at *7 (applying "relatively probing review" based on historical practice). The First Congress debated this very question when Representative Aedanus Burke proposed censuring newspaper publishers that had reported on House debates based on special access to the floor of the chamber. 1 Annals of Cong. 952 (1789). He accused publishers of "misrepresent[ing] these debates in the most glaring deviations from truth." *Id.* Others understood the resolution as an attempt to "driv[e] the gentlemen who were at the foot of the Speaker's chair [meaning, the publishers] to the gallery," which was generally open to the public. *Id.* at 954. That proposal drew wide condemnation as "an attack upon the liberty of the press," *id.* (Rep. Hartley), and (according to the man who drafted the First Amendment) as an "improper" effort "to throw impediments in the way of such information as the House had hitherto permitted," *id.* at 955 (Rep. Madison). Representative Burke withdrew his resolution, and the controversy had the effect of spurring a more formal practice in which the House set aside space on the tightly controlled floor of the House for reporters without discriminating based on viewpoint. Elizabeth Gregory McPherson, *Reporting the Debates of Congress*, 28 Q.J. Speech 141, 142 (1942). Because then-Representative James Madison and many others in the First Congress were also Framers, their actions are given special weight in interpreting the First Amendment. *Town of Greece v. Galloway*, 572 U.S. 565, 575–76 (2014). The administration's new slogan that "access to the White House is a privilege—not a right," ECF No. 16 at 2—thus misses the point. The Framers understood the First Amendment to prohibit viewpoint-based restrictions on press access to government spaces otherwise open to journalists.

Banning Plaintiffs from the White House also is unconstitutional because it is not reasonable in light of the purpose served by the White House press areas. The White House press facilities are "made publicly available as a source of information for newsmen" and serve the interests of "the public at large" in receiving information "gathered out of a multitude of tongues." *Sherrill*, 569 F.2d at 129–30 (quotation marks omitted); *see Cable News Network, Inc. v. Am. Broad. Cos.*, 518 F. Supp. 1238, 1244 (N.D. Ga. 1981) (describing the "'enduring and vital tradition of public entree' (through the press as agents) to the presidential activities covered by press pools"). Barring Plaintiffs, among the most prominent news organizations in the country, from these locations based on their perceived editorial viewpoints and the President's personal dislike of their journalism undermines the purpose of a forum designed to facilitate newsgathering and reporting by a variety of news organizations.

Moreover, the administration's purported criteria for excluding Plaintiffs—"professionalism" and "national security," *e.g.*, ECF No. 16-1 at 1—cannot count as a "sensible basis for distinguishing what may come in from what must stay out" and are thus unreasonable. *Mansky*, 585 U.S. at 16. The Supreme Court has held that the First Amendment does not tolerate standards that "plac[e] unbridled discretion" to regulate speech "in the hands of a government official." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988). And the D.C. Circuit reiterated last week that "it would be unreasonable to control access to White House press facilities through standardless discretion." *Mahoney*, 2026 WL 2836881, at *6 (citing *Ateba*, 133 F.4th at 125). As the categorical ban and the White House's actions since this Court's temporary restraining order show, gauzy standards of professionalism and national security leave "officials 'too much discretion'" to act in unpredictable ways "and may therefore be 'enforced selectively against those who hold unpopular points of view.'" *Id.* at *7. Such "arbitrary control over who

may speak invites the suppression of disfavored viewpoints and undermines the First Amendment's core protections." *Id.* at *6; *see id.* at *7 (citing precedent concerning access to "press conferences" held within governmental buildings).

Defendants' bald invocations of national security do not insulate the ban from First Amendment scrutiny. National security is not why the President banned Plaintiffs from the White House. *See supra*, at 31–32. Regardless, the First Amendment does not permit banning Plaintiffs from the White House based on the content of their reporting. Labels like "national security" do not create a "talismanic immunity from constitutional limitations." *Sullivan*, 376 U.S. at 269. Hard-pass holders have always reported on important news concerning national security. *New York Times Co. v. United States*, 403 U.S. at 717 (Black, J., concurring) ("The press was protected so that it could bare the secrets of government and inform the people.").

In sum, the ban violates the First Amendment for the independent reason that it excludes Plaintiffs from a nonpublic forum based on their perceived editorial viewpoints and through unreasonable means that give standardless discretion to the President and his administration.

**II. Plaintiffs will suffer irreparable injury absent a preliminary injunction.**

This Court correctly determined that Plaintiffs are "likely to suffer irreparable harm absent a temporary restraining order." ECF No. 24 at 5. That same analysis applies to the preliminary injunctive relief Plaintiffs now seek.

If not preliminarily enjoined, the ban will inflict irreparable harm to Plaintiffs' constitutional rights. "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod*, 427 U.S. at 373). That principle has special force for "[t]he loss of First Amendment freedoms." *Mahmoud*, 606 U.S. at 569 (quoting *Roman Cath. Diocese*, 592 U.S. at 19); *see Turner v. U.S. Agency for Glob. Media*, 502

F. Supp. 3d 333, 385 (D.D.C. 2020) (explaining that "chilling of First Amendment expression" is "irreparable harm"). The denial of access to the White House without due process of law likewise is an irreparable injury. *Karem*, 960 F.3d at 667–68; *see Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (due-process violations generally cause irreparable harm). And "there is a presumed availability of federal equitable relief against threatened invasions of constitutional interests." *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) (cleaned up). So plaintiffs who "have shown that they are likely to succeed on their constitutional claim" also successfully show "that they are likely to suffer irreparable harm without preliminary injunctive relief." *Taylor v. Trump*, 823 F. Supp. 3d 17, 40 (D.D.C. 2026) (emphasis omitted). Without a preliminary injunction, Plaintiffs will suffer severe impairment to their ability to gather and report news from the White House.

If not preliminarily enjoined, the ban also will cause "certain," "great," and "irreparable" harm, *Taylor*, 823 F. Supp. 3d at 39, to CNN's, MS NOW's, and POLITICO's ability to carry out their journalistic missions. An organization suffers irreparable harm if (1) the actions taken by the defendant "perceptibly impair[ ] the organization's programs," and (2) the defendant's actions "directly conflict with the organization's mission." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (brackets and quotation marks omitted). That standard is easily met here. As a court in this District has recognized, "without access to" the White House, reporters "lack[ ] the ability to observe events firsthand and to ask questions of White House officials." *Karem v. Trump*, 404 F. Supp. 3d 203, 216–17 (D.D.C. 2019). CNN, MS NOW, and POLITICO are organizations whose purpose is to report national news, for which they depend on individual reporters to gather information firsthand at the White House. The ban causes further irreparable harm downstream by disrupting CNN's ability to fulfill its primary television network pool duties,

in which it "function[s]" not only "as [a] surrogate[ ] for the public," *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (plurality opinion), but as a surrogate for the press who depend on pool coverage.

Critically important newsworthy events occur every day. The loss of this access for even a short period of time may constitute "an eon in today's news business." *Karem*, 960 F.3d at 665 (describing "a month-long loss" of White House access). And once Plaintiffs miss out on the opportunity to report on a story, that opportunity is gone forever. Their newsgathering, speech, and the journalistic mission they serve will suffer irreparable harm absent a preliminary injunction.

**III. The balance of hardships and public interest favor a preliminary injunction.**

As this Court has concluded, the last two factors support Plaintiffs, too. ECF No. 24 at 5–7. The "balance of equities" and "public interest" factors "'merge'" because Defendants are governmental officials. *Karem*, 960 F.3d at 668 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Here, these factors weigh decisively in favor of a preliminary injunction against the flagrantly unconstitutional ban.

There is "'always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional' government action." *Media Matters for Am. v. Paxton*, 138 F.4th at 585. The public interest also favors access because a "public awareness and understanding of the President's behavior facilitates his effectiveness as President" and permits "a determination by the public of the adequacy of the President's performance." *Cable News Network v. Am. Broad. Cos.*, 518 F. Supp. at 1244; *see New York Times v. Dep't of Defense*, 824 F. Supp. 3d at 53 (observing that the "constitutional interests at stake" in access to the government for reporting "are hard to overstate").

On the other side of the ledger, Defendants have no legitimate interest in enforcing the ban because "enforcement of an unconstitutional law is always contrary to the public interest." *Karem*,

960 F.3d at 668 (quoting *Gordon*, 721 F.3d at 653); *see Taylor*, 823 F. Supp. 3d at 41. Defendants have offered "little to back up" their claimed "national security interest" since "nothing in the record that predates this suit suggests" that their actions were "motivated by national security concerns." ECF No. 24 at 6. And the administration has not "explain[ed] how any of the reporting they identified in their letters to Plaintiffs damaged the national security" or how denying access to CNN, MS NOW, and POLITICO advances the administration's post hoc justifications when, "in most cases, the reporters who authored the stories Defendants identify in their letters *did not even hold hard passes*." *Id.* at 6–7.

## IV. The Court should waive any bond requirement.

The Court should exercise its discretion "to dispense with any security requirement whatsoever." *Associated Press*, 780 F. Supp. 3d at 60 (quoting *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980)). The Court has "wide discretion" not to require a bond. *Am. First Legal Found. v. Becerra*, 2024 WL 3741402, at *16 n.11 (D.D.C. Aug. 9, 2024). No security requirement is necessary because there is no risk that a preliminary injunction will cause "material damage." *Associated Press*, 780 F. Supp. 3d at 60. And requiring Plaintiffs to post a bond to regain equal access to report on the President and his administration would be at odds with the country's tradition of free speech and a free press. Forcing Plaintiffs to bear a financial cost simply to stand on the same footing as their journalistic peers who were not the target of government retaliation and viewpoint discrimination would compound Plaintiffs' First Amendment injury. This Court should dispense with a bond or again require a nominal bond. ECF No. 24 at 8.

## CONCLUSION

This Court should issue a preliminary injunction enjoining Defendants (save the President) and those acting in concert with them from taking any action to enforce the White House ban

against Plaintiffs, and ordering that Defendants afford Plaintiffs the same access to the White House and the President that they had before September 18, 2026, including the restoration of all hard passes revoked on or about that date.

Dated: September 28, 2026

Respectfully submitted,

*/s/ Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr. (D.C. Bar No. 420440)
Katie Townsend (D.C. Bar No. 1026115)
Patrick J. Fuster (CA Bar No. 326789)*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com
PFuster@gibsondunn.com

Connor S. Sullivan (D.C. Bar No. D00506)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2459
CSSullivan@gibsondunn.com

Connor P. Mui (D.C. Bar No. 90009004)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
CMui@gibsondunn.com

*Counsel for Plaintiffs*

**Admitted Pro Hac Vice*