# EXHIBIT 36

(Declaration of Katherine Fallow)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CABLE NEWS NETWORK, INC., et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>*Defendants*. | Civil Action No. 1:26-cv-3287 |

**DEFENDANTS' OPPOSITION TO**
**PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER**

## INTRODUCTION

The White House is the home and workplace for the Nation's Commander-in-Chief. Plaintiffs CNN, MSNOW, and Politico have long been granted privileged access to White House grounds. But the President concluded that they have failed to maintain basic minimum "standards of professionalism and decorum expected of those given access to the White House Complex, including" by "publishing sensitive or classified information." Ex. 1 Letter to CNN; Ex. 2 Letter to MSNOW; Ex. 3 Letter to Politico ("Letters"). In response, the President has preliminarily revoked their continued access to White House grounds. Letters at 1. After all, access to the White House is a privilege—not a right. The President has set out his factual findings and provided Plaintiffs an opportunity to contest this decision by 5:00 PM Friday, September 25, 2026.

Plaintiffs ask this Court to enjoin the President to provide them with immediate, continued access to the White House complex, contrary to his personal judgment, on three purported grounds. All fail. First, the President's actions are lawful under the First Amendment. While the D.C. Circuit has held that some areas of the White House grounds constitute a nonpublic forum, *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977), that decision is wrong and should be overruled. But even under *Sherrill*, the President's actions must be sustained because the President has "compelling interest[s]" in enforcing minimum standards for bona fide journalists and safeguarding national security information. At the very least, the Government may control reporters' access to restricted presidential areas, such as the Oval Office, even for viewpoint-discriminatory reasons. *Associated Press v. Budowich*, No. 25-5109, 2025 WL 1649265 (D.C. Cir. June 6, 2025) ("*AP*"). Second, the President's actions were not retaliatory because the Government would have taken the same action anyway, notwithstanding Plaintiffs' speech criticizing the President—indeed, the President has not revoked access to other outlets that have equally criticized the President. Third, Plaintiffs are unlikely to prevail on their due process claims because, even if they have a constitutional right to

access the White House, they have received adequate notice and post-deprivation process, including an opportunity to contest the President's factual findings. Finally, Plaintiffs cannot make the requisite showing of irreparable harm and both the public interest and balance of the equities favor the Government.

The Court should therefore deny Plaintiffs' motion for a temporary restraining order.

**BACKGROUND**

The White House is the official residence of the President. 3 U.S.C. § 102. Significantly, Presidents have long decided which journalists should receive privileged access, which has varied substantially by administration. For example, President Washington hand-picked which reporters would print his Farewell Address based on political considerations. *See* Harold Holzer, *The Presidents vs. The Press: The Endless Battle Between the White House and the Media—from the Founding Fathers to Fake News* 16 (2020) (explaining that President Washington selected a paper "never stained with the ribaldry and violence of party recriminations" (quotation marks omitted)). President Jefferson "encouraged the establishment of a new gazette ... that would remain reliably favorable to his administration"; its "reward would be first access to official news." *Id*. at 39.

In the early Twentieth Century, President Theodore Roosevelt began a practice of regularly inviting reporters into the Oval Office for off-the-record press conferences while he received his "regular midday shave." *Id.* at 93. He "picked and chose those he would allow to attend these sessions; he used the conference as an occasion for reward and punishment, screening out the reporters who were the least likely to be sympathetic to his policies." Blaire Atherton French, *The Presidential Press Conference: Its History and Role in the American Political System* 3 (1982). Indeed, President Roosevelt warned reporters that if they were to "violate a confidence or publish news that the President thought ought not to be published," then "he should be punished by having legitimate news withheld from him." Holzer, *supra*, at 100 (quotation marks omitted).

Decades later, President Kennedy sought to "court star correspondents" and thus gave certain reporters "special access" and "advance notice of administration announcements." Holzer, *supra*, at 213. President Johnson "tried to use personal interviews as a means of reward and punishment." Blaire Atherton French, *The Presidential Press Conference: Its History and Role in the American Political System* 18 (1982). Courts in this district have elsewhere summarized the comparatively recent history of press access, including hard passes, in seminal cases: *AP*, 2025 WL 1649265, at *1-*3; *Ateba v. Leavitt*, 133 F.4th 114, 117-119 (D.C. Cir. 2025); *Karem v. Trump*, 960 F.3d 656, 660-61 (D.C. Cir. 2020); *Sherrill*, 569 F.2d at 126-27.

Against this background, on Friday, September 18, the President issued a statement:

> I am proud to announce that, effective immediately, I am banning Fake News CNN, MSNOW (who recently changed their name from MSNBC due to lack of viewership and credibility!), and Politico (The recipients of an illegal and ridiculous $8 Million Dollar subscription, an All Time Record, directly from the United States Government, under Crooked Joe Biden, in order to keep them "alive." Seems like corruption to me!), from the White House as a result of their constant "reporting" FAKE NEWS! Media Outlets shouldn't be able to constantly write or report FICTION and LIES when they're covering the President of the United States, the Trump Administration, or the United States of America. Other Fake News Media Outlets to follow. Thank you for your attention to this matter! President DONALD J. TRUMP[1]

On Monday, September 21, 2026, the President further explained that:

> The White House is not instituting an assault on the Free Press, something which I cherish. It is instituting an assault on the FAKE NEWS, something that has grown like Cancer in our beloved United States of America. It is corrupt, purposeful, pervasive, fully coordinated, and totally out of control. It is a threat to our National Security, and must be stopped, NOW! Thank you for your attention to this matter. President DONALD J. TRUMP[2]

Later that day, Plaintiffs filed suit. Compl. In response, the President released another statement explaining, in part:

[1] Truth Social (Sept. 18, 2026, 3:04PM), https://truthsocial.com/@realDonaldTrump/117293599348325006.
[2] Truth Social (Sept. 21, 2026, 7:53AM), https://truthsocial.com/@realDonaldTrump/117308890736529824.

> Fake News people and publications that only write negatively, and who violate our National Security by writing false and defamatory stories with unknown "sources," shouldn't be allowed access to the most important Office anywhere in the World. It is called the Oval Office, and it should be treated with Decorum, Respect, and Dignity, not defiled by Third Rate Clowns, who purposefully distort, twist, and degrade with everything they write or publish. Virtually every story about me, or anything having to do with me, is negative, wrong and, in many cases, DANGEROUS for our Country![3]

On September 22, 2026, the White House issued letters to Plaintiffs providing "notice that the President has made the determination to revoke hard passes for members of your organization." Letters at 1. These letters explained that Plaintiffs "exhibited behavior in violation of the standards of professionalism and decorum expected of those given access to the White House Complex, including by trafficking in verifiable falsehoods about national security and other issues, and publishing sensitive or classified information." Letters at 1. Yet "[h]ard pass credentials are reserved for those who abide by standards of professional conduct, demonstrate a level of trustworthiness commensurate with the privilege of unfettered access to the White House Complex, and perform their duties in a way that does not interfere with the White House's daily operations." Letters at 1.

The letters also set out the factual basis for this preliminary decision. Each letter identified with specificity a "non-exhaustive list of reporting incidents, including those that have threatened national security and spread falsehoods." Letters at 1. For example, "CNN disclosed 'top-secret' construction details related to the East Wing bunker." Ex. 1 at 1; Wilson Decl. ¶ 22. "MSNOW reported on an alleged leak investigation," which, "if it existed, would be nonpublic sensitive law enforcement information." Ex. 2 at 1; Wilson Decl. ¶ 24. "Politico published a document detailing funding for the White House ballroom containing intricate descriptions of how the Secret Service would invest in security improvements." Ex. 3 at 1; Wilson Decl. ¶ 23. The letters elaborated that

[3] Truth Social (Sept. 21, 2026, 3:39PM), https://truthsocial.com/@realDonaldTrump/117310724294153031

the "[p]ublication of sensitive security information, and misinformation about national security information, diverts White House resources and those of the national security team in particular, which must evaluate whether the leaked information is classified, the source of any leak, and the security implications of any such disclosure." Letters at 1-2.

The President has given each Plaintiff the opportunity "to contest this initial decision or the factual basis set forth" in each letter. Letters at 2. Plaintiffs may submit any response by 5:00 pm on Friday, September 25, 2026. Letters at 2. Otherwise, "this initial decision will be final." Letters at 2. The President continues to engage the press, including Plaintiffs,[4] but believes they should not have access to White House grounds in light of his national security concerns.

## LEGAL STANDARD

"A temporary restraining order is 'an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion.'" *New Mexico v. Musk*, 769 F. Supp. 3d 1, 4 (D.D.C. 2025) (quoting *Hulli v. Mayorkas*, 549 F. Supp. 3d 95, 99 (D.D.C. 2021)). To justify that relief, a plaintiff must show that it is "likely to succeed on the merits," that it "is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The government's interest and the public interest "merge" when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I. Plaintiffs Are Unlikely To Succeed On The Merits Of Their Claims

Plaintiffs raise a First Amendment viewpoint discrimination claim, a First Amendment retaliation claim, and a Due Process claim. All are unlikely to succeed, because all flow from the mistaken conclusion that there is a special property or legal interest in access to the White House. There is not.

[4] *See, e.g.*, Brian Stelter, X (Sept. 22, 2026, 10:00AM) https://x.com/brianstelter/status/2102397658421752296

**A. Plaintiffs Are Unlikely To Succeed On Their Viewpoint Discrimination Claim**

The Supreme Court has explained that no one has a right to gain "unauthorized entry into the White House." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965). Nor does "the First Amendment … mandat[e] a right of access to government information or sources of information within the government's control." *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978). Indeed, the D.C. Circuit just recently explained that the First Amendment does not apply to certain restricted presidential spaces. *AP*, 2025 WL 1649265, at *1 (staying preliminary injunction). Other areas of the White House have recently been treated as "a nonpublic forum." *Ateba*, 133 F.4th at 122. The White House may restrict press access to these areas "'as long as the restrictions are' viewpoint neutral and reasonable." *Id.* at 123 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)).

This line of cases traces back to *Sherrill v. Knight*, which held that because "White House press facilities hav[e] been made publicly available as a source of information for newsmen, the protection afforded newsgathering under the first amendment guarantee of freedom of the press, requires that this access not be denied arbitrarily or for less than compelling reasons." 569 F.2d at 129 (citations omitted). While Defendants acknowledge the D.C. Circuit's decision in *Sherrill*, that case was wrongly decided, and Defendants expressly reserve their right to argue so on appeal.

Access to the White House is a privilege, not a right. In *Sherill*, the D.C. Circuit emphasized that "[t]hese press facilities [were] perceived as being open to all bona fide Washington-based journalists[.]" *Id.* The reality is much better described by the D.C. Circuit's more recent decision in *AP*. 2025 WL 1649265. There, the court acknowledged that there are more journalists who wish to interview the President than he can accommodate; "[i]n deciding which journalists to speak with, the President may of course take into account their viewpoint." *Id.* at *6; *accord Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 413 (4th Cir. 2006) (upholding State Governor's press directive

that "no one in the Executive Department or Agencies" should speak with two named reporters because the "Governor's Press Office feels that currently both are failing to objectively report on any issue dealing with" that administration). As a result, the court concluded that at least for certain spaces, "the White House may consider journalists' viewpoints when deciding whether to grant access." *AP,* 2025 WL 1649265 at *3. The same logic and standard should apply to access to White House grounds more generally. "Opening" the "White House" to some journalists should not "transform these spaces into nonpublic fora to which access must be granted on a viewpoint neutral basis." *Id.* at *10. Indeed, there are currently a finite number of hard passes, and yet the White House briefing room and West Wing facilities can accommodate only so many reporters. Under the *AP* decision, this counsels against the conclusion that the White House is a nonpublic forum. *See id.* at *9 ("These spaces should not be classified as nonpublic fora because access to them is tightly controlled and highly selective…. When access to government property is very limited, considerations of viewpoint may be permissible."). In short, there is no principled way of easily distinguishing between rooms that are a nonpublic forum and those that are no forum at all—particularly where the White House is not obligated to respond to any questions by reporters in the first place. *See id.* at *8 ("The AP's reporting on presidential events through electronic dissemination of news to editors or the public outside the White House is the only communicative activity at issue. But this activity could occur anywhere and therefore lacks the essential connection to the government space required to create even a nonpublic forum."). The reasoning of *AP* should properly control as to all parts of the White House complex.

Yet even under *Sherrill*, Defendants' decision to deny Plaintiffs continued access to White House grounds complies with the First Amendment because they have at least two "compelling

reasons," 569 F.2d at 129, namely, enforcing minimum standards of professionalism for journalists and protecting classified information.

**1. The Government has a compelling interest in awarding hard passes to journalists satisfying minimum standards**

First, Defendants may lawfully deny access to Plaintiffs because the President has concluded they fail to satisfy the minimum requirements of professionalism. Indeed, the D.C. Circuit has acknowledged that the White House can set standards governing qualifications for journalistic access. *Ateba*, 133 F.4th at 127. Nothing about *Sherrill* is inconsistent with the President's judgment that reporters who publish classified and sensitive information fail to meet the *Sherill* standard. Nor does *Sherrill* prevent the President from concluding that bona fide journalists would identify sources instead of relying on anonymous sources, commit to factual accuracy, and provide the White House an opportunity to comment. *Cf. Sherrill*, 569 F.2d at 128-130 (five times limiting ruling to "bona fide" journalists"). The President believes basic journalistic standards require calling, asking for comment, and providing a reasonable opportunity for a response. At a bare minimum, it is a significant violation of decorum to publish classified and sensitive national security information.

To be sure, the D.C. Circuit in *Sherrill* and *Karem* has held that advanced notice of prohibited conduct and of the consequences of noncompliance are required before a hard pass can be revoked. 960 F.3d at 667. Defendants submit those holdings should be overruled, but in any event, the White House has satisfied those requirements by providing an explanation of the relevant standards, both generally and with respect to Plaintiffs conduct specifically. Here, the President's letters set out with specificity what is required and how Plaintiffs have failed to adhere to these standards. Letters at 1. The letters point out with specificity examples of Plaintiffs' conduct that he determined fell below these standards. Letters at 1-2. The letters also provide Plaintiffs

with an opportunity to respond to these concerns and submit materials for the President's reconsideration.

**2. The Government has a compelling interest in national security**

Second, Plaintiffs' reporting gives rise to reasons to doubt their trustworthiness and, in fact, the President has determined that Plaintiffs have reported classified or sensitive information bearing on national security. Letters at 1-2. Defendants have a compelling governmental interest in protecting such information. Indeed, the Supreme Court has recognized that the Constitution vests the President with the "authority to classify and control access to information bearing on national security." *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988). Ultimately, the responsibility and "authority to protect such information falls on the President as head of the Executive Branch and as Commander in Chief." *Id.* at 527.

Here, as explained in the Letters, the President has found that Plaintiffs have engaged in a number of reporting incidents that have threatened national security. Letters at 1-2. Indeed, multiple examples concern reports about the White House complex currently under construction. Ex. 1 at 1; Ex. 3 at 1; *cf. Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the United States*, No. 26A203, 2026 WL 2564318, at *3 (U.S. Aug. 31, 2026) (weighing increased "risk of foreign actors 'gathering intelligence' on the project" (citing JA)). Such reporting directly raises national security concerns. Brown Decl. ¶¶ 11, 15. Indeed, "[t]he release of such information is exactly the type of release that can cause harm to the national security." Wilson Decl. ¶ 22. Furthermore, such reporting incidents also divert resources of national security and other personnel. Brown Decl. ¶ 15. The "[p]ublication of sensitive security information" and even "misinformation about national security information" requires Defendants to "evaluate whether the leaked information is classified, the source of any leak, and the security implications of any such disclosure." Letters at 1-2; Wilson Decl. ¶¶ 7-8. The President therefore has a compelling interest in limiting access to

White House grounds to organizations that do not pose such a risk to national security. Brown Decl. ¶ 12; Wilson Decl. ¶ 20. Defendants "believe that the President's determination to revoke credentials for news outlets and reporters that have caused such interference with government functions would be effective in reducing the amount of information that is published that undermines national security." Wilson Decl. ¶ 21.

**B. Plaintiffs Are Unlikely To Prevail On Their Retaliation Theory**

To properly make out a retaliation claim under the First Amendment, a plaintiff must demonstrate that "(1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quoting *Banks v. York*, 515 F. Supp. 2d 89, 111 (D.D.C. 2007)). But the Government can prevail if it can show that it "would have reached the same decision … even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Here, "[t]he record … adequately supports the conclusion" that the Government would have taken the same action based on a neutral "justification alone." *TikTok Inc. v. Garland*, 604 U.S. 56, 79 (2025).

Here, the President determined that Plaintiffs have failed to maintain minimum professional journalistic standards by publishing classified and national security information. This is an adequate, alternative ground to support the Government's actions here. Plaintiffs therefore cannot bear their burden of showing that the Government would not have taken adverse action against them, but-for their protected speech. Moreover, "the adverse impact" of being denied privileged access to government officials "is objectively *de minimis*[,]" as the Fourth Circuit found in *Ehrlich*. 437 F.3d at 419. Significantly, the policy at issue in *Ehrlich* was far more burdensome

than the policy at issue here: that case concerned a ban prohibiting all executive branch employees from talking to the identified reporters. That is far more than what is at issue here, which is simply preferential access to the White House complex.

**C. Plaintiffs Are Unlikely To Prevail On Their Due Process Claim**

Plaintiffs are unlikely to succeed on their due process claim, because they lack any constitutionally protected liberty or property interest in accessing the White House and they have received adequate.

"A procedural due process claim consists of two elements: (i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023). The D.C. Circuit in *Sherill* held that "the interest of a bona fide Washington correspondent in obtaining a White House press pass is protected by the first amendment" and "qualifies as liberty which may not be denied without due process of law under the [F]ifth [A]mendment." 569 F.2d at 130-31; *see also* id. at 131 n.22 (declining to recognize property interest); *Karem*, 960 F.3d at 665. While Defendants acknowledge *Sherrill*'s holding that White House reporters have protectable due process rights in their hard passes, Defendants respectfully submit that *Sherill* was wrongly decided and expressly reserve their right to argue this on appeal. In fact, individuals do not have a constitutionally protected liberty interest in access to the White House complex given that the public has no First Amendment right of "entry into the White House," *Zemel*, 381 U.S. at 17, and the Constitution does not "require government to accord the press special access to information not shared by members of the public generally." *Pell v. Procunier*, 417 U.S. 817, 834 (1974). Just as "[i]t should be obvious that no one has a 'right' to a security clearance[,]" because "[t]he grant of a clearance requires an affirmative act of discretion on the part of the granting official[,]" *Egan*, 484 U.S. at 528, so does no one have a right to access the White House, which requires an affirmative invitation from the President to access his home.

Even so, Plaintiffs are unlikely to succeed on their due process claim because Defendants have provided Plaintiffs with sufficient post-deprivation process. "Though the Due Process Clause generally requires the Government to afford individuals notice and an opportunity to be heard before depriving them of their property, there are 'extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'" *Zevallos v. Obama*, 793 F.3d 106, 116 (D.C. Cir. 2015) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)); *cf. Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (explaining that "due process is flexible and calls for such procedural protections as the particular situation demands").

Here, the President has provided notice to all Plaintiffs about the principles of decorum expected and required of reporters who have the privilege to cover the White House." Letters at 1-2. The letters explain that hard pass credentials are reserved for outlets that exhibit fact-based reporting and appropriate standards of professional conduct that do not interfere with the White House's daily operations. Such passes are reserved for those that demonstrate a level of trust commensurate with the privilege of unfettered access to the White House complex. The letters set out with specificity the factual bases for these decisions, including identifying with particularity a non-exhaustive list of reporting incidents where Plaintiffs' actions have threatened national security. The White House has also provided Plaintiffs with process to contest these factual findings by Friday. The Government will consider any materials that Plaintiffs wish to submit. The immediate suspension and opportunity to contest this initial decision is consistent with the Government's interest in protecting national security information.

Plaintiffs are therefore unlikely to prevail on their due process claim.

## II. Plaintiffs Cannot Show They Will Suffer Irreparable Harm

Plaintiffs cannot make the requisite showing of irreparable harm. To do so, they must clear a high bar and show harm that "is both certain and great." *Alpine Secs. Corp. v. Fin. Indus. Regul.*

*Auth.*, 121 F.4th 1314, 1332 (D.C. Cir. 2024). But Plaintiffs may continue to publish whatever content or editorials they wish. Many of the journalists in this country who report on the White House do not have access to the White House grounds. Like other reporters lacking on-grounds access, Plaintiffs may continue to show footage from the White House—indeed, media outlets already agree to pool such footage given the impracticality of having duplicative camera sets around the White House. And the White House's website broadcasts much of the President's remarks. Even if Plaintiffs could show that their lack of access to White House grounds limited their ability to convey their preferred message, it is at most a de minimis harm and certainly not irreparable. Many journalists broadcast from outside the White House's gates, and Plaintiffs inability to conduct broadcasts from outside the White House's North Portico does not rise to an irreparable harm. Furthermore, the "law recognizes that the nature of political debate is rough and tumble." *Eaton v. Meneley,* 379 F.3d 949, 956 (10th Cir. 2004). "It would be inconsistent with the journalist's accepted role in the 'rough and tumble' political arena to accept that a reporter of ordinary firmness can be chilled by a politician's refusal to comment or answer questions on account of the reporter's previous reporting." *Ehrlich*, 437 F.3d at 419. Any such harm is not irreparable.

Plaintiffs' ability to show irreparable harm is further limited by the fact that the President has provided each Plaintiff with notice and an opportunity to respond in writing by this Friday. In other words, Plaintiffs are receiving process and any injunction would short-circuit that process. If Plaintiffs wish to contest the factual findings contained in the letters, they may do so.

**III. The Public Interest And Balance Of The Equities Favor The Government**

The public interests in protecting classified and sensitive national security information strongly outweigh any countervailing interests Plaintiffs can identify. "It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation."

*Haig v. Agee*, 453 U.S. 280, 307 (1981); *see also United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (identifying President's interest in maintaining "[s]ecrecy" over classified "information" and preventing its "premature disclosure"). More specifically, the Supreme "Court has recognized the Government's 'compelling interest' in withholding national security information from unauthorized persons in the course of executive business." *Egan*, 484 U.S. at 527 (collecting cases).

The D.C. Circuit recently recognized these harms in upholding a government policy limiting media access at the Pentagon, because it "furthers important national security interests." *New York Times Co. v. U.S. Dep't of Def.*, No. 26-5113, 2026 WL 1179440, at *2 (D.C. Cir. Apr. 27, 2026) ("*NYT*"). There, the Court accepted a government "declaration explaining that prior to the 2025 PFAC Policy, journalists obtained 'sensitive or classified' information 'often monthly, and sometimes multiple times per month,' including information concerning 'operational plans' and 'intelligence assessments.'" *Id.* at *2 (quoting declaration). The court further accepted that "[u]nescorted access to the Pentagon was … 'a significant contributing factor' to that pattern because it enabled reporters to 'observe activity patterns' and identify potential sources of sensitive information." *Id.* (quoting declaration). On this basis, the court found that the Government had "supported its claim that this aspect of its policy furthers important national security interests." *Id.* at *2 (citing *Haig*, 453 U.S. at 307); *see also* Wilson Decl. ¶¶ 9-20.

Here, Defendants' letters and declarations similarly set forth the harms to national security. Letters at 1-2; Brown Decl.; Wilson Decl. This court should "not lightly override the [Government's] judgments on matters involving national security." *Anthropic PBC v. U.S. Dep't of War*, No. 26-1049, 2026 WL 1042493, at *3 (D.C. Cir. Apr. 8, 2026) (citing *Trump v. Hawaii*, 585 U.S. 667, 704 (2018); *see also Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918,

927 (D.C. Cir. 2003) ("[W]e have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review."). That is especially true where that judgment was made by the President himself. Defendants recognize that *Sherrill* rejected the proposition that concerns about the physical security of the President outside a Secret Service process could justify termination of a press pass. 569 F.2d at 130. Defendants, however, argue this precedent is wrongly decided and should be overruled because there is no such due process or First Amendment right attaching to these credentials. *Sherrill* also did not address threats to national security outside the physical security of the White House complex.

On the other side of the ledger, Plaintiffs seek only to maintain continued access to White House grounds to marginally improve their existing coverage of national affairs. Significantly, Plaintiffs may still publish whatever content they choose, including any opinions or editorials criticizing the President or his policies. Rather, Plaintiffs argue that they require immediate continued physical access to White House grounds so that they can have "the ability to observe events firsthand and to ask questions of White House officials." Mot. at 27. But as the *NYT* litigation illustrates, it can be this very access that gives rise to the publication of classified or sensitive national security information. Wilson Decl. ¶¶ 16, 20. Furthermore, Plaintiffs have a process open to them to contest the President's factual findings through Friday. The President has also continued to engage with members of the media, including Plaintiffs.

The public interest and balance of the equities therefore counsel against issuing a temporary restraining order requiring the President to grant Plaintiffs immediate, continued access to White House grounds, over his personal judgment of national security considerations. Such an extraordinary injunction would raise serious separation of powers concerns and set this Court on "a collision course" with the President. *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 389 (2004).

**IV. Any Remedy Should Be Narrowly Limited And Stayed Pending Any Appeal Authorized**

At the very least, no injunction may run against the President. *See Karem*, 960 F.3d at 668. Nor may this Court enjoin Defendants to provide Plaintiffs with access to presidentially restricted areas, such as the Oval Office and Air Force One. Just last year, the D.C. Circuit stayed "a preliminary injunction prohibiting White House officials from denying, on the basis of viewpoint, access to press events held in the Oval Office, on Air Force One, and at the President's home in Mar-a-Lago." *AP*, 2025 WL 1649265, at *1. The D.C. Circuit made clear that "The White House therefore retains discretion to determine, including on the basis of viewpoint, which journalists will be admitted" to at least these areas. *Id.* That requires this court at the very least to uphold a lesser-included policy restricting Plaintiffs' access to these areas.

Finally, if for any reason this Court should grant any part of Plaintiffs' motion, the Court should convert the motion for a temporary restraining order into a motion for a preliminary injunction, so that the parties' appellate rights are clear. In addition, the Court should also stay any injunction pending any appeal authorized by the Solicitor General. For the same reasons Plaintiffs' motion fails, Defendants also satisfy the *Nken*, 556 U.S. 418, standard for a stay pending appeal.

**CONCLUSION**

This Court should deny Plaintiffs' motion.

Dated: September 22, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Federal Programs Branch

ALEXANDER K. HAAS
Director

JOSEPH E. BORSON
Assistant Branch Director

/S/*Michael K. Velchik*
MICHAEL K. VELCHIK (DC Bar 187249)
Senior Counsel, Civil Division
United States Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530
Phone: (202) 860-8388
E-mail: michael.velchik@usdoj.gov

MICHAEL BRUNS
Trial Attorney

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon Plaintiffs' counsel by the Electronic Case Filing system on September 22, 2026.

/s/Michael K. Velchik
MICHAEL K. VELCHIK