**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KENNETH ROTH; DANIEL FROOMKIN; BEVERLY GAGE; PETER SCHMIDT-NOWARA; BENJAMIN WITTES; and ETHAN YOUNG,

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; STEVEN CHEUNG, in his official capacity as Assistant to the President for Communications; SEAN M. CURRAN, in his official capacity as Director of the Secret Service; and STEPHEN MILLER, in his official capacity as White House Chief of Staff,

Defendants.

Civil Action No. 1:26-cv-9327 (LGS)

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER**

## Table of Contents


Table of Authorities ........ ii

Introduction ........ 1

Argument ........ 3

I. The Court should grant Plaintiffs' motion for a preliminary injunction. ........ 3

A. Plaintiffs have standing. ........ 3

1. Plaintiffs' injuries are particularized. ........ 3

2. Plaintiffs have concrete, specific connections to members of the White House press corps. ........ 6

B. Plaintiffs are suffering irreparable harm. ........ 9

II. The Court should deny Defendants' request to transfer. ........ 12

Conclusion ........ 20

Certificate of Compliance ........ 21

## Table of Authorities

### Cases

*Abramowitz v. Lake*, 824 F. Supp. 3d. 1 (D.D.C. 2026) .......... 8

*Alpha Indus., Inc. v. Alpha Clothing Co.*, 2021 WL 2688722 (S.D.N.Y. June 30, 2021) .......... 17

*AP v. Budowich*, 2025 WL 1649265 (D.C. Cir. June 6, 2025) .......... 11, 12

*CNN v. Trump*, 2026 WL 3063460 (D.D.C. Oct. 13, 2026) .......... 11

*Dardarian v. DOD*, No. 26-CV-1965 (D.D.C.) .......... 19

*Dentsply Int'l Inc. v. Dental Brands for Less LLC*, 2016 WL 868335 (S.D.N.Y. Mar. 4, 2016) .......... 13, 14, 15, 16

*DiPizio v. Empire State Dev. Corp.*, 2015 WL 5824704 (S.D.N.Y. Oct. 5, 2015) .......... 17

*Dynamic Data Techs., LLC v. HTC Corp.*, 2019 WL 2433549 (S.D.N.Y. June 11, 2019) .......... 14, 16

*Ford v. Shader*, 2025 WL 3295015 (S.D.N.Y. Nov. 26, 2025) .......... 19

*Gallagher v. N.Y. State Bd. of Elections*, 477 F. Supp. 3d 19 (S.D.N.Y. 2020) .......... 10

*Gen. Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273 (2d Cir. 1997) .......... 12

*Gordon v. State Farm Fire & Cas. Co.*, 2025 WL 1079096 (S.D.N.Y. Apr. 10, 2025) .......... 17

*Gross v. BBC*, 386 F.3d 224 (2d Cir. 2004) .......... 14

*Kalman v. Cortes*, 646 F. Supp. 2d 738 (E.D. Pa. 2009) .......... 16

*Murthy v. Missouri*, 603 U.S. 43 (2024) .......... 1, 6

*N.Y. Times v. DOD*, No. 26-5113 (D.C. Cir.) .......... 19

*N.Y. Times v. DOD*, No. 26-5253 (D.C. Cir.) .......... 19

*Nat. Council of Prison Locs. v. Fed. Bureau of Prisons*, 2026 WL 1146301 (D. Conn. Apr. 28, 2026) .......... 17

*New York v. Pruitt*, 2018 WL 2411595 (S.D.N.Y. May 29, 2018) .......... 15

*NLRB v. Universal Smart Conts., LLC*, 166 F.4th 304 (2d Cir. 2026) .......... 13

*Pen Am. Ctr., Inc. v. Trump*, 448 F. Supp. 3d 309 (S.D.N.Y. 2020) .................................... passim

*Rag & Bone Holdings, LLC v. Miramar Brands Grp., Inc.*, 2026 WL 2334709 (S.D.N.Y. Aug. 12, 2026) .................................... passim

*Ruiz ex rel. E.R. v. United States*, 2014 WL 4662241 (E.D.N.Y. Sept. 18, 2014) .................... 18

*Schuyler v. Sun Life Assurance Co. of Can.*, 2021 WL 5853991 (S.D.N.Y. Dec. 9, 2021) .................................... 16

*Sentegra, LLC v. ASUS Computer Int'l*, 2016 WL 3093988 (S.D.N.Y. June 1, 2016) .................................... 15, 17

*Simpson v. Rodas*, 2012 WL 4354832 (S.D.N.Y. Sept. 21, 2012) .................................... 14

*Spokeo, Inc. v. Robbins*, 578 U.S. 330 (2016) .................................... 3

*Starr Indem. & Liab. Co. v. Brightstar Corp.*, 324 F. Supp. 3d 421 (S.D.N.Y. 2018) .................................... 17

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976) .................................... 4

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015) .......................... 12

*Warth v. Seldin*, 422 U.S. 490 (1975) .................................... 3

*Widakuswara v. Lake*, No. 26-5087 (D.C. Cir.) .................................... 19

**Statutes**

28 U.S.C. § 1391 .................................... 16

**Other Authorities**

*About the Clinic*, Media Freedom & Info. Access Clinic, https://perma.cc/L2TF-EWEG .................................... 18

*About Us*, Knight First Amend. Inst. at Columbia Univ., https://perma.cc/ZGZ5-FGEG .................................... 18

Am. Compl., *AP v. Budowich*, 780 F. Supp. 3d 32 (D.D.C. 2025), ECF No. 26 .................. 10, 15

Am. Compl., *CNN v. Trump*, No. 26-CV-3287 (D.D.C. Oct. 28, 2026), ECF No. 54 .................................... 10, 15

Resp. to Notice for Other Relief, *AP v. Budowich*, 25-5109 (D.C. Cir. Oct. 1, 2026), ECF No. 2195829 .................................... 19

## Introduction

Defendants' opening brief does not seriously engage with Plaintiffs' argument that Defendants have adopted an unconstitutional policy and practice of punishing members of the White House press corps whose reporting the president views as "false" or "fake" (the "Policy"). Defendants barely address Plaintiffs' argument that the spaces the White House has opened to the press constitute a "public forum" under the First Amendment, and they leave altogether uncontested Plaintiffs' claim that Defendants condition access to that forum on criteria that are viewpoint based and unreasonable. Instead, Defendants focus almost entirely on Plaintiffs' standing to sue, and on the question of whether Plaintiffs are suffering irreparable injury. Defendants' arguments are meritless.

Plaintiffs have standing because the Policy burdens their First Amendment right to receive independent reporting from members of the White House press corps. Defendants' argument that Plaintiffs' injuries are insufficiently particularized misconstrues well-established case law and largely ignores Plaintiffs' unrebutted evidence describing and documenting the ways in which each of them relies on White House reporting, and explaining the ways in which the Policy affects each of them in particular. Similarly, Defendants' contention that Plaintiffs have not demonstrated that they have concrete, specific connections to willing speakers all but ignores the record that Plaintiffs have submitted to the Court, which shows that Plaintiffs rely specifically on journalists and news organizations that Defendants have already targeted or explicitly threatened under the Policy. Defendants invoke the Supreme Court's recent decision in *Murthy v. Missouri*, but the Court in that case made clear that plaintiffs who suffer injuries because of restraints imposed on would-be speakers with whom they have concrete, specific connections have standing to challenge the constitutionality of those restraints. 603 U.S. 43, 74–76 (2024). Plaintiffs have standing here for

the same reasons that this Court found that plaintiffs had standing in *Pen American Center, Inc. v. Trump*, 448 F. Supp. 3d 309 (S.D.N.Y. 2020).

Defendants' arguments concerning irreparable harm are likewise unpersuasive. The argument that Plaintiffs should have brought suit two years ago is misguided because it was not until this fall that it became evident that Defendants had adopted the Policy, even if it is now clear that certain actions Defendants took earlier were taken in furtherance of the Policy. Defendants' argument that relief entered in two other cases somehow undercuts Plaintiffs' entitlement to preliminary relief here is equally misplaced. The relief issued in those cases runs only to the plaintiffs in those cases; it was partial relief even as to those plaintiffs; some of the relief has been stayed; and Defendants are contesting the relief on appeal, which means that the Policy of expelling news organizations from the White House on the basis of their reporting continues to have a chilling effect now.

The Court should also deny Defendants' request that it transfer this case to the D.D.C. because Defendants do not come close to carrying their heavy burden of making out a "clear and convincing" case for this relief. *Rag & Bone Holdings, LLC v. Miramar Brands Grp., Inc.*, 2026 WL 2334709, at *7 (S.D.N.Y. Aug. 12, 2026). The S.D.N.Y. is the superior venue because it is Plaintiffs' chosen forum, where Plaintiff Kenneth Roth resides and where a substantial part of the events giving rise to Plaintiffs' First Amendment claim occurs; because this Court has deep familiarity with the legal issues presented by this case; because Plaintiffs' means are modest relative to those of the federal government; and because keeping the case in this Court would promote judicial efficiency and the interests of justice.

The Court should grant Plaintiffs' motion for a preliminary injunction and deny Defendants' request to transfer.

## Argument

### I. The Court should grant Plaintiffs' motion for a preliminary injunction.

#### A. Plaintiffs have standing.

Plaintiffs have standing because the Policy burdens their First Amendment right to receive independent reporting from members of the White House press corps. *See Pen Am.*, 448 F. Supp. 3d at 323–24. As Plaintiffs' have explained, the Policy deprives Plaintiffs of reporting from journalists whose access to the White House Press Forum has already been restricted or revoked; it deprives Plaintiffs of reporting from journalists who experience a present, objectively reasonable chill on their participation in the forum; and it will deprive Plaintiffs of reporting from journalists who face a credible threat that Defendants will restrict or revoke their access in the future. Pls.' Br. 15–18, ECF No. 11. Contrary to Defendants' suggestions, Plaintiffs have amply demonstrated particularized harm, including the concrete, specific connections to members of the White House press corps that establish their First Amendment receipt-of-information injuries.

##### 1. Plaintiffs' injuries are particularized.

Defendants' argument that Plaintiffs' injuries are "generalized grievances" and insufficiently "particularized," Defs.' Opp'n 21–24, ECF No. 35, misconstrues standing law and ignores Plaintiffs' unrebutted evidence of "personal" and "individual" injury, *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 339 (2016).

Plaintiffs' injuries are not generalized grievances just because other members of the public may also be, and undoubtedly are, harmed by Defendants' Policy. Defs.' Opp'n 21. As the Supreme Court has made clear, a plaintiff has standing where she suffers a "distinct and palpable injury . . . , even if it is an injury shared by a large class of other possible litigants." *Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("[I]ndeed, [she] may invoke the general public interest in support of

[her] claim.”). In other words, Plaintiffs must have “a personal stake in the outcome” of this case—but they need not be the only ones. *Pen Am.*, 448 F. Supp. 3d at 319, 324 (citations omitted). For example, in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, the Supreme Court held that the plaintiffs—a single “individual Virginia resident who suffers from diseases that require her to take prescription drugs on a daily basis, and two nonprofit organizations”—had standing to challenge a statute that sought to prohibit any Virginia pharmacist from advertising prescription drugs. 425 U.S. 748, 753 (1976).

This Court’s decision in *Pen American* is especially instructive. That case involved a plaintiff organization that asserted direct organizational standing to challenge Defendant Trump’s practice of “revoking or threatening to revoke the security clearances of former government officials whose commentary he dislikes.” 448 F. Supp. 3d at 319. The Court found that the organization plausibly alleged that “Defendant’s retaliation and threats of further retaliation against these officials have objectively chilled the volume or quality of their media speech,” and that the organization’s “right to receive the speech has in turn been impaired.” *Id.* at 323–24. The Court further held that the organization’s “injury is particularized” because it “engages in advocacy for freedom of the press, monitors the government’s impact on the press, and publishes research and analysis on these issues,” and its “sources of information include . . . former government officials, who provide unique and expert insight on the Administration.” *Id.* at 324. “Loss of these official[s’] speech is therefore not a generalized grievance.” *Id.*

Defendants’ attempt to distinguish *Pen American* misses the mark. Defendants focus on an unrelated portion of the Court’s opinion, where the Court concluded that the plaintiff organization could not also assert associational standing based on a journalist member’s own “receipt-of-information injury.” 448 F. Supp. 3d at 322. Unlike the organization itself, the member’s injury

was not sufficiently particularized, the Court explained, because he asserted only a generalized interest in "chilled media speech generally." *Id.*

Here, Defendants largely ignore the evidence submitted by each Plaintiff attesting to the specific ways in which each of them relies on reporting from members of the White House press corps, and to the ways in which the Policy affects them in particular. Pls.' Br. 11–12; Compl. ¶¶ 48–65, ECF No. 1. Each Plaintiff uses independent White House reporting in a variety of personal and individual ways in their scholarship, teaching, journalism, or advocacy. Plaintiff Kenneth Roth's daily work as a human rights advocate and scholar requires the "accurate and up-to-the-minute understanding of" the president's administration that he gains from White House reporting. Roth Decl. ¶ 15. Plaintiff Daniel Froomkin finds White House reporters to be "key sources of information" for his work writing about "President Trump, his policies," and "his relationship to the media." Froomkin Decl. ¶ 9. Plaintiff Beverly Gage attests that the Policy "hinders [her] ability to access the information [she] require[s]" for her scholarship, teaching, and writing. Gage Decl. ¶ 15. Plaintiff Peter Schmidt-Nowara finds White House reporting to be "essential" for preparing syllabi and lesson plans for his high school students. Schmidt-Nowara Decl. ¶¶ 10–11. Plaintiff Benjamin Wittes depends on White House reporting to research and source ideas for his public writing and episodes of the Lawfare Daily podcast. Wittes Decl. ¶¶ 10–13. And Plaintiff Ethan Young relies on White House reporting to "help deliver relevant news that facilitates an informed discourse on campus," especially as relates to "the Trump administration's actions regarding higher education, generally, and the University of Pennsylvania, specifically." Young Decl. ¶ 6.

Like the plaintiff organization in *Pen American*, Plaintiffs' receipt-of-information injuries provide them with standing because they have demonstrated that the Policy has obstructed certain

speakers and speech on which Plaintiffs specifically rely, causing Plaintiffs particularized injuries. 448 F. Supp. 3d at 323–24 & n.3.

**2. Plaintiffs have concrete, specific connections to members of the White House press corps.**

Defendants additionally argue that "Plaintiffs cannot show standing because they do not show a concrete and specific connection to any reporters who allegedly were excluded from the White House or whose speech was assertedly chilled by the alleged policy." Defs.' Opp'n 24. This, too, is belied by the unrebutted record demonstrating Plaintiffs' numerous connections to members of the White House press corps and their reporting.

In *Murthy v. Missouri*, the Supreme Court explained that in a case asserting a listener's First Amendment right to receive information, the listener suffers a receipt-of-information injury where she "has a concrete, specific connection to the speaker." 603 U.S. at 74–76. The *Murthy* plaintiffs themselves asserted a "startingly broad" theory of standing premised on a vague "interest in reading and engaging with the content of other speakers on social media," and the Court faulted the plaintiffs for failing to "identif[y] any specific speakers or topics that they have been unable to hear or follow." *Id.* at 74–75. Here, unlike in *Murthy*, Plaintiffs have precisely identified members of the White House press corps whose reporting has been restricted, chilled, and threatened—reporting they have relied upon and have a right to receive.

As listeners, Plaintiffs have concrete, specific connections to members of the White House press corps that Defendants have already targeted under the Policy. Plaintiffs Froomkin, Roth, and Young read and rely on White House reporting from the AP, which Defendants expelled from the White House press pool in February 2025 because it refused to adopt the Trump administration's preferred geopolitical nomenclature. Froomkin Decl. ¶ 6; Roth Decl. ¶ 8; Young Decl. ¶ 5; Ex. 14. Plaintiffs Froomkin, Roth, Wittes, and Young read White House reporting from POLITICO, one

of the three news organizations that Defendants targeted in September 2026. Froomkin Decl. ¶¶ 6–7; Roth Decl. ¶ 11; Wittes Decl. ¶ 9; Young Decl. ¶ 5; Ex. 17. Plaintiffs Froomkin and Gage watch broadcast coverage of President Trump and his administration on CNN and MS NOW, the two other news organizations. Froomkin Decl. ¶ 6; Gage Decl. ¶ 7; Ex. 17. On social media, Plaintiffs Froomkin, Roth, and Young follow the accounts, and engage directly with the reporting, of specific White House reporters from CNN, POLITICO, and MS NOW. Froomkin Decl. ¶ 7; Roth Decl. ¶ 11; Young Decl. ¶ 5. Plaintiff Wittes follows the Bluesky account of Andrew Feinberg of the Independent, who was barred from serving as a print pool reporter on Air Force One in October 2026 after he asked the president unwelcome questions at an Oval Office press conference. Wittes Decl. ¶ 9; Exs. 33–34.

Plaintiffs also have connections to members of the White House press corps that Defendants have explicitly threatened with enforcement action under the Policy. Ex. 25 (Truth Social post in which Defendant Trump singled out USA Today, CNN, the Washington Post, the Guardian, Newsweek, the New York Times, ABC, NBC, and Forbes). Plaintiffs read and rely on White House reporting from the New York Times, the Washington Post, and the Guardian, and they often cite and discuss specific articles and journalists in their work. Froomkin Decl. ¶¶ 6, 10–11; Gage Decl. ¶¶ 7, 9, 11; Roth Decl. ¶¶ 8–10, 15; Schmidt-Nowara Decl. ¶¶ 6, 8, 12; Wittes Decl. ¶¶ 7, 13, 17; Young Decl. ¶¶ 5, 7, 10. Plaintiffs subscribe to the New York Times and the Washington Post. Froomkin Decl. ¶ 6; Gage Decl. ¶ 7; Roth Decl. ¶ 8; Schmidt-Nowara Decl. ¶ 6; Wittes Decl. ¶ 9; Young Decl. ¶ 5. Gage and Schmidt-Nowara subscribe and listen to podcasts from the New York Times that provide them with news and information about President Trump's actions and policies. Gage Decl. ¶ 7; Schmidt-Nowara Decl. ¶ 6. Plaintiffs Froomkin and Roth

follow the social media accounts of White House reporters from the New York Times. Froomkin Decl. ¶ 7; Roth Decl. ¶ 11.

And Plaintiffs have connections to many other members of the White House press corps who are subject to the Policy and face a present chill or credible threat of enforcement. Plaintiffs read the Wall Street Journal, NPR, PBS, Al Jazeera, Reuters, and the Boston Globe. Froomkin Decl. ¶ 6; Gage Decl. ¶ 7; Roth Decl. ¶ 8; Schmidt-Nowara Decl. ¶ 6; Young Decl. ¶ 5. Plaintiff Froomkin subscribes to the Wall Street Journal. Froomkin Decl. ¶ 6. Plaintiffs Gage and Young watch and read Fox News, and Plaintiff Gage listens to NPR. Gage Decl. ¶ 7; Young Decl. ¶ 5. Plaintiffs Froomkin and Young follow the social media accounts of White House reporters from CBS, NPR, PBS, and the Wall Street Journal. Froomkin Decl. ¶ 7; Young Decl. ¶ 5.

In light of Plaintiffs' extensive and close connections to White House reporters and reporting, Defendants' effort to distinguish *Abramowitz v. Lake* is unavailing. 824 F. Supp. 3d. 1 (D.D.C. 2026). In that case, Reporters Sans Frontières ("RSF") and others challenged the government's actions to "dramatically downsize the United States Agency for Global Media and its subsidiary, Voice of America" ("VOA"). *Id.* at 9. Following *Murthy*, the court found that these plaintiffs had a concrete, specific connection to VOA broadcasting because they "rely on VOA as a critical flow of information." *Id.* at 15 (citations and quotation marks omitted). Accordingly, the court held that RSF and its correspondents had standing "as consumers of VOA broadcasting." *Id.* Defendants assert without support that Plaintiffs here have not demonstrated standing because they have not alleged that they rely on White House reporting, Defs.' Opp'n 25–26—but the record shows the contrary. Plaintiffs rely on reporting by the White House press corps in precisely the same ways that RSF and its correspondents relied on VOA broadcasting. Froomkin Decl. ¶ 9; Gage Decl. ¶ 9; Roth Decl. ¶¶ 15–16; Schmidt-Nowara Decl. ¶ 10; Wittes Decl. ¶ 14; Young Decl ¶ 6.

**B. Plaintiffs are suffering irreparable harm.**

Defendants seek to cast doubt on Plaintiffs' showing of substantial, ongoing harm by arguing, first, that Plaintiffs should have brought suit sooner, and, second, that rulings in two other cases pending in the D.C. Circuit undercut Plaintiffs' entitlement to preliminary relief. Defs.' Opp'n 15–19. These arguments fail.

First, Plaintiffs filed suit as soon as practicable after the existence and scope of the Policy and its harm to Plaintiffs became clear. Defendants argue that Plaintiffs should have sued when they excluded the AP from the White House press pool in February 2025. But it was not apparent at the time that the action against the AP was part of a broader Policy of restricting the access of members of the White House press corps within the White House Press Forum, rather than a one-off, albeit unconstitutional, instance of retaliation. Exs. 14–16. The existence and scope of the Policy did not become apparent until Defendants' actions this fall, when the White House revoked the press credentials of journalists from CNN, POLITICO, and MS NOW. Exs. 17–18. The government itself publicly referred to the Policy for the first time in a legal brief filed on September 22, 2026, Ex. 36, at 11–12, 17; *see also* Ex. 35, at 14, 24, and its contours became clearer in the ensuing weeks, as Defendants engaged in, and threatened, additional enforcement actions under the Policy, Ex. 25 (threatening other members of the White House press corps); Exs. 27–30 (imposing further restrictions on CNN, POLITICO, and MS NOW). Plaintiffs filed this lawsuit within a matter of days after the White House's latest enforcement action, on October 21, barring Andrew Feinberg of the Independent from Air Force One. Exs. 33–34. Thus, the cases that

Defendants cite for the proposition that significant delay in bringing suit may weigh against a finding of irreparable harm are inapposite. Defs.' Opp'n 15–17.[1]

Second, Defendants argue that Plaintiffs' claims of irreparable harm are undermined or foreclosed by interim decisions in the pending cases of *CNN v. Trump* and *AP v. Budowich*, but those cases have not redressed, and cannot redress, Plaintiffs' injuries.

Most fundamentally, those two cases challenge different conduct on behalf of different parties, and the relief they seek will not extend to any other member of the White House press corps. Here, Plaintiffs challenge the unconstitutional Policy of restricting the access of disfavored journalists and news organizations within the entire White House Press Forum, and they seek relief to remedy the harm the Policy causes to Plaintiffs in the form of an order preventing enforcement of the Policy against *any* member of the White House press corps. Pls.' Br. 3. By contrast, in *CNN* and *AP*, a handful of news organizations have sued to reverse specific enforcement actions that Defendants have taken against them pursuant to the Policy. Am. Compl. ¶¶ 134–35, *CNN v. Trump*, No. 26-CV-3287 (D.D.C. Oct. 28, 2026), ECF No. 54 (seeking to enjoin "the President's ban" of CNN, MS NOW, and POLITICO from White House grounds and press pool events); Am. Compl. p. 31, *AP v. Budowich*, 780 F. Supp. 3d 32 (D.D.C. 2025), ECF No. 26 (seeking to "rescind [the] denial of the AP's access to the Oval Office, Air Force One, and other limited spaces" and to "rescind [the] denial of the AP's access to events"). Even if these cases are ultimately successful, they will not fully protect other journalists and news organizations that are subject to the Policy,

[1] Defendants' argument would be misguided even if Plaintiffs had in fact waited many months to sue. *See Gallagher v. N.Y. State Bd. of Elections*, 477 F. Supp. 3d 19, 41–42 (S.D.N.Y. 2020) ("[W]here, as here, an alleged wrongful governmental act has resulted in an ongoing deprivation of constitutional rights, delay in seeking relief does not defeat the presumption of irreparable harm . . . ." (citation omitted)).

including those like Andrew Feinberg and the Independent that have already been targeted under the Policy, Exs. 33–34; those like ABC, NBC, the New York Times, USA Today, and the Washington Post that have been explicitly threatened under the Policy, Ex. 25; and all those that are presently chilled by or otherwise face a credible threat of enforcement under the Policy, Ex. 25; Ex. 31, at 8–9; Ex. 32, at 32; Ex. 37.

In addition, those two cases have so far resulted only in narrow, partial relief for the news organizations that have brought them. In *CNN*, the district court preliminarily ordered the White House to restore the "'hard pass' credentials held by employees of CNN, MS NOW, and POLITICO." 2026 WL 3063460, at *2, *12 (D.D.C. Oct. 13, 2026). But the White House has continued to restrict the access of reporters from those organizations to certain White House spaces and press pool events, Ex. 15; Exs. 27–30, and the organizations' challenge to those restrictions is pending. Likewise in *AP*, a district court preliminarily enjoined the White House from banning the AP from spaces open to other members of the White House press pool. 2025 WL 1649265, at *13 (D.C. Cir. June 6, 2025). But on the government's motion for a stay of that order pending appeal, a divided emergency panel of the D.C. Circuit has allowed the White House to continue to ban the AP from "the Oval Office, Air Force One, . . . and other similar spaces." *Id.* Accordingly, the limited relief granted in these other cases does not cure the irreparable harm that Plaintiffs have demonstrated in this one. *See Pen Am.*, 448 F. Supp. 3d at 321 & n.2 ("Although loss of credentials may be injurious, Plaintiff has alleged instead that speech [itself] has been adversely affected, *i.e.* the injury of an *ongoing* chilling of speech and corollary *ongoing* interference with receipt of information." (quotation marks omitted)).

Finally, Defendants are wrong to suggest that Plaintiffs are not suffering irreparable harm because the divided emergency panel of the D.C. Circuit in the *AP* case has tentatively concluded

that the White House's viewpoint-based exclusion of that news organization from certain White House spaces does not violate the First Amendment. Defs.' Opp'n 18–19. That interim decision carries no precedential weight even within its own circuit. It is also wrong on the merits. In the panel majority's view, certain government-controlled spaces like the Oval Office and Air Force One can never be protected by forum doctrine because they are "restricted presidential spaces." *AP*, 2025 WL 1649265, at *1. But this conclusion is directly contrary to binding Second Circuit and Supreme Court precedent recognizing that forum doctrine protects as a nonpublic forum "all remaining public property" opened for First Amendment activity that is not a traditional or designated public forum—even highly controlled and selective spaces like military bases. *Gen. Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273, 278 (2d Cir. 1997); *see also Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 216 (2015) (forum doctrine applies to spaces "[w]here the government is acting as a proprietor, managing its internal operations"). Lastly, the panel's ruling addressed only the exclusion of one news organization—the AP—from a small subset of the spaces that make up the White House Press Forum. Defs.' Opp'n 18. As noted above, Plaintiffs suffer irreparable harm from Defendants' Policy that applies to all members of the White House press corps and governs their access to the entire White House Press Forum.[2]

## II. The Court should deny Defendants' request to transfer.

Defendants ask the Court to transfer this case to the D.D.C., and to do so even before the Court decides Plaintiffs' motion for a preliminary injunction. Defs.' Opp'n 6. But Defendants do not come close to carrying their heavy burden of making out a "clear and convincing" case for transfer. *Rag & Bone*, 2026 WL 2334709, at *7. The S.D.N.Y. is the superior venue because this

---

[2] For the same reasons, the interim stay decision in *AP* has no bearing on Plaintiffs' likelihood of success on the merits of their First Amendment claim or on the balance of equities and public interest. *Contra* Defs.' Opp'n 26–27.

district is Plaintiffs' chosen forum, where Plaintiff Roth resides and where a substantial part of the events giving rise to Plaintiffs' First Amendment claim occurs; because this Court is uniquely familiar with the legal issues presented by this case; because the six individual Plaintiffs' means are modest relative to the federal government; and because retaining the case would promote judicial efficiency and the interests of justice.

"A district court may, '[f]or the convenience of parties and witnesses' and 'in the interest of justice,' 'transfer any civil action to any other district or division where it might have been brought.'" *NLRB v. Universal Smart Conts., LLC*, 166 F.4th 304, 316 (2d Cir. 2026) (quoting 28 U.S.C. § 1404(a)). In weighing convenience and the interests of justice, the Court considers the following discretionary factors: (1) plaintiffs' choice of forum; (2) the convenience of witnesses; (3) the location of relevant documents and relative ease of access to sources of proof; (4) the convenience of the parties; (5) the locus of operative facts; (6) the availability of process to compel the attendance of unwilling witnesses; (7) the relative means of the parties; (8) the forum's familiarity with the governing law; and (9) trial efficiency and the interests of justice. *Rag & Bone*, 2026 WL 2334709, at *3. "The moving party must make a 'clear and convincing' showing that transfer is proper." *Id.* at *7. Plaintiffs' choice of forum should "not be overturned absent a definitive showing that the [alternate forum] is a superior venue." *Dentsply Int'l Inc. v. Dental Brands for Less LLC*, 2016 WL 868335, at *2 (S.D.N.Y. Mar. 4, 2016).[3]

Here, all of the discretionary transfer factors either weigh firmly in favor of keeping the case in this Court or are at most neutral. First, Plaintiffs' choice of forum weighs in favor of the S.D.N.Y. "Courts give a high degree of deference to the plaintiff's choice of forum." *Rag & Bone*,

---

[3] Plaintiffs do not dispute that this case might have been brought in the D.D.C. *See* 28 U.S.C. § 1391(e)(1)(A).

2026 WL 2334709, at *7 (citation omitted); *see also, e.g.*, *Gross v. BBC*, 386 F.3d 224, 230 (2d Cir. 2004) (plaintiffs' choice of forum "presumptively entitled to substantial deference"). Indeed, the very purpose of 28 U.S.C. § 1391(e) is to provide citizens with multiple options for proper venue to sue federal officials. And deference to Plaintiffs' chosen forum is even greater where, as with Plaintiff Roth here, "a plaintiff sues in [his] home forum." *Rag & Bone*, 2026 WL 2334709, at *7 (citation omitted).

Defendants' argument that Plaintiffs' choice of forum here warrants "diminishe[d]" deference, Defs.' Opp'n 13, is not helped by the two cases Defendants cite to support it. In *Dynamic Data Technologies, LLC v. HTC Corp.*, the court explained that "the importance of the plaintiff's choice . . . measurably diminishes" where "the forum selected is not plaintiff's home forum or the place where the operative facts of the action occurred." 2019 WL 2433549, at *7 (S.D.N.Y. June 11, 2019) (citation and quotation marks omitted). In that case, the court granted the defendants' motion to transfer out of the S.D.N.Y. where the plaintiff was "a Delaware corporation that is based in St. Paul, Minnesota." *Id.* at *8. Similarly, in *Simpson v. Rodas*, the court was presented with no "meaningful connections" to the S.D.N.Y., including a pro se plaintiff who was incarcerated in another district. 2012 WL 4354832, at *10 (S.D.N.Y. Sept. 21, 2012). By contrast, here, the S.D.N.Y. is home to Plaintiff Roth and, as explained further below, is a significant locus of operative facts.

Second, the convenience of witnesses is neutral. On the one hand, any government "witnesses are under Defendant[s'] control . . . and would therefore be available to testify in either venue." *Dentsply*, 2016 WL 868335, at *2. On the other, this case centers on the six Plaintiff witnesses, the majority of whom would find it more convenient to litigate in the "geographically closer" S.D.N.Y. *Id.*; *see* Compl. ¶¶ 11, 13–14, 16 (listing Plaintiffs' residences in the S.D.N.Y.,

E.D.N.Y., D. Conn., and E.D. Pa.). Moreover, "the convenience of non-party witnesses is accorded more weight than that of party witnesses," and Defendants have "not argued that non-party witnesses would be inconvenienced or unavailable if the case remained in this court." *Dentsply*, 2016 WL 868335, at *2. Defendants' speculation as to the identity and residence of any possible future non-party witnesses is not a proper, let alone persuasive basis for transfer. Defs.' Opp'n 10; *see Sentegra, LLC v. ASUS Computer Int'l*, 2016 WL 3093988, at *3 (S.D.N.Y. June 1, 2016) ("The party moving for transfer must provide the Court with a detailed list of probable witnesses who will be inconvenienced if required to testify in the current forum." (citation and quotation marks omitted)). This is especially so here because many members of the White House press corps are large corporations with significant resources, and many are headquartered in the S.D.N.Y., including the AP, MS NOW, and several of the threatened news organizations like ABC, NBC, and the New York Times. Am. Compl. ¶ 24, *AP v. Budowich*, 780 F. Supp. 3d 32 (D.D.C. 2025); Am. Compl. ¶ 18, *CNN v. Trump*, No. 26-CV-3287 (D.D.C. Oct. 28, 2026).

Third, the location of relevant documents is neutral. Plaintiffs agree with Defendants that "[t]he location of documents and other sources of proof does not favor either forum." Defs.' Opp'n 12; *see also Rag & Bone*, 2026 WL 2334709, at *7.

Fourth, the convenience of the parties is neutral. Defendants may "prefer to litigate" in the D.D.C., *Dentsply*, 2016 WL 868335, at *2, but "the civil division of the U.S. Attorney's Office in the Southern District of New York is perfectly capable of defending the federal government's position," *New York v. Pruitt*, 2018 WL 2411595, at *6 (S.D.N.Y. May 29, 2018). Any conceivable inconvenience that litigating in the S.D.N.Y. might cause Defendants is at the very least offset by the inconvenience that transfer to the D.D.C. would cause Plaintiffs because the S.D.N.Y. is "geographically closer" to where most Plaintiffs reside. *Dentsply*, 2016 WL 868335, at *2; *see*

*also Schuyler v. Sun Life Assurance Co. of Can.*, 2021 WL 5853991, at *3 (S.D.N.Y. Dec. 9, 2021) (denying transfer in part because plaintiff "lives in Connecticut, making her choice of forum a more convenient location" for her than defendant's preferred forum). Defendants themselves acknowledge that transfer would cause "increased inconvenience for Plaintiffs." Defs.' Opp'n 12. "Where a transfer would merely switch the burden of inconvenience from one party to the other, this factor . . . is essentially neutral." *Dentsply*, 2016 WL 868335, at *2 (citation omitted).[4]

Fifth, the locus of operative facts is neutral. Not only does Plaintiff Roth reside in this district, but a "substantial part of the events . . . giving rise" to his and his co-Plaintiffs' First Amendment claim has occurred and continues to occur here. 28 U.S.C. § 1391(e)(1)(B)–(C). Plaintiff Roth experiences the impact of Defendants' Policy in the S.D.N.Y. "In a case brought on First Amendment grounds, impact becomes the most important part of the case. Minimizing the impact of the [Policy], compared to its adoption or administration, would marginalize the Plaintiff's substantive First Amendment claim[] under the guise of a venue statute." *Kalman v. Cortes*, 646 F. Supp. 2d 738, 742 (E.D. Pa. 2009). And in a case premised on Plaintiffs' First Amendment rights as listeners, Plaintiffs "suffer[] harm" in the district where they are deprived of the information they would like to receive, "as opposed to the district in which the [Policy] was written and the decision to restrict" Plaintiffs' rights "was made." *Id.* at 742; *see also Dentsply*, 2016 WL 868335, at *3 ("The location of Defendant's warehouse and distribution center is . . . not dispositive" because "this case focuses on Defendant's *sale* of Plaintiff's products, and any resulting confusion those sales have caused in the dentists who have purchased those products.").

[4] Defendants' reliance on *Dynamic Data Technologies* is again misplaced, since that case explains that the convenience of the parties "factor favors transfer" only where, unlike here, "the non-movant is located outside of both the transferor and transferee forums." 2019 WL 2433549, at *4.

Defendants' challenged conduct has also occurred in the S.D.N.Y. Plaintiffs challenge Defendants' Policy of restricting access to spaces that they open to the press for protected newsgathering and reporting when the president is away from the White House, including when he travels. Pls.' Br. 1–2, 21. Defendants have repeatedly enforced the Policy against reporters by preventing them from traveling with the president aboard Air Force One, including, for example, barring CNN from accompanying President Trump to the United Nations General Assembly and other events in New York. Exs. 27–30. Accordingly, "even if some of the operative facts occurred in [the D.D.C., that the D.D.C.] is not the sole locus of operative facts weakens the case for transferring venue there." *Sentegra, LLC*, 2016 WL 3093988, at *5; *see also Nat. Council of Prison Locs. v. Fed. Bureau of Prisons*, 2026 WL 1146301, at *11 (D. Conn. Apr. 28, 2026) (the location of the federal decisionmaker "does not inherently become the 'locus of operative facts' because executive action occurs there").[5]

Sixth, the availability of process is neutral. Plaintiffs agree with Defendants that "[p]rocess would be available in both Districts to compel the attendance of unwilling witnesses." Defs.' Opp'n 12; *see Rag & Bone*, 2026 WL 2334709, at *7.

Seventh, the relative means of the parties weighs in favor of the S.D.N.Y. *See Starr Indem. & Liab. Co. v. Brightstar Corp.*, 324 F. Supp. 3d 421, 441 (S.D.N.Y. 2018) ("Where disparity exists between the parties, . . . the relative means of the parties may be considered." (citation omitted)). The federal government has ample resources to litigate in the S.D.N.Y., whereas

---

[5] The cases cited by Defendants are not to the contrary, and none involved a plaintiff who resided in the S.D.N.Y. or any other substantial connection to the district. *See Sentegra, LLC*, 2016 WL 3093988, at *1 (Colorado plaintiff); *Alpha Indus., Inc. v. Alpha Clothing Co.*, 2021 WL 2688722, at *1 (S.D.N.Y. June 30, 2021) (Tennessee plaintiff); *Gordon v. State Farm Fire & Cas. Co.*, 2025 WL 1079096, at *4 (S.D.N.Y. Apr. 10, 2025) (Connecticut plaintiff); *DiPizio v. Empire State Dev. Corp.*, 2015 WL 5824704, at *7 (S.D.N.Y. Oct. 5, 2015) (W.D.N.Y. plaintiffs).

Plaintiffs are six individuals represented pro bono by two small nonprofit legal organizations. Compl. ¶¶ 11–16.[6] Plainly, the Court may "presume[] that [Plaintiffs'] means are modest compared to the United States." *Ruiz ex rel. E.R. v. United States*, 2014 WL 4662241, at *13 (E.D.N.Y. Sept. 18, 2014); *see Rag & Bone*, 2026 WL 2334709, at *7 ("[T]he relative means of the parties favors Defendant because it is relatively small compared to Plaintiffs.").

Eighth, the forum's familiarity with the governing law weighs in favor of the S.D.N.Y. Defendants "assume[]" as they must that "the Court is familiar with the law governing Plaintiffs' First Amendment claims," Defs.' Opp'n 12, but they fail to mention this Court's deep familiarity with the specific legal issues presented by this case. As noted above, the Court presided over *Pen American*, which involved remarkably similar First Amendment claims. 448 F. Supp. 3d at 319. The Court has directly relevant expertise in the law governing Plaintiffs' "receipt-of-information injuries" and the Policy's chilling effect on "the White House press corps' speech, the questions they ask Defendant[s] and the reporting they consequently are able to publish." *Id.* at 324.[7]

Ninth, trial efficiency and the interests of justice weigh in favor of the S.D.N.Y. Defendants cannot point to any judicial efficiency to be gained from transfer to the D.D.C. There are multiple cases in that district brought by different plaintiffs, raising different First Amendment claims, and challenging different actions that the government has taken against members of the press, and Defendants do not explain how or why the existence of those cases in the D.D.C.—all of which are before different district judges and in different procedural postures—favors transfer of

---

[6] *About Us*, Knight First Amend. Inst. at Columbia Univ., https://perma.cc/ZGZ5-FGEG; *About the Clinic*, Media Freedom & Info. Access Clinic, https://perma.cc/L2TF-EWEG.

[7] Notably, the government litigated *Pen American* in the plaintiffs' chosen forum and did not seek to transfer that case to the D.D.C.

Plaintiffs' action to that district.[8] As the government itself asserted in the *AP* case, "[l]itigation in *CNN* is ongoing. But however that litigation is ultimately resolved, it will have little bearing on the issues before this Court." Resp. to Notice for Other Relief 1, *AP v. Budowich*, 25-5109 (D.C. Cir. Oct. 1, 2026), ECF No. 2195829. Defendants also argue that transfer "would not hinder judicial efficiency because the case remains in the early stages of litigation and there has not yet been a significant investment by the Southern District of New York in this case in terms of either time or work." Defs.' Opp'n 13 (citation and quotation marks omitted). But Defendants' burden is to show by clear and convincing evidence that transfer would "actively promote efficiency," rather than merely not hinder it. *Ford v. Shader*, 2025 WL 3295015, at *5 (S.D.N.Y. Nov. 26, 2025) ("[Defendant] posits that it would not be inefficient to transfer this action to the Southern District of Florida because the parties remain in the early stages of litigation. He does not explain, however, how doing so would actively promote efficiency." (citation omitted)). At the same time, given this Court's familiarity with many of the key legal issues in this case, denying transfer would in fact promote judicial efficiency.

Finally, Defendants' argument that transfer would serve the interests of justice once again relies on the incorrect assumption that "the operative events occurred" in the D.D.C. Defs.' Opp'n 12–13. As Plaintiffs clarified above, that assumption is based on a misunderstanding of their First

---

[8] *See AP v. Budowich*, No. 25-5109 (D.C. Cir.) (pending appeal of preliminary injunction ruling by Judge McFadden), *CNN v. Trump*, 26-CV-3287 (D.D.C.) (ongoing briefing before Judge Kelly on plaintiffs' motion for further preliminary injunction); *see also, e.g.*, *N.Y. Times v. DOD*, No. 26-5253 (D.C. Cir.) (pending appeal of preliminary injunction ruling by Judge Friedman related to Pentagon's proposed press policy); *N.Y. Times v. DOD*, No. 26-5113 (D.C. Cir.) (pending appeal of separate rulings by Judge Friedman granting summary judgment for plaintiffs and compelling compliance); *Widakuswara v. Lake*, No. 26-5087 (D.C. Cir.) (pending appeal of ruling by Judge Lamberth on cross-motions for partial summary judgment related to right-to-receive claims brought by RSF and correspondents as consumers of VOA broadcasting); *Dardarian v. DOD*, No. 26-CV-1965 (D.D.C.) (awaiting ruling by Judge Cooper on cross-motions for summary judgment related to right-to-receive claims brought by subscribers of Stars & Stripes newspaper).

Amendment claim and the locus of where the many harms and impacts of Defendants' Policy occur. Given the balance of the factors above, it would serve the interests of justice to permit Plaintiffs to seek to vindicate their First Amendment rights against federal officials in their chosen forum.

Accordingly, the Court should deny Defendants' transfer request because they have "not shown by clear and convincing evidence that transfer would be proper, particularly given the great deference to Plaintiffs' choice of forum," the Court's familiarity with the issues, the relative means of the parties, and considerations of judicial efficiency and the interests of justice. *Rag & Bone*, 2026 WL 2334709, at *8 (quotation marks omitted).

## Conclusion

For the reasons stated above, Plaintiffs respectfully request that the Court preliminarily enjoin Defendants Cheung, Curran, and Miller from enforcing the Policy, and that the Court deny Defendants' request to transfer this case.

November 23, 2026

Respectfully submitted,

/s/ *Katherine Fallow*

Katherine Fallow
Jameel Jaffer
Jake Karr
Nicola Morrow
Taylor Fox
Knight First Amendment Institute
at Columbia University
475 Riverside Drive, Suite 302
New York, N.Y. 10115
(646) 745-8500
katie.fallow@knightcolumbia.org

David A. Schulz
Christina Lee
Media Freedom & Information Access Clinic
Yale Law School[9]
127 Wall Street
New Haven, C.T. 06511
(203) 432-5827
david.schulz@yale.edu

*Counsel for Plaintiffs*

[9] The views expressed herein do not purport to represent the institutional views of Yale Law School.

**Certificate of Compliance**

Pursuant to Local Civil Rule 7.1(c), this Court's Individual Rule III.B.1, and this Court's November 18, 2026 order granting additional words, ECF No. 38, I certify that this reply contains 6,499 words, excluding the caption, table of contents, table of authorities, and signature blocks.

November 23, 2026

Respectfully submitted,

/s/ *Katherine Fallow*
Katherine Fallow